UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE CASTEL

——————————————— x

THE CITY OF EDINBURGH COUNCIL ON :
BEHALF OF THE LOTHIAN PENSION
FUND, On Behalf of Itself and All Others
Similarly Situated,

          Plaintiff,

   vs.

VODAFONE GROUP PUBLIC LIMITED
COMPANY, ARUN SARIN, SIR JULIAN M.
HORN-SMITH, KENNETH J. HYDON,
ANDREW N. HALFORD, PETER R.
BAMFORD, PAUL M. DONOVAN, JÜRGEN
VON KUCZKOWSKI, THOMAS GEITNER,
ALAN P. HARPER and LORD IAN
MacLAURIN,

          Defendants.

——————————————— x

'07 CIV 9921

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS



RECEIVED
NOV 09 2007
U.S.D.C. S.D.N.Y.
CASHIERS

DEMAND FOR JURY TRIAL

## SUMMARY AND OVERVIEW

1.     This is a securities class action on behalf of all persons who purchased the publicly traded securities, including common/ordinary stock and American Depositary Receipts ("ADRs"), of Vodafone Group Public Limited Company ("Vodafone" or the "Company") between 6/10/04 and 2/24/06 (the "Class Period"), against Vodafone and certain of its officers for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.     During the telecom boom at the turn of the last century, Vodafone grew into one of the world's largest providers of mobile, *i.e.*, wireless, telephone services, with worldwide operations in 28 countries, including in the United States, Germany, Italy and Japan. Vodafone accomplished such rapid growth by spending over $300 billion to make several acquisitions. Vodafone's largest and most notable acquisition was the acquisition of Mannesmann in Germany in 2000 for $170 billion, at that time one of the largest acquisitions in business history.

3.     During the Class Period, defendants extolled the success of Vodafone's German and Italian operations, the "One Vodafone" program and the successful introduction of its new 3-G phones and service. To make it appear that Vodafone was succeeding and thus further their fraudulent scheme and course of conduct, the defendants caused Vodafone to report false and misleading (and artificially manipulated and inflated) financial results for F04, throughout F05 and for part of F06, which overstated Vodafone's operating profits, EBITDA, assets and net worth by several billion dollars, due to defendants' failure to timely recognize and take the required write-downs for the impaired value of certain operations, resulting, in part, from previous acquisitions at inflated prices.

4.     Due to defendants' continued reporting of false financial results and continuing false assurances regarding the state of Vodafone's Japanese, German and Italian operations, its future cash flows, the success of the One Vodafone program and the level of Vodafone's future cash tax

payments, Vodafone's publicly traded securities continued to trade at artificially inflated prices. On 11/14/05, Vodafone's ADRs and common/ordinary shares traded as high as $25.30 and £1.46, respectively.

5.      On 11/15/05, Vodafone shocked the securities markets by reporting a 23% decline in operating profits for the six-month period ended 9/30/05. As a result of these revelations, Vodafone's stock and ADRs collapsed from $25.30 on 11/14 to $21.90 on 11/16, while its common/ordinary shares collapsed from £1.46 on 11/14 to £1.26 on 11/16. However, defendants also reassured the investing public that Vodafone's Japanese turnaround plan was still "on plan" and "on course," and that the carrying value of its Japanese assets was not impaired and thus Vodafone's ADRs and ordinary shares continued to trade at artificially inflated, albeit lower prices.

6.      Then, on 2/27/06, Vodafone revealed a $40-$49 billion asset write-down due to the impaired value of its German (Mannesmann), Italian and Japanese operations. This led to a further decline in Vodafone's ADRs to $19.51 per share and in its ordinary shares to £1.09 per share, inflicting further damage on prior Class Period purchasers of those securities, taking the prices of these securities back down to the levels they had been when the fraudulent scheme to inflate them began.

7.      The statements issued during the Class Period were false and misleading in failing to disclose the following true facts:

(a)      Throughout the Class Period, Vodafone's financial statements and reports were materially falsified and overstated, including the overstatement of its assets and operating earnings due to the over-valuation of its German, Italian and Japanese operations;

(b)      Vodafone's Mannesmann (German) operations had not been successfully integrated into Vodafone's overall operations and were suffering from significant operational

problems, inefficiencies and a lack of growth and profitability adequate to permit Vodafone to recover its investment in Mannesmann;

(c)     Vodafone's Japanese operations were materially overvalued on Vodafone's financial statements due to the failure to hold or gain sufficient market share so as to permit Vodafone to recover its investment in its Japanese operations;

(d)     Vodafone's "One Vodafone" cost savings and operational efficiency initiative was not succeeding or achieving any significant cost savings; and

(e)     Due to the foregoing adverse factors which were negatively impacting Vodafone's operations and financial performance, defendants knew that the levels of financial performance being forecast for Vodafone for F06 and F07 would not and could not be achieved.

## JURISDICTION AND VENUE

8.     Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

9.     Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District. Vodafone has major business operations here and has been sued here in the past. In terms of its business, shareholders and legal compliance, Vodafone has had and continues to have very extensive contacts with the United States. Vodafone has a significant presence in the United States. Vodafone owns 45% of Verizon Wireless. Verizon Wireless operates a nationwide network, covering almost 90% of the U.S. population and 96 of the top 100 mobile telecommunications markets within the United States. The Company's ordinary shares are listed on the London Stock Exchange and the Company's ADRs are listed on the NYSE.

10.     The Bank of New York, as custodian of the Company's ADR program, holds approximately 12.2% of the Company's ordinary shares as nominee. The total number of ADRs

- 3 -

outstanding at 5/07 was 647,375,153.  Vodafone has 53 billion common shares outstanding.  As of

5/07, 1,138 holders of record of ordinary shares had registered addresses in the United States.  The

Company has American Depositary Shares ("ADSs") which are evidenced by ADRs issued by the

Bank of New York, as Depositary, under a Deposit Agreement.  ADS holders may instruct The Bank

of New York on the exercise of voting rights relative to the number of ordinary shares represented

by their ADRs.  At 3/07, approximately 30.60 % of the Company's shares were held in North

America.

11.    MacLaurin admitted in Vodafone's 2004 Annual Report that Vodafone is "subject to

the . . . U.S. securities laws."  According to his letter in the 2004 Annual Report:

> Corporate governance continues to be at the forefront of your Board's
> considerations. During the year we have fully complied with the Combined Code
> relating to corporate governance, as appended to the Listing Rules of the UK Listing
> Authority. In addition, we also have to comply with US securities laws. The
> Sarbanes-Oxley Act of 2002 has introduced a number of changes to corporate
> governance requirements with which we have complied this year and with which we
> will comply as new requirements are introduced over the coming years.

12.    Vodafone makes periodic filings with the U.S. SEC and presents its financial results

in accordance with U.S. Generally Accepted Accounting Principles ("GAAP").  Vodafone's annual

and other reports to shareholders and its written releases all contain forward-looking statement

disclaimers and warnings, which are unique to the United States Private Securities Litigation Reform

Act of 1995.

13.    The Company's ordinary shares are listed on the London Stock Exchange and the

Frankfurt Stock Exchange and the Company's ADRs are listed on the NYSE.  The ADRs represent

10 ordinary shares.  The ADRs and ordinary shares trade in efficient markets and significant

arbitrary trading between them goes on as the trading of each of the shares influences the other.

According to Vodafone, "the Company holds briefing meetings with its major institutional

shareholders in . . . the US . . . usually twice each year after the interim results and preliminary

announcement, to ensure that the investing community receives a balanced and complete view of the Group's performance and the issues faced by the Group." Also, "[a]ll . . . resolutions at the Company's [Annual General Meetings] are decided on a poll. . . . The proxy votes cast in relation to all resolutions are disclosed to those in attendance at the meeting and the results of the polls are published in national newspapers in the . . . US . . . ." Vodafone forwards information regarding its financials and other business operations to investors worldwide, and its ADR/ordinary shareholders at the same time.

## THE PARTIES

14.     Plaintiff The City of Edinburgh Council on Behalf of the Lothian Pension Fund purchased Vodafone publicly traded securities as described in the attached certification and was damaged thereby.

15.     Defendant Vodafone operates as a mobile telecommunications company principally in the United States, Europe, and Asia Pacific.

16.     Defendant Arun Sarin ("Sarin") was during the Class Period and is Chief Executive Officer ("CEO") of Vodafone.

17.     Defendant Sir Julian M. Horn-Smith ("Horn-Smith") was Deputy Chief Executive and Chief Operating Officer of Vodafone during the Class Period until he left the Company in 7/06.

18.     Defendant Andrew N. Halford ("Halford") has been, since 7/05, Chief Financial Officer ("CFO") and a director of Vodafone.

19.     Defendant MacLaurin was Chairman of the Board from July 1998 until he announced his retirement in March 2006.

20.     Defendant Peter R. Bamford ("Bamford") was Chief Marketing Officer and a director of Vodafone during the Class Period until he left the Company in 4/06.

21.    Defendant Paul M. Donovan ("Donovan") was CEO, Central Europe, Middle East, Asia Pacific and Affiliates of Vodafone since 1/05.

22.    Defendant Jürgen von Kuczkowski ("von Kuczkowski") was CEO, Northern European Region, and CEO of Vodafone-Germany.

23.    Defendant Thomas Geitner ("Geitner") was Chief Technical Officer and a director of Vodafone from 2002 until 12/06.

24.    Defendant Alan P. Harper ("Harper") was Group Strategy and Business Integration Director of Vodafone since 7/00.

25.    Defendant Kenneth J. Hydon ("Hydon") was CFO of Vodafone during the Class Period until he left the Company in 7/05.

26.    The individuals named as defendants in ¶¶16-25 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Vodafone's periodic reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market.

27.    Defendants knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's securities and would cause the prices of the Company's publicly traded securities to become artificially inflated. Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and other members of the Class. The Individual Defendants were motivated to engage in the manipulations alleged herein, in part because their compensation was largely based on performance measures, including EBITDA and operating profits.

28.    Each defendant is liable for (i) making false statements, or (ii) failing to disclose adverse facts known to him about Vodafone. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Vodafone publicly traded securities was a success, as it: (i) deceived the investing public regarding Vodafone's prospects and business; (ii) artificially inflated the prices of Vodafone's publicly traded securities; (iii) permitted defendants to receive bonuses and have their performance shares vest based on the growth in the value of the Company; and (iv) caused plaintiff and other members of the Class to purchase Vodafone publicly traded securities at inflated prices.

29.    Defendants took advantage of the temporary inflation in Vodafone's stock price, selling 11.1 million shares of their Vodafone stock for proceeds of $29 million during the Class Period.

## BACKGROUND

30.    Vodafone was formed in 1983. Vodafone grew rapidly through acquisitions and by 2000 owned stakes in wireless carriers around the globe. Vodafone made acquisitions of Germany's Mannesmann and Italy's Omnitel networks. Vodafone combined its U.S. wireless operations (acquired when the Company bought AirTouch in 1999) with those of Bell Atlantic and GTE to form Verizon Wireless, the No. 1 U.S. wireless provider and 45%-owned by Vodafone.

## CLASS PERIOD EVENTS AND FALSE STATEMENTS

31.    On or about 6/10/04, Vodafone issued its 2004 Annual Report. The 2004 Annual Report contained a letter from MacLaurin, stating:

> It is my privilege to report, once again, another highly successful year for your company, with an excellent overall operating performance generating further substantial growth in profits . . . .
>
> . . . In February, we launched the Vodafone Mobile Connect 3G/GPRS datacard, which provides fast, secure access to corporate networks from lap top computers . . . .  I believe that this technological evolution offers us significant

growth opportunities and Vodafone is very well positioned to take advantage of these opportunities due to its global footprint and its continued strong performance.

32.     The 2004 Annual Report also contained a letter from Sarin, stating:

This past year, Vodafone has delivered another set of solid financial results. We have had . . . continued margin improvement . . . .

\*     \*     \*

Another significant force impacting our business is competition. We face different competitors across our markets, but we have a tremendous advantage. Vodafone can draw from resources across all our markets and respond competitively in a way that does not impact the performance of the organisation as a whole.

33.     Vodafone's 2004 Annual Report discussed the Company's German, Italian and Japanese operations:

**Germany**

Vodafone Germany performed well in the year, further improving its operational performance.

\*     \*     \*

Operating profit before goodwill amortisation and exceptional items improved by £306 million to £1,741 million, principally driven by cost efficiencies in the second half of the year, particularly in network and IT costs.

\*     \*     \*

**Italy**

Vodafone Italy produced another strong set of results, in spite of the increasingly competitive and highly penetrated market.

\*     \*     \*

Operating profit before goodwill amortisation and exceptional items grew significantly . . . .

\*     \*     \*

**Japan**

This financial year has been challenging for Vodafone Japan due to the strength of competitor offerings.

- 8 -

\*     \*     \*

The Group is developing a full range of 3G handsets which are expected to be available in the quarter leading up to Christmas 2004 and are expected to put Vodafone Japan in a better competitive position. . . . A plan is in place to improve Vodafone Japan's performance and competitive position, focusing on cost reductions through leveraging the Group's global scale and scope . . . .

34.     In Vodafone's 2004 financial statements, it was stated:

**Notes to the Consolidated Financial Statements**

\*     \*     \*

In accordance with accounting standards the Group regularly monitors the carrying value of its fixed assets. A review was undertaken at 31 March 2004 to assess whether the carrying value of assets was supported by the net present value of future cash flows derived from assets using cash flow projections for each asset in respect of the period to 31 March 2014.

\*     \*     \*

The results of the review undertaken at 31 March 2004 indicated that no impairment charge was necessary.

35.     Vodafone's 2004 Annual Report also contained the following certifications required

by Sarbanes Oxley;

## RULE 13a-14(a) CERTIFICATION

I, Arun Sarin, certify that:

1.  I have reviewed this annual report on Form 20-F of Vodafone Group Plc (the "Company");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

- 9 -

4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarise and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: June 9, 2004

                         /s/ Arun Sarin
                         Arun Sarin
                         Chief Executive

*    *    *

RULE 13a-14(b) CERTIFICATION

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), the undersigned officer of Vodafone Group Plc, a company incorporated under the laws of England and Wales (the "Company"), hereby certifies, to such officer's knowledge, that:

- 10 -

The Annual Report on Form 20-F for the year ended March 31, 2004 (the "Report") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: June 9, 2004                          /s/ Arun Sarin
                                            Arun Sarin
                                            Chief Executive

*     *     *

RULE 13a-14(a) CERTIFICATION

I, Kenneth J. Hydon, certify that:

1. I have reviewed this annual report on Form 20-F of Vodafone Group Plc (the "Company");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   (b) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (c) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by this

- 11 -

report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarise and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: June 9, 2004                              /s/ Kenneth J. Hydon
                                                Kenneth J. Hydon
                                                Financial Director

36.    On 7/26/04, Vodafone issued its 6/30/04 quarterly report via a release headlined and

stating:

Vodafone Continues Strong Performance in Customer and Revenue Growth

   Vodafone Group Plc ("Vodafone") announces today key performance indicators for the quarter ended 30 June 2004 . . . .

                         *         *         *

   Arun Sarin, Chief Executive of Vodafone, commented

   ". . . We have recorded good performances . . . . [O]ur business is progressing well, despite a tougher competitive environment . . . .

37.    On 9/27/04, Vodafone held an analyst meeting. On the day of this event, Vodafone

issued a release stating:

VODAFONE ANALYST AND INVESTOR DAY

                         *         *         *

   The day will principally consist of a series of presentations by the senior management from Vodafone's largest operating companies . . . . Vodafone Japan,

- 12 -

Vodafone Italy . . .and Vodafone Germany will provide an overview of each of the individual businesses.

Arun Sarin, Chief Executive of Vodafone, will introduce the day's events by reiterating the guidance for the current financial year as outlined at the company's preliminary results announcement in May 2004.

In addition, Vodafone will confirm that it expects to reduce mobile capital expenditure to less than 10% of mobile revenue in the year to 31 March 2008.

Vodafone will also disclose its expectations of the financial benefits of its One Vodafone programme to deliver the benefits of scale and scope. The One Vodafone initiatives are expected to achieve £2.5 billion of annual pre-tax operating free cash flow improvements by the year ending 31 March 2008. Cost initiatives are anticipated to generate improvements of £1.4 billion, with a further £1.1 billion from revenue initiatives.

38.     On 9/29/04, Sarin made a presentation to brokers, analysts, institutional investors and company managers at the Sanford C. Bernstein & Co. 1st Annual Pan European Strategic Decisions Conference 2004. Sarin stated:

One, our business is performing well. . . . The guidance remains very strong. The reason to highlight that is as this year has come along many of our competitors aren't reporting results that are as robust as our results here.

39.     On 10/1/04, Vodafone issued a release stating:

CHANGE IN US GAAP ACCOUNTING FOR INTANGIBLE ASSETS – NO IMPACT ON VODAFONE'S RESULTS UNDER UK GAAP

On 29 September 2004 the Staff of the United States Securities and Exchange Commission ("SEC") announced new guidance in the interpretation of accounting principles generally accepted in the United States ("US GAAP") in relation to accounting for intangible assets.

The new SEC guidance will not affect the presentation of Vodafone Group Plc's ("Vodafone") results or the carrying values of any assets under UK GAAP (or, in the future, under IFRS).

40.     On 10/13/04, Vodafone issued a release:

BOARD CHANGES AND NEW ORGANISATIONAL STRUCTURE AT VODAFONE

\*        \*        \*

- 13 -

Vodafone will simplify its existing regional structure with major countries and business areas reporting into the Chief Executive. All first line management functions in the Operating Companies will have a dual reporting line to the respective functions at Group level.

Arun Sarin, Chief Executive said: "We are creating an organisation that is better positioned to respond to the high expectations of our customers. Faster execution will enable us to extend our lead within the mobile industry and deliver the benefits to customers, our employees and our shareholders."

41.    On 11/10/04, Vodafone issued a release announcing the launch of its 3-G service:

**Global launch of Vodafone live! with 3G**

Vodafone today announces the global launch of Vodafone live! with 3G across an unrivalled 13 countries. Vodafone live! with 3G will be available in Austria, France, Germany, Greece, Ireland, Italy, Japan, the Netherlands, Portugal, Spain, Switzerland and the UK.

- Extensive range of 10 new 3G handsets offering a wide choice for customers

                    *        *        *

Arun Sarin, Chief Executive, Vodafone, said:

"Today is an important day for Vodafone and the start of a new era in mobile communications.

"Vodafone live! with 3G will dramatically change the way our customers experience their Vodafone services and we are confident that Vodafone live! with 3G will be a success. . . .

"Vodafone live! with 3G provides Vodafone with a new platform for profitable growth."

42.    On 11/16/04, Vodafone issued a release reporting its results for the six months ended 9/30/04, stating:

- Group operating profit, before goodwill amortisation and exceptional items, of £5.7 billion, with organic growth at constant exchange rates of 5%

- Earnings per share, before goodwill amortisation and exceptional items, increased by 10% to 5.28 pence.

                    *        *        *

Arun Sarin, Chief Executive, commented:

> I am very pleased to present a robust set of half year results demonstrating a strong overall operational performance. . . . [W]e are excited about our growth opportunities and ability to leverage global scale and scope advantages.

43.    The statements issued between 6/10/04 and 11/16/04 were false and misleading in failing to disclose the following true facts:

(a)    Vodafone's Mannesmann (German) operations had not been successfully integrated into Vodafone's overall operations and were suffering from significant operational problems, inefficiencies and a lack of growth and profitability adequate to permit Vodafone to recover its investment in Mannesmann;

(b)    Vodafone's Italian and Japanese operations were also substantially overvalued and suffering from operational problems, inefficiencies and a lack of growth adequate to permit Vodafone to recover its investment in that operation;

(c)    Vodafone's "One Vodafone" cost savings and operational efficiency initiative was not succeeding or achieving any significant cost savings and would not result in Vodafone achieving anywhere near the £2.5 billion improvement (pre-tax) in cash flow by F07-F08, as was being forecast;

(d)    Contrary to defendants' representations, Vodafone's German and Italian operations were not succeeding in spite of increased and intensifying competition; in fact, to the contrary, those operations were faltering and losing ground to competitors; and

(e)    Due to the foregoing adverse factors which were negatively impacting Vodafone's operations and financial performance, defendants knew that the levels of financial performance being forecast for Vodafone for F06 and F07 would not and could not be achieved.

44.    On 1/20/05, Vodafone issued a release stating:

UPDATE ON ADOPTION OF INTERNATIONAL
FINANCIAL REPORTING STANDARDS

Vodafone Group Plc ("Vodafone") is preparing for the adoption of International Financial Reporting Standards ("IFRS") as its primary accounting basis for the year ending 31 March 2006. . . .

Vodafone will report under UK Generally Accepted Accounting Practice ("UK GAAP") for the year ending 31 March 2005, and will subsequently present this financial information in accordance with IFRS.

\*         \*         \*

Ken Hydon, Financial Director, commented:

"The financial information provided today shows how IFRS impacts on Vodafone's recent results in advance of its adoption in the next financial year. The most significant change is that Vodafone will no longer amortise goodwill, resulting in a clearer presentation of underlying business performance.

45.    On 1/25/05, Vodafone issued a release:

VODAFONE REACHES 150 MILLION CUSTOMERS – STRONGEST
QUARTER SINCE DECEMBER 2000

\*         \*         \*

Arun Sarin, Chief Executive of Vodafone, commented:

"I am very pleased to announce another impressive quarter for customer and revenue growth. We have seen consistently strong performance across Europe . . . .

\*         \*         \*

Germany

Net customer additions of 843,000 demonstrated continued strong growth in Germany and resulted in a closing base of 26.9 million customers, with churn remaining stable compared to the previous quarter. . . .

\*         \*         \*

Strong customer growth was the primary driver behind a 6% increase in service revenue for the quarter compared to the same quarter last year.

\*         \*         \*

Italy

Proportionate net customer additions were 359,000 in the quarter, leading to a total proportionate customer base of over 17 million. . . .

Service revenue for the quarter increased 8% compared to the same period last year. . . .

46.     On 5/24/05, Vodafone issued a release regarding its results for the year ended 3/31/05:

Vodafone today announces preliminary results for the year ended 31 March 2005, which meet or exceed stated targets for the Group's global operations across every metric.  The highlights of the results are:

Strong financial performance:

\*         \*         \*

- Earnings per share, before goodwill amortisation and exceptional items, increased by 14% to 10.41 pence.

47.     In 6/05, Vodafone issued its 2005 Annual Report.  The 2005 Annual Report contained a letter from defendant MacLaurin, stating:

It is my pleasure to report another year of achievement for your company . . . .

. . . I believe we have made significant progress, particularly with the consumer launch of 3G and the ongoing implementation of our One Vodafone programme.

\*         \*         \*

In October, the merger of Vodafone Holdings K.K. and Vodafone K.K. in Japan was completed following our successful tender offer to increase our shareholdings in both companies. This clearly demonstrates our long-term commitment to the strategically important mobile market in Japan. The merger has created a simplified company structure which has already contributed towards greater operational effectiveness and financial efficiencies and, although the business is currently not performing as well as we would wish, I am confident that, in time, our investment will prove to be very rewarding.

48.     The 2005 Annual Report contained a letter from CEO Sarin, stating:

This has been another successful year for Vodafone.

\*     \*     \*

Our results are built on the base of a strong overall Group operational performance
that has delivered on all our key targets.

49.     The 2005 Annual Report indicated that Vodafone had recorded an impairment of the

carrying value of goodwill relating to Vodafone Sweden of £315 million.  No impairment was

recorded for impaired goodwill in other countries, including Germany.

50.     Vodafone's 2005 Annual Report also contained certifications by Sarin and Hydon

required by Sarbanes Oxley.

51.     On 7/14/05, Vodafone held a conference in Dusseldorf for analysts to discuss

Vodafone's German operations:

> [SARIN:] . . . Vodafone Germany is an outstanding company measured on any basis,
> whether it's around customers, whether it's around shareholder returns, whether it's
> around management practices, whether it's around employee satisfaction, we have a
> first-rate company . . . .
>
> The principal speakers today are going to be Jurgen von Kuczkowski, who is
> the Chief Executive; Fritz Joussen, who is currently our Chief Operating Officer and
> will become Chief Executive in October; and Albert Weismuller, who is our Chief
> Financial Officer.

\*     \*     \*

> Our company here is outperforming our competition. . . . EBITDA market share is
> up 3.7% in the 12 months that we've just closed.

\*     \*     \*

> [VON KUCZKOWSKI:]     This chart shows you that we are the
> profitability leader here in Germany, demonstrating how we can combine close
> wireless controlling costs.  As a company, we still see good local scale efficiency
> opportunities combined with a huge potential of thriving benefits from being in the
> heart of Europe and One Vodafone.

52.     On 7/25/05, Vodafone issued a release reporting on its recent operating performance,

stating:

> "We have seen strong performances across Europe . . . and we continue to
> focus on improving our business in Japan.

*    *    *

Overall these KPIs are in line with our expectations and we are therefore reiterating our guidance for the full year to March 2006.

Germany

Vodafone Germany delivered a quarter of strong customer growth . . . .

*    *    *

Italy

Proportionate net customer additions were 204,000 in the quarter. The total proportionate customer base was 17.5 million at the end of June. 6.4% higher year on year on an organic basis. Blended annual ARPU increased to 360 for the year to June compared to 359 for the year to March. Annual churn increased slightly when compared to March.

53.    On 8/3/05, Vodafone filed a Prospectus Supplement with the SEC for the sale of $750 million in 5% Notes due 2015, which would be sold to underwriters who would then sell the Notes to the public. The Prospectus Supplement incorporated by reference Vodafone's false financial statements previously reported, including the Company's Form 20-F for the year ended 3/31/05.

54.    The statements issued between 1/20/05 and 8/3/05 were false and misleading in failing to disclose the following true facts – then known to or recklessly disregarded by defendants:

(a)    As detailed herein, Vodafone's financial statements and reports, as disseminated to the investing public, its shareholders and as filed with the SEC, were materially falsified and overstated, including an overstatement of its assets and operating earnings due to the over-valuation of its German, Italian and Japanese operations;

(b)    Vodafone's Mannesmann (German) operations had not been successfully integrated into Vodafone's overall operations and were suffering from significant operational problems, inefficiencies and a lack of growth and profitability adequate to permit Vodafone to recover its investment in Mannesmann;

- 19 -

(c)     Vodafone's Italian and Japanese operations were also substantially overvalued and suffering from operational problems, inefficiencies and a lack of growth adequate to permit Vodafone to recover its investment in that operation;

(d)     Vodafone's worldwide scale of operations did not give it a competitive advantage;

(e)     Contrary to defendants' representations, Vodafone's German and Italian operations were not succeeding in spite of increased and intensifying competition; and

(f)     Due to the foregoing adverse factors which were negatively impacting Vodafone's operations and financial performance, defendants knew that the levels of financial performance being forecast for Vodafone for F06 and F07 would not and could not be achieved.

55.     On 11/15/05, Vodafone stunned the securities markets by revealing that it faced $8.7 billion (£5.1 billion) in cash tax payments over the next few years, as well as lower than previously forecast revenue growth and a decline in EBITDA and profit margin. These revelations caused Vodafone's ordinary and ADR shares to plunge lower – their largest one-day declines in over seven years – falling to as low as £1.26 and $21.90, respectively. However, because defendants did not make full and complete truthful disclosures and continued to make misrepresentations and false and misleading statements, Vodafone's publicly traded securities continued to trade at artificially inflated prices.

56.     Notwithstanding the revelation of 11/15/05, on 11/15/05, Vodafone made a number of false reassurances both in a release and in a conference call that day. Vodafone's 11/15/05 release stated:

VODAFONE GROUP PLC
INTERIM RESULTS FOR THE SIX MONTHS ENDED
30 SEPTEMBER 2005

\*     \*     \*

- 20 -

Robust financial performance

*    *    *

\*    Adjusted basic earnings per share increased by 8.5% to 5.37 pence. Basic earnings per share were 4.36 pence. Profit before taxation for the period was £4.1 billion after an impairment charge of £0.5 billion.

*    *    *

Arun Sarin. Chief Executive, commented:

"I am pleased to announce another strong set of results. . . . We continue to outperform our competitors in most of our markets . . . ."

57.    On 1/24/06, the Company issued a press release entitled "Vodafone Reports Third Quarter KPIs and Reiterates Guidance," which stated in part:

Vodafone Group Plc today announces key performance indicators for the quarter ended 31 December 2005. The main highlights are:

- Good overall operating performance in challenging markets

*    *    *

- Vodafone reiterates its current year guidance. The Group expects organic growth for this financial year in proportionate mobile revenue in the middle of the 6% to 9% range. Vodafone also expects the organic proportionate mobile EBITDA margin for this financial year to be at the lower end of the flat to 1 percentage point lower range

- Vodafone's preliminary outlook for the next financial year remains unchanged

Arun Sarin, Chief Executive of Vodafone, commented:

"Vodafone has delivered a good operational performance in a challenging environment. . . . We expect to deliver full year results in line with our existing guidance and our preliminary outlook for next year remains unchanged."

58.    The statements issued between 11/15/05 and 1/24/06 were false and misleading in failing to disclose the following true facts – then known to or recklessly disregarded by defendants:

(a)    As detailed herein, Vodafone's financial statements and reports, as disseminated to the investing public, its shareholders and as filed with the SEC, were materially

- 21 -

falsified and overstated, including an overstatement of its assets and operating earnings due to the

over-valuation of its German, Italian and Japanese operations;

(b)    Vodafone's Mannesmann (German) operations had not been successfully

integrated into Vodafone's overall operations and were suffering from significant operational

problems, inefficiencies and a lack of growth and profitability adequate to permit Vodafone to

recover its investment in Mannesmann;

(c)    Vodafone's Italian operations were also substantially overvalued and suffering

from operational problems, inefficiencies and a lack of growth adequate to permit Vodafone to

recover its investment in that operation;

(d)    Vodafone's Japanese operations were materially overvalued on Vodafone's

financial statements due to the failure to hold or gain sufficient market share so as to permit

Vodafone to recover its investment in its Japanese operations;

(e)    Vodafone's worldwide scale of operations did not give it a competitive

advantage;

(f)    Contrary to defendants' representations, Vodafone's German and Italian

operations were not succeeding in spite of increased and intensifying competition; and

(g)    Due to the foregoing adverse factors which were negatively impacting

Vodafone's operations and financial performance, defendants knew that the levels of financial

performance being forecast for Vodafone for F06 and F07 would not and could not be achieved.

59.    Then, on 2/27/06, Vodafone again shocked the markets by revealing a massive

goodwill write-down in the goodwill for Vodafone Germany ("most . . . attributable to Vodafone

Germany"), Vodafone Italy and, particularly, Vodafone Japan, "in the range of £23 billion to £28

billion [$40-$50 billion], reflecting a lower view of growth prospects, particularly in the medium to

long term, than those it had used previously" – this was one of the largest goodwill asset wipeouts in the history of public company financial reporting, which would adversely impact Vodafone's "operating" profits and eliminated – in one day – 25% of Vodafone's equity base!

60.     The revelations of 11/15/05, which indicated that Vodafone's European operations were more troubled than had previously been revealed, were compounded on 2/27/06, when Vodafone revealed a $49 billion asset write-down due to the impaired value of its German (Mannesmann), Italian and Japanese operations. This led to a further decline in Vodafone's ADRs to $19.51 per share and in its ordinary shares to £1.09 per share.

61.     After the end of the Class Period, Vodafone admitted it had "a lower view of growth prospects, particularly in the medium to long term."

## FALSE FINANCIAL STATEMENTS

62.     In order to overstate its earnings in F04-F06, Vodafone violated International Financial Reporting Standards ("IFRS"), U.K. and U.S. GAAP and SEC rules by failing to properly record tens of billions of dollars of impaired goodwill (intangible assets) to reflect the diminished future economic benefits associated with its investments in operations in Mannesmann (Germany), Japan, Italy, Sweden and elsewhere. Vodafone has now admitted that the value of the goodwill is dramatically impaired and has taken a $49 billion write-down (including an $8 billion impairment related to Japan).

63.     Vodafone's results were materially false due to Vodafone's failure to write off the billions of dollars in goodwill (intangible assets) on its books at each of the above financial reporting periods.

64.     Statements of International Accounting Standards issued by the Board of the International Accounting Standards Committee ("IASC") between 1973 and 2001 are designated "International Accounting Standards" ("IAS"). The International Accounting Standards Board

- 23 -

("IASB") announced in 4/01 that its accounting standards would be designated IFRS. Also in 4/01, the IASB announced that it would adopt all of the IAS issued by the IASC. The Interpretations of IAS issued by the International Financial Reporting Interpretations Committee (formerly, the "Standing Interpretations Committee") do not have the same status as IAS, but, in accordance with IAS No. 1, ¶11, "financial statements should not be described as complying with International Accounting Standards unless they comply with all the requirements of each applicable Standard and each applicable interpretation of the Standing Interpretations Committee."

65.    U.S. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

66.    IFRS require that goodwill be tested for impairment at least annually and when indicators are identified that an asset may be impaired. IFRS require that companies compare the carrying value of an asset to the recoverable amount, on fair value. Any shortfall should be recorded as a loss.

67.    U.S. GAAP, as set forth in FASB Statement of Financial Accounting Standard ("SFAS") No. 142, require that companies recognize an impairment loss for goodwill when the carrying amount exceeds its fair value.

68.    By the time it reported its interim F04 results, Vodafone's goodwill investment in Germany (Mannesmann), Italy and Japan had deteriorated dramatically as compared to the value at

the acquisition dates, including when Vodafone paid hundreds of billion of dollars for Mannesmann in early 2000. In addition to the businesses not growing as expected when acquired, even the cost of Mannesmann looked increasingly inflated by 2004, at the latest, due to the lack of growth in that business and similar businesses. Thus, the defendants were increasingly aware that the impairment indicators existed.

69.    Pursuant to IFRS and U.S. GAAP, the Company was required to recognize a loss to reflect the impairment in goodwill. In fact, had Vodafone properly recorded goodwill impairment as required by the relevant accounting standards, its earnings during the Class Period would have been wiped out.

70.    Further, the undisclosed adverse information concealed by defendants during the Class Period, including failing to adequately disclose Vodafone's tax liability, is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## LOSS CAUSATION/ECONOMIC LOSS

71.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Vodafone's stock price and operated as a fraud or deceit on Class Period purchasers of Vodafone stock by misrepresenting the Company's financial results, business success and future business prospects. Defendants achieved this façade of success, growth and strong future business prospects by blatantly concealing the Company's huge tax liabilities, concealing its difficulties in Germany and Japan, and falsifying the Company's financial statements by failing to record goodwill impairment. Later, however, when defendants' prior misrepresentations and fraudulent conduct began to be disclosed and became

- 25 -

apparent to the market, Vodafone stock fell as the prior artificial inflation came out of Vodafone's ADRs and ordinary share prices. As a result of their purchases of Vodafone shares during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

### COUNT I

**For Violation of §10(b) of the 1934 Act
and Rule 10b-5 Against All Defendants**

72.    Plaintiff incorporates ¶¶1-71 by reference.

73.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

74.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Vodafone publicly traded securities during the Class Period.

75.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Vodafone publicly traded securities. Plaintiff and the Class would not have purchased Vodafone publicly traded securities at the prices they paid, or at

all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

76.      As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Vodafone publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

77.      Plaintiff incorporates ¶¶1-76 by reference.

78.      The Individual Defendants acted as controlling persons of Vodafone within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Vodafone, and their ownership of Vodafone stock, the Individual Defendants had the power and authority to cause Vodafone to engage in the wrongful conduct complained of herein. Vodafone controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and Vodafone are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

79.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Vodafone's publicly traded securities, including ADRs and ordinary shares, on the open market during the Class Period (the "Class"). Excluded from the Class are defendants.

80.      The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Vodafone had billions of ADRs and shares of stock outstanding, owned by thousands of persons.

81.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the 1934 Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the prices of Vodafone's publicly traded securities were artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

82.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

83.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

84.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

- 28 -

B.      Awarding plaintiff and the members of the Class compensatory damages;

C.      Awarding plaintiff and the members of the Class pre-judgment and post-judgment

interest, as well as their reasonable attorneys' fees, expert witness fees and other costs;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity

and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate

state law remedies to assure that the Class has an effective remedy; and

E.      Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 9, 2007                COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
                                       SAMUEL H. RUDMAN
                                       DAVID A. ROSENFELD


                                       _____
                                              SAMUEL H. RUDMAN

                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)

                                       COUGHLIN STOIA GELLER
                                         RUDMAN & ROBBINS LLP
                                       DARREN J. ROBBINS
                                       PATRICK W. DANIELS
                                       DAVID C. WALTON
                                       MARK SOLOMON
                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101-3301
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)

                                       Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Vodafone_2.doc

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

THE CITY OF EDINBURGH COUNCIL ON BEHALF OF THE LOTHIAN
PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the
direction of plaintiff's counsel or in order to participate in this private action or any
other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the
class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in
the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a
class in an action filed under the federal securities laws except as detailed below
during the three years prior to the date of this Certification:

*Smith, et al. v. Eli Lilly and Company, et al.*, No. 1:07-cv-01310-JBW (E.D.N.Y.)
*Kairalla v Amgen Inc., et al.*, No. CV-07-2536-PSG-PLA (C.D. Cal.)

6.    The Plaintiff will not accept any payment for serving as a representative
party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

VODAFONE

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of October, 2007.

THE CITY OF EDINBURGH COUNCIL
ON BEHALF OF THE LOTHIAN
PENSION FUND

By: _____

Its: _____ EIK DREVER _____

HEAD OF INVESTMENT
AND PENSIONS

- 2 -

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 06/10/2004 | 133,965 | $2.34 |
| 06/10/2004 | 260,707 | $2.36 |
| 06/11/2004 | 144,719 | $2.34 |
| 06/14/2004 | 457,567 | $2.32 |
| 06/15/2004 | 109,240 | $2.33 |
| 06/16/2004 | 371,417 | $2.33 |
| 06/21/2004 | 105,000 | $2.30 |
| 06/30/2004 | 114,000 | $2.22 |
| 07/01/2004 | 58,293 | $2.18 |
| 09/02/2004 | 1,735,340 | $2.29 |
| 09/03/2004 | 1,974,012 | $2.26 |
| 10/15/2004 | 119,152 | $2.47 |
| 10/29/2004 | 2,191,000 | $2.58 |
| 11/04/2004 | 260,432 | $2.61 |
| 02/09/2005 | 194,751 | $2.62 |
| 02/15/2005 | 605,217 | $2.67 |
| 03/16/2005 | 407,952 | $2.67 |
| 03/21/2005 | 109,590 | $2.65 |
| 03/21/2005 | 124,998 | $2.63 |
| 03/22/2005 | 66,154 | $2.64 |
| 03/23/2005 | 58,346 | $2.62 |
| 03/30/2005 | 155,730 | $2.63 |
| 03/31/2005 | 54,406 | $2.66 |
| 04/06/2005 | 64,712 | $2.65 |
| 04/11/2005 | 42,000 | $2.68 |
| 06/03/2005 | 368,459 | $2.48 |
| 06/06/2005 | 177,492 | $2.47 |
| 06/07/2005 | 418,706 | $2.50 |
| 06/08/2005 | 251,343 | $2.51 |
| 06/27/2005 | 163,592 | $2.45 |
| 06/28/2005 | 149,515 | $2.44 |
| 07/13/2005 | 109,691 | $2.54 |
| 08/05/2005 | 207,139 | $2.61 |
| 09/01/2005 | 866,792 | $2.80 |
| 09/15/2005 | 243,292 | $2.79 |
| 11/22/2005 | 16,552 | $2.18 |
| 11/22/2005 | 201,740 | $2.19 |
| 11/23/2005 | 51,421 | $2.17 |
| 11/23/2005 | 90,941 | $2.18 |
| 11/24/2005 | 25,381 | $2.18 |
| 11/28/2005 | 40,765 | $2.20 |
| 11/29/2005 | 15,927 | $2.16 |
| 11/30/2005 | 39,026 | $2.17 |

**Acquisitions (cont.)**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 12/16/2005 | 36,029 | $2.17 |
| 12/16/2005 | 1,222,552 | $2.19 |
| 01/17/2006 | 243,642 | $2.21 |
| 01/31/2006 | 116,875 | $2.09 |
| 01/31/2006 | 181,006 | $2.09 |
| 01/31/2006 | 239,431 | $2.09 |
| 02/10/2006 | 270,824 | $2.04 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 06/24/2004 | 1,069,000 | $2.23 |
| 08/31/2004 | 4,481,010 | $2.30 |
| 11/08/2004 | 29,264 | $2.59 |
| 11/18/2004 | 72,000 | $2.72 |
| 11/18/2004 | 73,000 | $2.72 |
| 02/11/2005 | 100,000 | $2.60 |
| 02/28/2005 | 178,000 | $2.65 |
| 04/20/2005 | 150,000 | $2.63 |
| 07/05/2005 | 1,291,726 | $2.39 |
| 07/20/2005 | 720,025 | $2.47 |
| 11/17/2005 | 344,000 | $2.22 |
| 11/18/2005 | 420,000 | $2.21 |
| 11/21/2005 | 422,000 | $2.16 |
| 12/09/2005 | 397,000 | $2.26 |
| 12/12/2005 | 166,000 | $2.27 |
| 12/13/2005 | 167,000 | $2.27 |
| 12/14/2005 | 319,147 | $2.23 |
| 12/14/2005 | 510,635 | $2.22 |
| 12/15/2005 | 186,251 | $2.21 |
| 12/16/2005 | 224,622 | $2.18 |
| 12/19/2005 | 783,000 | $2.15 |
| 12/19/2005 | 786,000 | $2.17 |
| 12/20/2005 | 90,268 | $2.17 |
| 12/21/2005 | 318,946 | $2.16 |
| 01/03/2006 | 445,320 | $2.19 |
| 01/04/2006 | 445,320 | $2.20 |
| 01/05/2006 | 421,249 | $2.21 |
| 01/06/2006 | 421,249 | $2.30 |
| 01/09/2006 | 77,281 | $2.35 |
| 01/09/2006 | 421,248 | $2.33 |
| 01/10/2006 | 487,536 | $2.29 |
| 02/10/2006 | 122,628 | $2.10 |
| 02/17/2006 | 494,265 | $2.19 |

*Opening position of 45,220,806 shares.