UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

THE CITY OF EDINBURGH COUNCIL ON   :
BEHALF OF THE LOTHIAN PENSION       :
FUND, On Behalf of Itself and All Others :
Similarly Situated,                  :
                                     :
                    Plaintiff,       :
                                     :
        vs.                          :
                                     :
VODAFONE GROUP PUBLIC LIMITED        :
COMPANY, et al.,                     :
                                     :
                    Defendants.      :
                                     :
——————————————————— x

Civil Action No. 1:07-cv-09921-PKC

CLASS ACTION

AMENDED COMPLAINT FOR
VIOLATION OF THE FEDERAL
SECURITIES LAWS

Lead Plaintiff The City of Edinburgh Council on Behalf of the Lothian Pension Fund ("Lead Plaintiff" or "Plaintiff") makes the following allegations based upon the investigation undertaken by its counsel, which included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Vodafone Group Public Limited Company ("Vodafone" or the "Company"), interviews with former Vodafone employees, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY AND OVERVIEW

1.     This is a securities class action on behalf of all persons who purchased the publicly traded securities, including common/ordinary stock and American Depositary Receipts ("ADRs"), of Vodafone between 6/10/04 and 2/27/06 (the "Class Period"), against Vodafone and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.     During the telecom boom at the turn of the last century, Vodafone grew into one of the world's largest providers of mobile, *i.e.*, wireless, telephone services, with worldwide operations in 28 countries, including in the United States, Germany, Italy and Japan. Vodafone's rapid growth occurred while Lord Ian MacLaurin of Knebworth ("MacLaurin") and Sir Christopher Gent ("Gent") were its Chairman and Chief Executive Officer ("CEO"), respectively. They accomplished such rapid growth by causing Vodafone to spend over $300 billion to make several acquisitions. Vodafone's largest and most notable acquisition was the acquisition of Mannesmann in Germany in 2000 for $170 billion, at that time one of the largest acquisitions in business history. At the height of

the telecom boom and Vodafone's apparently successful growth, Vodafone's ADRs[1] on the New York Stock Exchange ("NYSE") reached a high of $63 per share, while its common/ordinary shares traded elsewhere reached a high of £4.00 per share. Based on Vodafone's 67+ billion outstanding common/ordinary shares, this gave the Company a market capitalization of over £230 billion, making it one of the world's four most valuable companies.

3.     However, Vodafone imploded in fiscal 2002-2003 as the telcom bubble burst. The Company suffered huge losses and took billions in asset write-downs. For F02 (ended 3/31/02),[2] Vodafone suffered a loss of almost $24 billion due in large part to massive write-downs of over $10 billion from prior over-valued acquisitions, including $7 billion due to the Mannesmann acquisition.

[THIS SPACE INTENTIONALLY LEFT BLANK]

---

[1]     Each ADR represents 10 ordinary shares.

[2]     Vodafone's fiscal year ends 3/31 of each year.

4.     Vodafone's ADRs and ordinary shares collapsed to as low as $13.10 and £.80 per share, respectively, and billions in market capitalization were wiped out, inflicting huge losses on Vodafone's shareholders.[3]

5.     This collapse in the prices of Vodafone's publicly traded securities resulted in consternation among its stockholders and contributed to the widespread belief that Vodafone's executives had made serious mistakes in attempting to grow the Company so fast through large acquisitions. As Vodafone attempted to recover from the 2002-2003 debacle, on 7/30/03, Gent was "pushed upstairs" and made Vodafone's Life President and MacLaurin handpicked Arun Sarin ("Sarin") as the new CEO of Vodafone, charged with the responsibility of restoring stockholder value after the collapse in Vodafone's stock and ADR prices. This restoration of shareholder value

---

[3]



**Vodafone Group Plc (ADRs and Common Shares)**
Daily Share Pricing: January 2, 1997 to July 3, 2002

was supposedly to be accomplished by capturing the economies of scale in Vodafone's huge size and global scale and by the successful integration of Vodafone's past acquisitions, thus improving Vodafone's operations and generating increasing free cash flow, each year over the next several years and by avoiding wasteful spending, *i.e.*, ***not making any more large acquisitions of the type that had harmed Vodafone in the past***.

6.     During F02, Vodafone supposedly took all the asset value write-downs necessary to reflect the current fair value of its prior acquisitions on its balance sheet, including some $7 billion for its German (Mannesmann) acquisition, such that the goodwill shown on Vodafone's balance sheet was not inflated, meaning Vodafone's future operating earnings would not be hurt by further huge asset (goodwill) write-downs.  In connection with Vodafone's Mannesmann write-down, Vodafone wrote down ***only*** Mannesmann's ground line assets – not its mobile assets – which Vodafone insisted were fairly valued, representing to investors that no further asset impairment write-downs were required for Mannesmann, as its future operations would enable Vodafone to fully recover its investment in that entity.  When Sarin's efforts appeared to be leading Vodafone toward financial recovery during F04, Vodafone's ADR and common/ordinary share prices recovered significantly, reaching highs of $27.88 and £1.50, respectively, by 1/04:

[THIS SPACE INTENTIONALLY LEFT BLANK]

4



**Vodafone Group Plc (ADRs and Common Shares)**
Daily Share Pricing: October 1, 2002 to January 14, 2004

7.    However, in early 2004, Sarin and MacLaurin shocked Vodafone stockholders and the investment community by causing Vodafone to attempt to acquire AT&T's wireless assets for $38 billion, another gigantic telecom acquisition of the type which had been harmful to Vodafone in the past.  Investors reacted very negatively to this acquisition attempt, which forced MacLaurin and Sarin to abandon it.  In reaction to this ill-fated acquisition attempt and serious problems with Vodafone's Japanese operation (Vodafone KK), Vodafone's ADRs and common/ordinary shares plunged lower:



8.    These declines, which wiped out billions of dollars of shareholder value, caused a further growing "*chorus of complaints*" in the investment community against the Sarin/MacLaurin executive team.   Major financial publications ran articles criticizing Vodafone's "*dismal*" performance, some asserting that Vodafone had "*misled*" and "*failed*" the City, *i.e.*, London's important financial community, had "*failed*" its shareholders, that "*the Company's best days are behind it*" and that matters had to be "*put right*" by the Company.  Vodafone's 2004 stock price decline also significantly impaired the value of stock options held by Sarin and other members of the Sarin/MacLaurin management team and made it unlikely that they would be able to obtain the type of multi-million dollar bonuses from Vodafone they desired, the amount of which depended in part on whether Vodafone achieved targeted performance indicators, including Vodafone stock price appreciation.  These factors put tremendous pressure on Sarin, the new, high-profile CEO of Vodafone, and MacLaurin, Vodafone's long-time Chairman, who had spearheaded Vodafone's prior

6

growth strategy and hand-picked Sarin as CEO, to show concrete operative and financial progress in their management of Vodafone and to pacify Vodafone stockholders and boost Vodafone's share and ADR prices. This would not only restore value to the Vodafone executives' stock options, but also enable Sarin and MacLaurin and their top cohorts to hold onto their lucrative executive positions, allowing them to pocket millions of dollars a year in pay and performance bonuses.

9.     In 6/04, Vodafone was about to issue its F04 Annual Report and then report its 1stQ F05 results. In order to try to stem the decline in Vodafone ADRs and ordinary shares and try to push those shares up higher in price, Sarin, MacLaurin and their top cohorts commenced their scheme and course of conduct to boost the trading prices of Vodafone's publicly traded securities and deceive Vodafone's shareholders and purchasers of the publicly traded securities of Vodafone. They did this then and thereafter, while reporting strong operating earnings and EBITDA results,[4] by repeatedly asserting that: (i) despite intensified competition, Vodafone's important operating units – especially its German and Italian operations – were doing very well; (ii) despite the troubled nature of its Japanese operations, they had put in place a plan to turn that important Vodafone operation around; (iii) Vodafone would achieve strong profit margin growth for F06 (to end March 31, 2006), with huge cash flow improvements ($2.5 billion *yearly* by 2007-2008) due to the "One Vodafone" operational plan and a reduction in Vodafone's capital expenditures to less than 10% of Vodafone's mobile revenues by F08; and (iv) Vodafone faced only a "modest increase in tax payments" in the future.

---

[4]     Until it adopted International Financial Reporting Standards ("IFRS") beginning 4/1/05 for its F06 year, Vodafone recognized large annual goodwill amortizing charges due to prior acquisitions, resulting in large net losses. Thus, Vodafone stressed investors should focus on its reported *operating* profits or EBITDA, financial metrics which did not include non-cash goodwill amortization charges.

10.     During this period, defendants repeatedly extolled the success of Vodafone's German and Italian operations, the "One Vodafone" program (by which Vodafone's international operations were supposedly being integrated and streamlined), which would generate $2.5 billion in additional yearly free cash flow by 2007-2008, and the successful introduction of its new 3-G phones and service, especially in Japan.  To make it appear that Vodafone was succeeding and thus further their fraudulent scheme and course of conduct, the defendants caused Vodafone to report false and misleading (and artificially manipulated and inflated) financial results for F04, throughout F05 and for part of F06, which overstated Vodafone's operating profits, EBITDA, assets and net worth by several billion dollars, due to defendants' failure to timely recognize and take the required write-downs for the impaired value of Vodafone's German, Italian and Japanese operations resulting, in part, from previous acquisitions in those zones at inflated prices.  This manipulated financial reporting occurred while defendants were falsely assuring investors that Vodafone's German and Italian operations were succeeding and growing, ***despite increasingly competitive conditions*** and decreases in termination fees[5] imposed by regulators, and that its Japanese operations, while troubled, were being turned around in a manner that would not require substantially increased capital expenditures to be incurred or any asset (goodwill) impairment charge to be recognized.  They also concealed that Vodafone was going to incur additional cash tax payments of approximately $7 billion during F06-F08, which would materially impair its free operating cash flow during those periods.

11.     Throughout the Class Period, Vodafone reported strong operating financial results, representing that its core European businesses were performing well and its troubled Japanese

---

[5]     Termination fees are charges, authorized by regulatory authorities, that one mobile carrier must pay another when a customer terminates service with one carrier and switches to another.

operation was improving and being turned around, which would lead to strong revenue, operating profit margin and EBITDA growth in F06 and F07 – with $7 billion in annual free cash flow. For instance, defendants told investors:

(a)     Vodafone's overall business was "progressing" and "performing well," "despite a tough competitive environment," and its business was "going well," enjoying "robust operational performance." Thus, despite "intensifying competition" and "regulatory led termination rate reductions," Vodafone's business was "running fully in line with expectations," and was "on track"; thus defendants were "excited" as Vodafone was "uniquely positioned to succeed through [its] scale and scope."

(b)     As a result, Vodafone reported "strong" and "robust" financial results, "showing good operational growth" and a "healthy financial position" – demonstrating its "strong overall operational performance." Vodafone's "strong financial performance . . . met or exceeded [its] stated targets," "highlighting [Vodafone's] operational and financial strength," despite "increasing" "competitive pressures." According to Vodafone, its "superior results" and "performance" were due to its "global scale and scope . . . showing through." This, in turn, was due to a new "organisational structure" announced in 10/04, which strengthened its management team "to ensure effective and fast decision-making" and generated "more organizational efficiency."

(c)     Vodafone's major new product/service launched during the Class Period was called "*3-G*." Vodafone said its 3-G service was "***the start of a new era in mobile communications***," and Vodafone was "'***confident' [it] would be a success***," providing "***services of the highest quality***" and "***a new platform for profitable growth***." According to Vodafone, the 3-G "***launch . . . significantly improves our competitive position in Japan***" as the "***product is good***,"

9

"*services are good*," "*content is good*" and, as a result, out in the marketplace, 3-G was "*doing well*,*" enabling the Company to make "*significant progress*" with this product/service.

        (d)      Europe was Vodafone's core market – with Germany and Italy its main businesses on the continent.  Defendants assured investors they were "*comfortable*" with Vodafone's "*operational progress in Europe*,*" where operations were "*robust*," leading to confidence in a "*margin uplift*."  They said "*most pleasing*" was that "*in Europe we are outperforming our competitors*" with a "*consistently strong performance across Europe*" – in fact, "*[y]ou can expect from us continued out-performance versus our competition in Europe,*" where Vodafone was seeing "*accelerating growth*" and "*market share*."  Specifically, as to Italy and Germany, defendants said "*[o]ur businesses are performing well*" where "*margins . . . are . . . up*."  Italy was enjoying "*flattish*" but *very high margins*, with an "*increasing customer base*" being the "*main driver of service revenue growth*."  Vodafone Italy "*continue[s] to perform well in all key areas*," *i.e.*, "*robustly*," despite an "*increasing*" and "*very competitive*" environment as its "*core strategy . . . continues to prove successful*" in "*growing its business*."  In Italy, Vodafone had successfully "*fenced off*" a major competitive threat from Hutchinson, achieving "*accelerated growth*" and "*out-performance*," and thus had "*won our battle for growth and value*" due to a "*strong . . . very strong competitive position*," which would allow Vodafone to "*succeed in the Italian market . . . in the future*."  As to Germany, Vodafone saw "*continued strong growth*," leaving it "*well-positioned*" with impressive profitability and the "*highest*" EBITDA margins in Germany, "*significantly ahead of [its] other two competitors*."  Thus, Germany saw "*continued uplift in EBITDA margin*," leaving it "*poised for continued growth and improvement*" in margins – "*despite a very competitive" environment*.  Vodafone's German business was "*outstanding . . . measured on any

basis," and was "*outperforming . . . competition*," making it the "*profitability leader . . . in Germany*," where it would "*continue to grow EBITDA*."

(e)    In Japan, a troubled operation, the "*3G launch . . . significantly improve[d] [Vodafone's] competitive position in Japan*," where an "*ongoing transformation plan [was] expected to improve . . . performance and competitive position*."  Defendants represented that Japan was "*fundamentally a good business*," where "*good progress has been achieved*" and the turnaround was "*on track*," achieving "*encouraging results*" – thus Vodafone retained its "*long term commitment*" to Japan and was "*confident*" that "*our investment*" will "*prove to be very rewarding*."

(f)    The One Vodafone program was to produce £2.5 billion in "*annual . . . free cash flow*" improvements by F07-F08.  According to Vodafone, it "*continue[d] to make strong progress*" with One Vodafone and the program was "*progressing well*," leaving Vodafone "*on target to deliver £2.5 billion additional . . . free cash flow by*" **F08**.  Vodafone was also to reduce "*CapEx.*," *i.e.*, expenditures, to "*less than 10% of . . . revenue*" by F07-F08, was also achieving "*significant progress*" and "*progress is good*," and Vodafone was "*on track*" to achieve the improvements of both these programs.

(g)    As a result of all these favorable factors, defendants represented that the carrying value (goodwill) of its Germany, Italy and Japan businesses were properly and fairly presented, secure and not impaired, and that new SEC regulations and the new IFRS would "*not affect*" those carrying values which would be "*carried forward*" at the current balance under U.K. and U.S. Generally Accepted Accounting Principles ("GAAP") upon Vodafone's switch to IFRS in F05 and thereafter.

11

(h)    Defendants' assurances regarding Vodafone's cash flow prospects were made despite a £9 billion deferred tax obligation carried on its balance sheet, as the "*unwind*" of those liabilities was not "*imminent*," but would occur "*in due course*" – but Vodafone could not give "*accurate timing on that*" as such timing was "*very difficult to predict*."

(i)    As a result of these various factors, defendants forecast strong results for Vodafone in F06-F07 – revenue growth of 6%-9% ("*high single-digits*"), stable to flat to 1% margins and free cash flow of £6.5-£7 billion – emphasizing these forecasts would be achieved despite "*intensifying competition*" and "*regulatory intervention*" with "*termination rate cuts in most markets*," which were "*not a surprise*" and were "*baked into*" Vodafone's plans and forecasts.

12.    As the MacLaurin/Sarin team bombarded the securities markets and investment community with these positive statements, assurances and forecasts, it had the intended impact upon the price of the publicly traded securities of Vodafone. Vodafone's ADRs increased to a Class Period high of $28.31 and its ordinary/common shares increased to a Class Period high of £1.54 – an increase of over 33%. As Vodafone's publicly traded securities traded at inflated prices – the ADRs and ordinary shares traded as high as $28.04 and £1.50 even in mid-9/05 – Sarin and his cohorts took advantage of the artificially inflated stock price their false and misleading statements and scheme to defraud had created by selling off large amounts of their common/ordinary shares, pocketing at least $29 million in illegal insider trading proceeds, while many other executives and managers of Vodafone, who are not required to publicly report their stock transactions, exercised their now "in the money" stock options and then sold the shares – while pocketing additional millions of dollars of illegal insider trading proceeds. Sarin and other top Vodafone executives also pocketed millions of dollars of bonuses because they made it appear that Vodafone had achieved certain key performance indicators in F04-F05, triggering those multi-million dollar bonuses, even though, in fact, had the

12

truth been told, those performance indicators would not have been achieved and those bonuses would not have been paid, at least in the amounts they were paid.

13.    Due to defendants' continued reporting of false financial results and continuing false assurances regarding the state of Vodafone's Japanese, German and Italian operations, its future cash flows, the success of the One Vodafone program and the level of Vodafone's future cash tax payments, Vodafone's publicly traded securities continued to trade at artificially inflated prices. On 11/14/05, Vodafone's ADRs and common/ordinary shares traded as high as $25.30 and £1.46, respectively.

14.    Then, between 11/15/05 and 2/27/06, Vodafone made a series of company-specific revelations contradicting and indicating the falsity of defendants' prior positive representations. On 11/15/05, Vodafone shocked the securities markets by reporting a 23% decline in operating profits for the six-month period ended 9/30/05, abandoning its F06 revenue growth and profit margin forecasts and revealing that it faced at least $7 billion in cash flow impairments due to cash tax payments to be made in F06-F08, and that the EBITDA of its Japanese operations would fall sharply in F06 due to higher capital expenditures. As a proximate result of these revelations, Vodafone's stock and ADRs collapsed from $25.30 on 11/14 to $21.90 on 11/16, while its common/ordinary shares collapsed from £1.46 on 11/14 to £1.26 on 11/16 – a company-specific price decline of 20%, which was not due to market forces or other matters unrelated to the revelations of information contradicting, and thus indicating the falsity of some of defendants' prior positive statements, assurances and forecasts, all of which inflicted substantial damage on prior Class Period purchasers of Vodafone's publicly traded securities. However, defendants also reassured the investing public that Vodafone's Japanese turnaround plan was still "***on plan***" and "***on course***," and that the carrying value of its Japanese assets was not impaired and thus Vodafone's ADRs and ordinary shares

13

continued to trade at artificially inflated, albeit lower prices. The revelations of 11/15/05, which indicated that Vodafone's European operations were more troubled than had previously been revealed were compounded on 2/27/06, when Vodafone revealed a $40-$49 billion asset write-down due to the impaired value of its German (Mannesmann), Italian and Japanese operations, admissions that the operations in these countries were much less successful (or less capable of being turned around) than had previously been represented, that the value of these assets on Vodafone's F04-F06 financial statements had been vastly overstated, and thus that Vodafone had actually been suffering large operating losses in these operations due to the excessive valuations at which it carried them on its books. This led to a further decline in Vodafone's ADRs to $19.51 per share and in its ordinary shares to £1.09 per share, inflicting further damage on prior Class Period purchasers of those securities, taking the prices of these securities back down to the levels they had been when the fraudulent scheme to inflate them began. Shortly thereafter, Vodafone confirmed its inability to turn around its Japanese operation and that operation's lack of long-term viability by selling the Japanese operations – incurring a huge $8.6 billion loss! As a result of this debacle, MacLaurin, Gent, Paul Hazen, Vodafone's Deputy Chairman, Bamford and Horn-Smith left the Company and there was the implementation of yet another "*new*" organizational structure of the management of the Company.

15.    After the end of the Class Period, Vodafone admitted it had "***a lower view of growth prospects, particularly in the medium to long term***." Sarin admitted the previously forecast growth and cost savings would not be achieved in the stated timeframes and, in fact, capital expenditures would increase, not fall, while free cash flow would fall sharply to as low as £4 billion in F07 due to the higher tax payments and higher capital expenditures.

16.    The statements issued during the Class Period were false and misleading when made. The statements were affirmatively false in misstating facts regarding Vodafone's business and

finances. In addition, the statements were false and misleading in failing to disclose the following true facts – then known to or recklessly disregarded by defendants:

(a)     Throughout the Class Period, Vodafone's financial statements and reports, as disseminated to the investing public, its shareholders and as filed with the SEC, were materially falsified and overstated, including a massive overstatement of its assets, goodwill (intangible assets) and shareholder equity, and its EBITDA and operating earnings were inflated due to the over-valuation of its German, Italian and Japanese operations;

(b)     Vodafone's Mannesmann (German) operations had not been successfully integrated into Vodafone's overall operations and were suffering from significant operational problems, inefficiencies and a lack of growth and profitability adequate to permit Vodafone to recover its investment in Mannesmann;

(c)     Vodafone's Italian operations were also substantially overvalued and suffering from operational problems, inefficiencies, an impaired competitive position and a lack of growth adequate to permit Vodafone to recover its investment in that operation;

(d)     Contrary to Vodafone's representations that its Japanese operations could, would and were being turned around, in fact, Vodafone's Japanese operations were not only severely troubled but those problems were getting materially worse, which would require massive additional capital expenditures in an effort to salvage that business, or the sale of that business at a huge loss;

(e)     Vodafone's Japanese operations were materially overvalued on Vodafone's financial statements due to the failure to hold or gain sufficient market share so as to permit Vodafone to recover its investment in its Japanese operations;

(f)     Vodafone's introduction of 3-G service and products was a failure in Japan, where the level of service was defective and far worse than that of competitors, which, combined

with the poor quality and functionality of Vodafone's new 3-G handsets, was leading to increased customer dissatisfaction and rejection of Vodafone's service in Japan and a lack of adequate market share and growth in that operation sufficient to justify Vodafone ever recapturing its investment in its Japanese operations;

(g)     Vodafone's worldwide scale of operations did not give it a competitive advantage; in fact, it placed Vodafone at a considerable competitive disadvantage, burdening it with excessive costs, infrastructure and bureaucracy, which inhibited the implementation of business decisions and strategies necessary for Vodafone to achieve the type of growth and success its executives were forecasting for it;

(h)     Vodafone's "One Vodafone" cost savings and operational efficiency initiative was not succeeding or achieving any significant cost savings and would not result in Vodafone achieving anywhere near the £2.5 billion improvement (pre-tax) in cash flow by F07-F08, as was being forecast;

(i)     Vodafone knew from discussions and interactions with tax authorities in several countries that it would have to make multi-billion dollar cash tax payments beginning in F06 or F07, which would amount to over $1.5 billion per year, for several years, meaning that Vodafone could not possibly achieve the levels of cash flow being forecast for F07, F08 and beyond;

(j)     Vodafone's top management was in a state of dissention and disarray, virtually paralyzed by bitter in-fighting between Gent, Sarin, MacLaurin and others, such that business and strategic decisions were being deferred or not properly or promptly implemented, which was hurting Vodafone's business;

(k)     The large stock buy-back activities which defendants were causing Vodafone to implement were not being done because defendants believed that Vodafone's ordinary shares

16

were undervalued, represented a good value or investment, or that such expenditures were a wise use of Vodafone's corporate resources; rather, such buy-backs were being engaged in by defendants to support and, if possible, artificially inflate Vodafone's stock price and assist key insiders in unloading large numbers of their Vodafone shares at inflated and, for them, highly profitable prices;

(l)       Contrary to defendants' representations, Vodafone's German and Italian operations were not succeeding in spite of increased and intensifying competition; in fact, to the contrary, those operations were faltering and losing ground to competitors, such that it was increasingly unlikely that Vodafone would ever be able to recover its investment in those operations; and

(m)       Due to the foregoing adverse factors, which were negatively impacting Vodafone's operations and financial performance, defendants knew that the levels of financial performance being forecast for Vodafone for F06 and F07 would not and could not be achieved and that those forecasts were actually false when made.

17.       The stock chart set forth below graphically presents these events demonstrating how Vodafone's ADRs and common/ordinary shares were artificially inflated during the Class Period and outperformed stocks of its peer group and how the Company's ADRs and common/ordinary shares suffered company-specific material price declines as the truth entered the market, exposing defendants' prior falsifications, resulting in the previous artificial inflation in the price of those shares coming out of the shares, inflicting damage and economic loss on Class Period purchasers.

17



## JURISDICTION AND VENUE

18.     Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

19.     Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.  Vodafone has major business operations here and has been sued here in the past.  In terms of its business, shareholders and legal compliance, Vodafone has had and continues to have very extensive contacts with the United States.  Vodafone has a significant presence in the United States.  Vodafone owns 45% of Verizon Wireless.  Verizon Wireless operates a nationwide network, covering almost 90% of the U.S. population and 96 of the top 100 mobile telecommunications markets within the United States.  The Company's ordinary shares are listed on the London Stock Exchange and the Frankfurt Stock Exchange and the Company's ADRs are listed on the NYSE.

20.     The Bank of New York, as custodian of the Company's ADR program, holds approximately 12.2% of the Company's ordinary shares as nominee.  The total number of ADRs outstanding at 5/07 was 647,375,153.  Vodafone has 53 billion common shares outstanding.  As of 5/07, 1,138 holders of record of ordinary shares had registered addresses in the United States.  The Company has American Depositary Shares ("ADSs") which are evidenced by ADRs issued by the Bank of New York, as Depositary, under a Deposit Agreement.  ADS holders may instruct The Bank of New York on the exercise of voting rights relative to the number of ordinary shares represented by their ADRs.  At 3/07, approximately 30.60% of the Company's shares were held in North America.

21.     MacLaurin admitted in Vodafone's 2004 Annual Report that Vodafone is "***subject to the . . . U.S. securities laws***."  According to his letter in the 2004 Annual Report:

19

Corporate governance continues to be at the forefront of your Board's considerations. During the year we have fully complied with the Combined Code relating to corporate governance, as appended to the Listing Rules of the UK Listing Authority. ***In addition, we also have to comply with US securities laws.*** The Sarbanes-Oxley Act of 2002 has introduced a number of changes to corporate governance requirements with which we have complied this year and with which we will comply as new requirements are introduced over the coming years.

22.     Vodafone makes periodic filings with the U.S. SEC and presents its financial results in accordance with U.S. GAAP.  Vodafone's annual and other reports to shareholders and its written releases all contain forward-looking statement disclaimers and warnings, which are unique to the laws of the United States.

23.     The Company's ordinary shares are listed on the London Stock Exchange and the Frankfurt Stock Exchange and the Company's ADRs are listed on the NYSE.  The ADRs represent 10 ordinary shares.  The ADRs and ordinary shares trade in efficient markets and significant arbitrary trading between them goes on as the trading of each of the shares influences the other. According to Vodafone, "the Company holds briefing meetings with its major institutional shareholders in . . . ***the US . . . usually twice each year after the interim results and preliminary announcement, to ensure that the investing community receives a balanced and complete view of the Group's performance and the issues faced by the Group***."  Also, "[a]ll . . . resolutions at the Company's [Annual General Meetings] are decided on a poll. . . .  The proxy votes cast in relation to all resolutions are disclosed to those in attendance at the meeting and ***the results of the polls are published in national newspapers in the . . . US . . . .***"  Vodafone forwards information regarding its financials and other business operations to investors worldwide, and its ADR/ordinary shareholders at the same time.

## THE PARTIES

24.     Plaintiff The City of Edinburgh Council on Behalf of the Lothian Pension Fund purchased Vodafone publicly traded securities, as set forth in their certification previously filed in this litigation and incorporated by reference herein, and was damaged thereby.

25.     Defendant Vodafone operates as a mobile telecommunications company principally in the United States, Europe, and Asia Pacific.

26.     Defendant Sarin, during the Class Period, was and is CEO of Vodafone.  During the Class Period, Sarin received a bonus of $1.8 million for 2005 tied to Vodafone's reported 2005 performance and the 2005 performance of its stock in addition to his $1.8 million salary.  During the Class Period, Sarin also sold 2,110,000 shares of his Vodafone stock for proceeds of nearly $5.7 million, while in possession of adverse undisclosed information about Vodafone.  This defendant's pre- and Class Period stock sales are shown below:



27.     Defendant Sir Julian M. Horn-Smith ("Horn-Smith") was Deputy Chief Executive and Chief Operating Officer of Vodafone during the Class Period until he left the Company in 7/06. During the Class Period, Horn-Smith received a bonus of $1.3 million for 2005 tied to Vodafone's

reported 2005 performance and the 2005 performance of its stock in addition to his salary of $1.3 million. During the Class Period, Horn-Smith sold 1,210,459 shares of his Vodafone stock for proceeds of $3.2 million – 37% of the shares he owned – while in possession of adverse undisclosed information about Vodafone. This defendant's pre- and Class Period stock sales are shown below:



28.    Defendant Andrew N. Halford ("Halford") has been, since 7/05, Chief Financial Officer ("CFO") and a director of Vodafone. From April 2002 to December 2004, Halford was Vice President and CFO of Verizon Wireless. Halford had no vested stock options during the Class Period and thus could not and did not sell any Vodafone stock.

29.    Defendant MacLaurin was Chairman of the Board from July 1998 until he announced his retirement in March 2006. MacLaurin joined the Board of Vodafone in January 1997 and was Chairman of the Nominations and Governance Committee.

30.    Defendant Peter R. Bamford ("Bamford") was Chief Marketing Officer and a director of Vodafone during the Class Period until he left the Company in 4/06. Defendant Bamford sold 1,295,384 shares of his Vodafone stock for proceeds of $2.86 million – 84% of the shares he owned

– while in possession of material undisclosed information about Vodafone.  This defendant's pre- and Class Period stock sales are shown below:



**Vodafone Group**
**Defendant Peter R. Bamford's Insider Stock Sales Proceeds**
**January 2, 2004 - February 27, 2006**

31.    Defendant Paul M. Donovan ("Donovan") was CEO, Central Europe, Middle East, Asia Pacific and Affiliates of Vodafone since 1/05.  Defendant Donovan sold 692,536 shares of his Vodafone stock for proceeds of $1,832,450 – 66% of the shares he owned – while in possession of material undisclosed information about Vodafone.  This defendant's pre- and Class Period stock sales are shown below:

[THIS SPACE INTENTIONALLY LEFT BLANK]

23



32.      Defendant Jürgen von Kuczkowski ("von Kuczkowski") was CEO, Northern European Region, and CEO of Vodafone-Germany.  Defendant von Kuczkowski sold 2,091,802 shares of his Vodafone stock for proceeds of $5.8 million – 99% of the shares he owned – while in possession of material undisclosed information about Vodafone.  This defendant's pre- and Class Period stock sales are shown below:



33.     Defendant Thomas Geitner ("Geitner") was Chief Technical Officer and a director of Vodafone from 2002 until 12/06.  Defendant Geitner sold 792,680 shares of his Vodafone stock for proceeds of $1.85 million – 65% of the shares he owned – while in possession of material undisclosed information about Vodafone.  This defendant's pre- and Class Period stock sales are shown below:



34.     Defendant Alan P. Harper ("Harper") was Group Strategy and Business Integration Director of Vodafone since 7/00.  Harper joined Vodafone in 1995 as Group Commercial Director and subsequently became Managing Director of Vodafone U.K. until appointed to his current position.  Defendant Harper sold 2,931,242 shares of his Vodafone stock for proceeds of $7.7 million – 81% of the shares he owned – while in possession of material undisclosed information about Vodafone.  This defendant's pre- and Class Period stock sales are shown below:



**Vodafone Group**
Defendant Alan P. Harper's Insider Stock Sales Proceeds
January 2, 2004 - February 27, 2006

Total Shares Sold:  2,931,242
Total Sales Proceeds:  $7.76 million
% of Shares Owned Sold: 81%

Class Period:  June 10, 2004 - February 27, 2006

35.     Defendant Kenneth J. Hydon ("Hydon") was CFO of Vodafone during the Class Period until he left the Company in 7/05.  During the Class Period, Hydon received a bonus of about $1.1 million for 2005 tied to Vodafone's reported performance and the 2005 performance of its stock in addition to his salary of about $1.1 million.

## MOTIVE AND OPPORTUNITY/SCIENTER

36.     Vodafone's Board members and its Group Executive Committee ran Vodafone's business.  According to Vodafone's 2004 Annual Report:

**Directors and Senior Management**

The business of the Company is managed by its Board of Directors.  The Company's Articles of Association provide that, until otherwise determined by ordinary resolution, the number of directors will not be less than three.  Biographical details of the directors and senior management are as follows:

**Directors**

Chairman

**Lord MacLaurin of Knebworth**, **DL**, aged 62, has been a member of the Board of directors since June 1999 and became Deputy Chairman and the Board's nominated senior non-executive director in May 2000.  He is Chairman of the Audit Committee and a member of the Nominations and Governance Committee.  He became a director of AirTouch in April 1993.  In 2001, he retired as Chairman and Chief

Executive Officer of Wells Fargo & Company and its principal subsidiary, Wells Fargo Bank, NA. Paul Hazen is also a director of Safeway, Inc., Willis Group Holdings Limited, Xstrata AG and E.piphany and he is Chairman of Accel-KKR.

Deputy Chairman

**Paul Hazen**, aged 63, has been a member of the Board of directors since June 1999 and became Deputy Chairman and the Board's nominated senior independent director in May 2000. He is Chairman of the Audit Committee and a member of the Nominations and Governance Committee. In 2001, he retired as Chairman and Chief Executive Officer of Wells Fargo & Company and its principal subsidiary, Wells Fargo Bank, NA. Paul Hazen is Chairman of Accel-KKR and KKR Financial Corp. and is also a director of Safeway, Inc., Willis Group Holdings Limited and Xstrata AG.

**Executive Directors**

**Arun Sarin**, Chief Executive, aged 49, has been a member of the Board of directors since June 1999 and is a member of the Nominations and Governance Committee. He was a director of AirTouch from July 1995 and was President and Chief Operating Officer from February 1997 to June 1999. He was Chief Executive Officer for the United States and Asia Pacific region until 15 April 2000, when he became a non-executive director. He was appointed Chief Executive after the AGM on 30 July 2003. Arun Sarin joined Pacific Telesis Group in San Francisco in 1984 and has served in many executive positions in his 20 year career in telecommunications. He has also served as a director of The Gap, Inc., The Charles Schwab Corporation and Cisco Systems, Inc.

**Julian Horn-Smith**, Group Chief Operating Officer, aged 55, has been a member of the Board of directors since June 1996. He was appointed Group Chief Operating Officer on 1 April 2001, having been Chief Executive of Vodafone's Continental Europe businesses and a director of several of the Group's overseas operating companies. He is responsible for ensuring the operating performance of Group businesses. Julian Horn-Smith is the Chairman of the Supervisory Board of Vodafone Deutschland GmbH and is a non-executive director of Smiths Group Plc.

**Peter Bamford**, Chief Marketing Officer, aged 50, has been a member of the Board of directors since April 1998. He is responsible for the full range of marketing and commercial activities including brand, product development, content management, Partner Networks and global accounts. He is also responsible for the Group's operations in the UK & Ireland. Previously, he was Chief Executive, Northern Europe, Middle East & Africa Region. He was Managing Director of Vodafone UK until April 2001. Before joining Vodafone in 1997, Peter Bamford held senior positions with Kingfisher Plc and Tesco Plc and was a director of WH Smith Plc.

**Vittorio Colao**, Chief Executive, Southern Europe, Middle East and Africa Region, aged 42, joined the Board of directors on 1 April 2002. He has had responsibility for

the Group's businesses in Southern Europe since April 2001.  He spent the early part of his career at McKinsey & Co, where he was a Partner, before joining Omnitel Pronto Italia S.p.A. as its Chief Operating Officer.  In 1999, he became the Chief Executive Officer of Omnitel Pronto Italia S.p.A. (now operating as Vodafone Italy). Vittorio Colao is currently a member of the Aspen Institute and non-executive director of RAS Insurance in Italy.

**Thomas Geitner**, Chief Technology Officer, aged 49, has been a member of the Board of directors since May 2000.  He is responsible for Group Technology & Business Integration and will be leading the implementation of a standardised architecture for business processes, Information Technology and network systems. Prior to joining the Group, he was a member of the Management Board of RWE AG. Thomas Geitner is a member of the Management Board of Vodafone Holding GmbH and Vodafone Deutschland GmbH and a member of the supervisory board of Singulus Technologies AG.

**Ken Hydon**, Financial Director, aged 59, has been a member of the Board of directors since 1985.  He is a Fellow of the Chartered Institute of Management Accountants, the Association of Chartered Certified Accountants and the Association of Corporate Treasurers.  He is a director of several subsidiaries of the Company and is a member of the Board of Representatives of the Verizon Wireless partnership in the United States.  Ken Hydon has recently been appointed a non-executive director of Reckitt Benckiser Plc and Tesco Plc.  He will retire from the Board on conclusion of the AGM in 2005.

37.     Pursuant to Vodaphona's 2005 Annual Report:

Members of the Executive Committee who are not also executive directors are regarded as senior managers of the Company.  Chaired by Arun Sarin, this committee focuses on the Group's strategy, financial structure and planning, succession planning, organisational development and Group-wide policies.  The Executive Committee comprises the executive directors, details of whom are shown above, and the senior managers listed below

*       *       *

**Paul Donovan**, Chief Executive, Other Vodafone Subsidiaries, aged 46, was appointed to this position in January 2005.  He joined Vodafone in 1999 as Managing Director-Commercial, and was appointed Chief Executive of Vodafone Ireland in 2001.  He has over fifteen years experience in the telecommunications and IT industries and has held senior roles at BT, One2One and Optus Communications and, prior to that, marketing roles at the Mars Group, Coca Cola and Schweppes Beverages.

*       *       *

**Alan Harper**, Group Strategy and Business Integration Director, aged 48, joined Vodafone in 1995 as Group Commercial Director and he subsequently became Managing Director of Vodafone UK.  He was appointed to his current position in July 2000.  Prior to joining the Group he held the post of Business Strategy Director with Mercury One2One and senior roles with Unitel and STC Telecoms.  He is also a member of the Vodafone D2 GmbH Supervisory Board and Chairman of the Vodafone UK Foundation.

\*        \*        \*

**Jürgen von Kuczkowski**, Chief Executive of Vodafone D2 GmbH (Germany), aged 64, was appointed to this position in June 1994.  He joined Mannesmann Mobilfunk GmbH (now Vodafone D2 GmbH) in October 1990, initially as Director of Sales and Distribution.  He was previously the Chief Executive, Central Europe Region and Chief Executive, Northern Europe Region.

38.    Vodafone's 2005 Annual Report also provided that:

**Executive Management**

The executive directors, together with certain other Group functional heads and regional Chief Executives, meet monthly as the Executive Committee and the Integration and Operations Committee, both under the chairmanship of the Chief Executive.  The Executive Committee is responsible for the day-to-day management of the Group's businesses, the overall financial performance of the Group in fulfilment of strategy, plans and budgets and Group capital structure and funding.  It also reviews major acquisitions and disposals.  The Integration and Operations Committee is responsible for setting operational plans, budgets and forecasts, product and service development, customer segmentation, managing delivery of multi-market propositions and managing shared resources.

39.    In addition, Vodafone's 2005 Annual Report represented that the Company had two management committees, which oversaw the execution of its business strategy:

- The Executive Committee

The Executive Committee is responsible for the day-to-day management of the Group's businesses, the overall financial performance of the Group in fulfilment of strategy, plans and budgets and Group capital structure and funding.  t also reviews major acquisitions and disposals.  The Integration and Operations Committee is responsible for setting operational plans, budgets and forecasts, product and service development, customer segmentation, managing delivery of multi-market propositions and managing shared resources.

- Integration and Operations Committee

29

On 1 January 2005, a new Integration and Operations Committee came into effect. Chaired by Arun Sarin, the Committee is responsible for setting operational plans, budgets and forecasts, product and service development, customer segmentation, managing delivery of multi-market propositions and managing shared resources. The Committee comprises the members of the Executive Committee . . .

40.     According to Vodafone's 2004 Annual Report:

The Board has a formal schedule of matters specifically referred to it for decision, including the approval of Group commercial strategy, major capital projects, the adoption of any significant change in accounting policies or practices and material contracts not in the ordinary course of business.

*          *          *

The executive directors, together with certain other Group functional heADR and regional Chief Executives, meet on ten occasions each year as the Group Executive Committee under the chairmanship of the Chief Executive.  This Committee is responsible for the day-to-day management of the Group's businesses, the overall financial performance of the Group in fulfillment of strategy, plans and budgets and Group capital structure and funding.  It also reviews major acquisitions and disposals.

Two management committees, the Group Operational Review Committee and the Group Policy Committee, oversee, together with the Group Executive Committee, the execution of the Board's strategy and policy.

The Group Operational Review Committee, which meets ten times a year under the chairmanship of the Group Chief Operating Officer, comprises other executive directors, certain Group functional heADR and regional Chief Executives. This Committee is responsible for the operational performance and achievement of targets of the Group's business, with a focus on the enhancement of voice services and growth of non-voice services, new global products and services, brand development, technology and other cost and revenue synergies within the Group's regions.

The Group Policy Committee, which meets six times each year, is chaired by the Chief Executive.  The Financial Director and the Group Chief Operating Officer, together with certain other Group functional heADR, join him on the Committee, which is responsible for the determination of policy and the monitoring of non-operational areas of activity which are important to the Group overall, including strategy, finance, human resources, legal, regulatory and corporate affairs.

41.     The individuals named as defendants in ¶¶25-34 are referred to herein as the

"Individual Defendants."  The Individual Defendants, because of their positions with the Company,

possessed the power and authority to control the contents of Vodafone's periodic reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market.  Each defendant was provided with copies of the Company's reports and releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the company-issued false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

42.    Defendants knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's securities and would cause the prices of the Company's publicly traded securities to become artificially inflated.  Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiff and other members of the Class.  The Individual Defendants were motivated to engage in the manipulations alleged herein, in part because their compensation was largely based on performance measures, including EBITDA and operating profits. The Individual Defendants also received performance shares and options which vested based on the growth in the apparent value of the Company.  The 2004 Annual Review & Summary Financial Statement showed how this worked:

> However, awards of short and long term incentives were determined so that this positioning would only be attained if the Company achieves exceptionally demanding performance levels.  To deliver this level of remuneration, the Chief Executive received performance shares with a face value of two times salary and

options with a face value of eight times salary in 2003. The graph below illustrates the approximate pre-tax long term incentive gains to the Chief Executive that would be achieved based on various Company growth, EPS and TSR performance scenarios:



"For example, if the Company's share price increases by 50% from 145 pence to approximately 219 pence . . . there is 50% vesting of long term incentives. The Chief Executive would have a pre-tax gain of just under £5 million. . . ." It is unusual for a public company to have an executive bonus compensation scheme which is directly tied to an increase in the price of the Company stock, as this gives the executive a direct motive to inflate the price of the stock, even for the short term, to trigger vesting, payments or grants.

43. Each defendant is liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to him about Vodafone. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Vodafone publicly traded securities was a success, as it: (i) deceived the investing public regarding Vodafone's prospects and business; (ii) artificially inflated the prices of Vodafone's publicly traded securities; (iii) permitted defendants to receive bonuses and have their performance shares vest based on the growth in the value of the Company;

32

and (iv) caused Plaintiff and other members of the Class to purchase Vodafone publicly traded securities at inflated prices.

**BACKGROUND**

44.     Vodafone was formed in 1983. Vodafone grew rapidly through acquisitions and by 2000 owned stakes in wireless carriers around the globe. Vodafone made acquisitions of Germany's Mannesmann and Italy's Omnitel networks. Vodafone combined its U.S. wireless operations (acquired when the Company bought AirTouch in 1999) with those of Bell Atlantic and GTE to form Verizon Wireless, the No. 1 U.S. wireless provider and 45%-owned by Vodafone.

45.     During the telecom boom at the turn of the last century, Vodafone grew into one the world's largest providers of mobile, *i.e.*, wireless, telephone services, with worldwide operations in 28 countries, including in the United States, Germany, Italy and Japan. Vodafone's rapid growth occurred while MacLaurin and Gent were its Chairman and CEO, respectively, which they accomplished by causing Vodafone to spend over $300 billion to make several acquisitions. The largest and most notable acquisition was the acquisition of Mannesmann in Germany in 2000 for $170 billion, one of the largest acquisitions in business history. At the height of the telecom boom and Vodafone's growth, Vodafone's ADRs on the NYSE reached a high of $63 per share, while its common/ordinary shares traded elsewhere reached a high of £4.00 per share, giving the Company a market capitalization of over £230 billion, based on its 67+ billion outstanding common/ordinary shares – making it one of the world's four most valuable companies.

46.     However, Vodafone imploded in F02-F03 as the telecom bubble burst. The Company suffered huge losses and took billions in asset value write-downs. For F02, ended 3/31/02,[6]

---

[6]     Vodafone's fiscal year ends 3/31 of each year.

Vodafone suffered a loss of almost $24 billion due in large part to massive write-downs of over $10 billion from prior overvalued acquisitions, including $7.0 billion due to the Mannesmann acquisition. As a result, Vodafone's ADRs and ordinary shares collapsed to as low as $13.10 and £.80 per share, respectively.

47.    This collapse in the prices of Vodafone's publicly traded securities resulted in great consternation among its stockholders and contributed to the widespread belief that Vodafone had made serious mistakes in attempting to grow the Company so fast through large acquisitions. As Vodafone attempted to recover from the 2002-2003 debacle, on 7/30/03, Gent was "pushed upstairs" and made Vodafone's Life President and MacLaurin handpicked Sarin as the new CEO of Vodafone, charged with the responsibility of restoring stockholder value after the horrible collapse in Vodafone's stock and ADR prices, This restoration of shareholder value was to be accomplished by capturing the economies of scale in Vodafone's huge size and global scale and by the integration of Vodafone's past acquisitions, thus improving Vodafone's operations and generating increasing free cash flow each year over the next several years and by avoiding, *i.e.*, **not making, more large acquisitions of the type that had harmed Vodafone in the past**.

48.    During 2002, Vodafone supposedly took all the asset value write-downs necessary to cause its prior acquisitions to reflect their current fair value – write-downs totaling $10+ billion, including $7.0 billion for its German (Mannesmann) acquisition, such that the goodwill earned on Vodafone's balance sheet was not inflated, causing investors to believe Vodafone's future operating earnings would not be hurt by further huge asset (goodwill) write-downs. In connection with Vodafone's Mannesmann write-down, Vodafone wrote down **only** Mannesmann's ground line assets – not its mobile assets – which it insisted were fairly valued, representing to investors that no further asset impairment write-downs were required for Mannesmann, as its future operations would enable

Vodafone to fully recover its investment in that entity.  When Sarin's efforts appeared to be leading Vodafone toward financial recovery during F04, Vodafone's ADR and common/ordinary share prices recovered significantly, reaching highs of $27.88 and £1.50, respectively, in 1/04.

49.    However, in early 2004, Sarin and MacLaurin shocked Vodafone stockholders and the investment community by causing Vodafone to attempt to acquire AT&T's wireless assets for $38 billion, another gigantic telecom acquisition of the type which had been harmful to Vodafone in the past.  Investors reacted very negatively to this acquisition attempt which forced MacLaurin and Sarin to abandon it.  In reaction to this ill-fated acquisition attempt and as Vodafone revealed serious problems with Vodafone's Japanese operations (Vodafone KK), its ADRs and common/ordinary shares plunged lower.

50.    These declines, which wiped out billions of dollars of shareholder value, caused a further growing "*chorus of complaints*" in the investment community against the Sarin/MacLaurin executive team.  Major financial publications ran articles in the Summer of 2004, criticizing Vodafone's "*dismal*" performance, some asserting that Vodafone had "*misled*" and "*failed*" the City, *i.e.*, London's important financial community, had "*failed*" its shareholders and that "*the Company's best days are behind it*" and that matters had to be "*put right*" by the Company. Vodafone's 2004 stock price decline also significantly impaired the value of stock options held by Sarin and other members of the Sarin/MacLaurin management team to buy Vodafone shares and made it unlikely that they would be able to obtain the type of multi-million dollar bonuses from Vodafone they wanted, the amount of which depended in part on whether Vodafone achieved targeted performance indicators, including Vodafone stock price appreciation.  All of this put tremendous pressure on Sarin, the new, high-profile CEO of Vodafone, and MacLaurin, Vodafone's long-time Chairman, who had spearheaded Vodafone's prior growth strategy and hand picked Sarin

as CEO, to show concrete operative and financial progress in their management of Vodafone and to pacify Vodafone stockholders, halt the decline in Vodafone's stock and ADR prices and, if possible, boost Vodafone's share and ADR prices not only to restore value to the Vodafone executives' stock options, but also so that Sarin and MacLaurin and their top cohorts could hold onto their lucrative executive positions, allowing them to pocket millions of dollars a year in pay and performance bonuses.

## CLASS PERIOD EVENTS AND FALSE STATEMENTS

51.    On or about 6/10/04, the first day of the Class Period, Vodafone issued its 2004 Annual Report. The 2004 Annual Report contained a letter from MacLaurin, stating:

> It is my privilege to report, once again, *another highly successful year for your company, with an excellent overall operating performance generating further substantial growth in profits. . . .*
>
> *. . . In February, we launched the Vodafone Mobile Connect 3G/GPRS datacard, which provides fast, secure access to corporate networks from lap top computers. . . . I believe that this technological evolution offers us significant growth opportunities and Vodafone is very well positioned to take advantage of these opportunities due to its global footprint and its continued strong performance.*
>
> *                    *                    *
>
> *Vodafone is a vibrant company, dedicated to the creation of shareholder value. This value is achieved through . . . the advance in technology – 3G – and the investment in assets where positive returns may be clearly identified.*

52.    The 2004 Annual Report also contained a letter from Sarin, stating:

> This past year, Vodafone *has delivered another set of solid financial results. We have had . . . continued margin improvement . . . .*
>
> *                    *                    *
>
> *Another significant force impacting our business is competition. We face different competitors across our markets, but we have a tremendous advantage. Vodafone can draw from resources across all our markets and respond competitively in a way that does not impact the performance of the organisation as a whole.*

36

\*      \*      \*

By delivering on our goals and conducting rigorous economic and financial analyses before we make pricing, acquisition and scale decisions, we demonstrate the discipline to always act in the best interests of our shareholders.

\*      \*      \*

**Leverage global scale and scope**

Another **unique advantage** for Vodafone is our expansive global footprint. Operating in 26 markets **puts us in an enviable position to leverage our global scale and scope. We are using this advantage to deliver exceptional 3G-based services. When we introduce 3G handsets in large volumes later this year we will be well equipped to drive demand and attract even higher market share in the 3G world.**

Another **competitive advantage** is our leadership position on cost and time to market. From network services to sales, and marketing to customer care and billing, we have many varied systems in use across the business. **With strong cooperation between our various operating companies we can achieve further savings.**

\*      \*      \*

**We have just reinforced our long term commitment to Japan by making a further** investment of up to £2.6 billion. **Our transactions in Japan will simplify the structure, confirm our commitment to the Japanese marketplace and enable us to deliver on the changes needed to improve our position.**

53.    Vodafone's 2004 Annual Report also represented:

**Mannesmann synergies**

**Mannesmann has been integrated into the Group and the expected synergies for the year ended 31 March 2004 announced at the time of the acquisition have been achieved, exceeding the target mainly as result of higher savings from capital expenditure, handset procurement and additional revenue opportunities.**

54.    Vodafone's 2004 Annual Report discussed the Company's German, Italian and Japanese operations:

**Germany**

Vodafone Germany performed well in the year, further improving its operational performance.

\*      \*      \*

37

Operating profit before goodwill amortisation and exceptional items improved by £306 million to £1,741 million, principally driven by cost efficiencies in the second half of the year, particularly in network and IT costs.

\* \* \*

**Italy**

Vodafone Italy produced another strong set of results, in spite of the increasingly competitive and highly penetrated market.

\* \* \*

Operating profit before goodwill amortisation and exceptional items grew significantly. . . .

\* \* \*

**Japan**

This financial year has been challenging for Vodafone Japan due to the strength of competitor offerings.

\* \* \*

The Group is developing a full range of 3G handsets which are expected to be available in the quarter leading up to Christmas 2004 and are expected to put Vodafone Japan in a better competitive position. . . . A plan is in place to improve Vodafone Japan's performance and competitive position, focusing on cost reductions through leveraging the Group's global scale and scope. . . .

55.    The 2004 Annual Report also stated:

**Goodwill and intangible assets**

The relative size of the Group's goodwill and other intangible assets makes a number of judgements surrounding the determination of their carrying value, and related amortisation, ***critical to the Group's financial position and performance***.

At 31 March 2004, intangible assets, including goodwill attributable to the acquisition of interests in associated undertakings, amounted to ***£93,622 million*** (2003: £108,085 million), ***and represented 70% (2003: 70%) of the Group's total fixed assets***. . . .

\* \* \*

**Impairment reviews**

Asset recoverability is an area involving management judgement, requiring assessment as to whether the carrying value of assets can be supported by the net present value of future cash flows derived from such assets using cash flow projections which have been discounted at an appropriate rate. . . .

UK GAAP requires management to ***undertake a review for impairment if events*** or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Group management ***currently undertakes a review of goodwill, intangible assets and investments in associated undertakings at least annually to consider whether a full impairment review is required***.

56.    In Vodafone's 2004 financial statements, it was stated:

**Notes to the Consolidated Financial Statements**

*        *        *

In accordance with accounting standards the Group regularly monitors the carrying value of its fixed assets. A review was undertaken at 31 March 2004 to assess whether the carrying value of assets was supported by the net present value of future cash flows derived from assets using cash flow projections for each asset in respect of the period to 31 March 2014.

*        *        *

The results of the review undertaken at 31 March 2004 indicated that no impairment charge was necessary.

57.    Vodafone's 2004 Annual Report also contained the following certifications required

by Sarbanes Oxley:

RULE 13a-14(a) CERTIFICATION

I, Arun Sarin, certify that:

1.    I have reviewed this annual report on Form 20-F of Vodafone Group Plc (the "Company");

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial

39

condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.     The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

        (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

        (b)     Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        (c)     Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.     The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

        (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarise and report financial information; and

        (b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: June 9, 2004
/s/ Arun Sarin
Arun Sarin
Chief Executive

                    *          *          *

## RULE 13a-14(b) CERTIFICATION

        Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), the undersigned

officer of Vodafone Group Plc, a company incorporated under the laws of England and Wales (the "Company"), hereby certifies, to such officer's knowledge, that:

The Annual Report on Form 20-F for the year ended March 31, 2004 (the "Report") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: June 9, 2004     /s/ Arun Sarin
Arun Sarin
Chief Executive

\*     \*     \*

## RULE 13a-14(a) CERTIFICATION

I, Kenneth J. Hydon, certify that:

1.     I have reviewed this annual report on Form 20-F of Vodafone Group Plc (the "Company");

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.     The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b)     Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)    Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.    The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarise and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: June 9, 2004        /s/ Kenneth J. Hydon
Kenneth J. Hydon
Financial Director

*        *        *

RULE 13a-14(b) CERTIFICATION

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), the undersigned officer of Vodafone Group Plc, a company incorporated under the laws of England and Wales (the "Company"), hereby certifies, to such officer's knowledge, that:

The Annual Report on Form 20-F for the year ended March 31, 2004 (the "Report") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: June 9, 2004        /s/ Kenneth J. Hydon
Kenneth J. Hydon
Financial Director

58.    On 7/26/04, Vodafone issued its 6/30/04 quarterly report via a release headlined and

stating:

***Vodafone Continues Strong Performance in Customer and Revenue Growth***

42

*Vodafone Group Plc ("Vodafone") announces today key performance indicators for the quarter ended 30 June 2004. . . .*

\*       \*       \*

Arun Sarin, Chief Executive of Vodafone, commented

*". . . We have recorded good performances. . . . [O]ur business is progressing well, despite a tougher competitive environment. . . .*

\*       \*       \*

Germany

Net customer additions of 462,000 demonstrate *continued strong growth in Germany*. . . .

\*       \*       \*

*Strong customer growth* was the primary driver behind a 7% increase in service revenue for the quarter compared to the same quarter last year. . . .

Italy

Proportionate net customer additions were 205,000 in the quarter. . . . Churn remained broadly stable.

Service revenue for the quarter increased 10% on the same quarter last year. . . .

Net acquisitions and retention costs as a percentage of service revenues in the quarter slightly increased on the same period last year, reflecting the increase in competitive activity in the Italian market. *However, these costs remain at very low levels when compared to the rest of the Group*.

59.     In mid-8/04, Sarin went on a "road show" to meet with important securities analysts from major investment firms to provide them information about Vodafone and to try to boost Vodafone's stock and ADR prices. The following analyst reports resulted from Sarin's meetings and communications with analysts, who reported to the market what he had said to the analysts:

- 8/13/04, Bear Stearns:

  \*\*\*     One on One meeting with Arun Sarin *was comforting with respect to . . . operational progress in Europe. . . .*

43

\*       \*       \*

\*\*\*    *Operations appear robust in Europe. . . .*

\*       \*       \*

**Comfortable with operations across Europe.** *Management remain comfortable with operational progress to date in Europe. . . .*

- 8/16/04, Deutsche Bank:

  *We had a one-one meeting with Vodafone's CEO, Arun Sarin.*

  \*       \*       \*

  Revenue growth/margins. *Vodafone believes consensus for the next few years (post 04/05) is low and revenue growth above this will be driven by subscriber growth, as well as voice and data usage. Vodafone's MI systems enable Mr. Sarin to review subscriber metrics weekly, operational data monthly and the company operates a 3mth forecasting process. He remains confident regarding the margin uplift potential in Europe.*

  \*       \*       \*

  – *Capex*. . . . Mr. Sarin expects capex to have reached its peak at c.GBP5bn. . . . *He reiterated the company's 10 pc capex/sales guidance for 07/08*.

  – Margins. . . . *He remains confident regarding the margin uplift potential in Europe and cited that it would be achieved in different ways. . . .*

  – Revenue growth. *The company believes consensus for the next few years (post 04/05) is low . . . .*

- 8/18/04, Investec:

Positive Meeting with Arun Sarin

- . . . Earlier this week, we had a *positive meeting* with Vodafone CEO, Arun Sarin.

  \*       \*       \*

- . . . *Vodafone shares have rallied somewhat in the last week, aided by analyst meetings . . . .*

- 9/8/04, Citigroup:

\*    We were very pleased to meet with Arun Sarin, CEO Vodafone, now in his second year in the hot seat. *The colour of the meeting was upbeat*. . . .

44

- 9/8/04, J.P. Morgan:

Meeting with Arun Sarin: Positive on . . . FY06 outlook

\*        \*        \*

We met with Vodafone CEO, Arun Sarin yesterday afternoon. Here we focus on the points he made incremental to the already widely-communicated statements from the post-KPI analyst meetings held last month.

\*        \*        \*

\*        ***FY06 outlook: continued healthy revenue growth and margin momentum achievable assuming no deterioration in the competitive outlook***

\*        We viewed the overall message as positive and capable of sustaining share price recovery.

60.        On 9/27/04, Vodafone held a huge meeting for analysts and institutional investors.

On the day of this event, Vodafone issued a release stating:

VODAFONE ANALYST AND INVESTOR DAY

\*        \*        \*

The day will principally consist of a series of presentations by the senior ***management from Vodafone's largest operating companies. . . . Vodafone Japan, Vodafone Italy*** . . .and Vodafone ***Germany will provide an overview of each of the individual businesses.***

Arun Sarin, Chief Executive of Vodafone, will introduce the day's events by ***reiterating the guidance for the current financial year as outlined at the company's preliminary results announcement in May 2004.***

In addition, ***Vodafone will confirm that it expects to reduce mobile capital expenditure to less than 10% of mobile revenue in the year to 31 March 2008.***

Vodafone will also disclose its expectations of the financial benefits of its One Vodafone programme to deliver the benefits of scale and scope. ***The One Vodafone initiatives are expected to achieve £2.5 billion of annual pre-tax operating free cash flow improvements by the year ending 31 March 2008. Cost initiatives are anticipated to generate improvements of £1.4 billion, with a further £1.1 billion from revenue initiatives***.

61.        During the 9/27/04 Analyst Day presentation by Vodafone, the following slides were displayed and discussed:

45

# Vodafone Analyst & Investor Day

Monday 27 September 2004

## Vodafone Group Plc

## Arun Sarin

Chief Executive

1

**◯ vodafone**

## Reiterating outlook for FY 04/05

| | |
|---|---|
| Average organic customer growth* | High single digit |
| Organic mobile revenue growth* | High single digit |
| Mobile EBITDA margin* | Broadly stable |
| Fixed asset additions | Around £5bn |
| Free cash flow | Around £7bn |
| Mobile capex to sales in 2007/08 | Less than 10% |

* Proportionate Basis

4

**◯ vodafone**









48











## Vodafone Holdings K.K. outlook

🍷 No Change to current year forecast

| | Forecast[1] (¥ Bn) | Update: |
|---|---|---|
| **Revenue** | 1,531 | 🔴 Slight year on year increase of 1.5%; highly dependent on handset sales in the second half of the fiscal year |
| | | 🔴 Service revenue currently in line with plan |
| | | 🔴 "Happy Time 1" removed from market July 04; "Happy Time 2" released and currently delivering expected results |
| **Ordinary income** | 127 | 🔴 In line with plan |
| | | 🔴 Cost reduction programme on track |
| **Net income** | 110 | 🔴 In line with plan |
| | | 🔴 Includes cost from voluntary retirement programme |

(1) J-GAAP basis

22

🔴 vodafone

---

## Summary

🍷 Financial forecast of Vodafone Holdings unchanged

🍷 Successful implementation of transformation plan is key to future performance

🍷 Vodafone KK will improve competitiveness by:

– Offering Japan-centric, differentiated range of terminals

– 3G network with performance equal to competitors

– Building Vodafone brand preference in Japan through delivering differentiated customer propositions to all customer segments

– Capturing benefits of Vodafone Group's best practice

23

🔴 vodafone

51















# Business objectives

- Brand preference - No 1 mobile brand in Germany

- Revenue growth through sustainable differentiation

- Operational excellence benefiting from global scale and scope

- Profitable growth

14    vodafone



62.    During the 9/27/04 conference, the following was stated:

[SARIN:]    . . . [W]elcome to Vodafone's Investor Day. . . .  We've got five operating companies presenting here today.  The UK, Germany, Italy, Japan and the United States. . . .  *First of all, our operating performance is on-track*. . . .  *And most importantly, we have quantified One Vodafone*.  We've announced today that by the year 2007, 2008, we expect to achieve One Vodafone benefits to the tune of 2.5 billion pounds annually on a going forward basis, *on a pre-tax basis on a cash flow basis*. . . .  *Our margins in Germany will be up.  There is more competition in Italy, these days.  We think our margins in Italy are likely to be flattish, on very high margins*, you will recall. . . .  *[W]e believe that our mobile cap-ex-to-sales ratio will be below 10% by the year 2007, 2008.  So, I'm simply reiterating guidance on the back of excellent performance on part of our operating companies* . . . .  The bottom line though is that our belief is that because we are one company that we think we will have an advantage to the tune of 2.5 billion pounds annually, starting 2007, 2008. . . .  *It is a cash number and it is a significant number*.

63.    On 9/28/04, *The Times (London)* reported on Vodafone's investor/analyst conference:

Arun Sarin, chief executive of Vodafone, yesterday *sought to regain investor confidence* after the company's failed bid for AT&T Wireless by outlining cost cuts of £2.5 billion . . . .

Speaking at an investor conference ahead of the mobile giant's half-year results in November, *Mr. Sarin outlined a series of measures which he said would*

*boost annual pre-tax operating free cashflow by £2.5 billion by the end of March 2008.*

*        *        *

*The one-day conference was aimed at part in silencing critics who accused the group of a lack of visibility.*

*Since the company's abortive attempt to buy AT&T Wireless, the third largest mobile phone business in the US, Mr. Sarin has been on a City charm offensive, seeking to regain investor confidence in both him and the company.*

*During the summer he staged a series of one-to-one meetings with analysts and investors.*

64.     On 9/28/04, Deutsche Bank issued a report on Vodafone's investor/analyst day meeting, reflecting management's presentation:

**INVESTOR DAY – MANAGEMENT OPTIMISM**

*        *        *

*The only material incremental news was the unveiling of what management believes it can extract from the "One Vodafone" program – namely £2.5bn of FCF benefit through '07/08.*

*        *        *

- *. . . German management made an upbeat presentation. . . .*

65.     On 9/29/04, Investec issued a report on Vodafone's investor/analyst day meeting, reflecting management's presentation:

*Positive Tone on Margins and Re-iteration of Returns Guidance*

- *. . . Vodafone's presentation on Monday provided an **upbeat tone on margins, disclosure and re-iterated positive noises on shareholder returns ahead on November's interims. . . .***

- **One Vodafone Provides Confidence on Margins** Vodafone outlined further detail on its plans to further exploit its economies of scale. . . .  Vodafone stated that it could secure £2.5bn of incremental pre-tax operating cash flow by y/e March '08. This is to be achieved from £1.1bn of incremental revenue and £1.4bn of OpEx, CapEx and handset savings.  In terms of total OpEx and CapEx, Vodafone was therefore implying that March '04's total cost base of £11.5bn would be broadly flat until 2008. ***This creates positive margin sentiment and much wanted detail on the***

57

> *potential for Vodafone to exploit its scale advantage*. . . . *[T]he fact is that CEO Sarin – together with the majority of its country presentations during the day – was talking a positive tone on margins*.

66.     On 9/29/04, Sarin made a presentation to brokers, analysts, institutional investors and company managers at the Sanford C. Bernstein & Co. 1st Annual Pan European Strategic Decisions Conference 2004.  Sarin stated:

> *One, our business is performing well. . . .  The guidance remains very strong.  The reason to highlight that is as this year has come along many of our competitors aren't reporting results that are as robust as our results here.*

> \*          \*          \*

> *I want to reiterate the fact that we're very excited.  And again, the reason I highlight that is over the weekend there was some news about some of our competitors saying that they weren't quite as confident. . . .*

> . . . One Vodafone is basically the scale and scope benefits of our Company. As you know, we've acquired a number of companies over the last years.  The question is – what is the payback?  What difference does it really make to be as large and as global as we are?  *And we've quantified it for you.  £2.5b by the year 2007/2008 on an ongoing basis, annual on a cash flow basis*.

> \*          \*          \*

> *Margins in Germany are going to be up.  We're feeling more competition in Italy and I think we'll end up with flattish margins in Italy.  May I just remind you that the margins in Italy are in the low 50s, so we are quite high to begin with.*

> \*          \*          \*

> We have previously stated that our CapEx to sales ratio by the year 2007/2008 will be less than 10%.  *We're reiterating that guidance at this time*.

> \*          \*          \*

> *I'd just like to reiterate and say business is going well. . . .*

> \*          \*          \*

> QUESTION AND ANSWER

> \*          \*          \*

58

[ANALYST:] Some questions about your commitment to shareholder value. There's a lot of frustration with the performance of the stock price over the last several years. What priority does the stock price have to you? How do you intend to try and address people's concerns in that regard?

[SARIN:]    If I can take you back to the first chart here, I hoped you would see from the first chart that increasing shareholder value is the very, very important strategic goal for me, for the Company. *So we're obviously very interested in making sure that we can have a good share price*. . . .

As you can imagine, we don't set the share price on a daily basis. Yes, we are buying back some shares these days. *We are highly confident about the fact that we feel that these are very, very good value for us to buy back our shares and hence we are buying back our shares.*

\*      \*      \*

*Yes, we are buying back some shares these days. We are highly confident about the fact that we feel that these are very, very good value for us to buy back our shares and hence we are buying back our shares.*

67.    On 9/30/04, Sanford Bernstein issued a report on Vodafone based on the recent Vodafone/Sarin presentation:

**VOD: Insights from CEO presentation at Bernstein Conference.**

\*      \*      \*

- Mr. Sarin reiterated his confidence in Vodafone reducing capex-to-sales below 10% by March '08 (a controversial target).

68.    The statements issued between 6/10/04 and 9/29/04 were false and misleading when made. The statements were affirmatively false in misstating facts regarding Vodafone's business and finances. In addition, the statements were false and misleading in failing to disclose the following true facts – then known to or recklessly disregarded by defendants:

(a)    As detailed herein, Vodafone's F04 and 1stQ F05 financial statements and reports, as disseminated to the investing public, its shareholders and as filed with the SEC, were materially falsified and overstated, including a massive overstatement of its assets and its goodwill

59

(intangible assets) and shareholder equity, and its EBITDA and operating earnings were inflated due to the over-valuation of its German, Italian and Japanese operations;

(b)     Vodafone's Mannesmann (German) operations had not been successfully integrated into Vodafone's overall operations and were suffering from significant operational problems, inefficiencies and a lack of growth and profitability adequate to permit Vodafone to recover its investment in Mannesmann;

(c)     Vodafone's Italian operations were also substantially overvalued and suffering from operational problems, inefficiencies and a lack of growth adequate to permit Vodafone to recover its investment in that operation;

(d)     Contrary to Vodafone's representations that its Japanese operations could, would and were being turned around, in fact, Vodafone's Japanese operations were not only severely troubled but those problems were getting materially worse, which would require massive additional capital expenditures in an effort to salvage that business, or the sale of that business at a huge loss;

(e)     Vodafone's Japanese operations were materially overvalued on Vodafone's financial statements due to the failure to hold or gain sufficient market share so as to permit Vodafone to recover its investment in its Japanese operations;

(f)     Vodafone's worldwide scale of operations did not give it a competitive advantage; in fact, it placed Vodafone at a considerable competitive disadvantage, burdening it with excessive costs, infrastructure and bureaucracy, which inhibited the implementation of business decisions and strategies necessary for Vodafone to achieve the type of growth and success its executives were forecasting for it;

(g)     Vodafone's "One Vodafone" cost savings and operational efficiency initiative was not succeeding or achieving any significant cost savings and would not result in Vodafone

achieving anywhere near the £2.5 billion improvement (pre-tax) in cash flow by F07-F08, as was being forecast;

(h)      Vodafone knew from discussions and interactions with tax authorities in several countries that it would have to make multi-billion dollar cash tax payments beginning in F06 or F07, which would amount to over $1.5 billion per year, for several years, meaning that Vodafone could not possibly achieve the levels of cash flow being forecast for F07, F08 and beyond;

(i)      The large stock buy-back activities which defendants were causing Vodafone to implement were not being done because defendants actually believed that Vodafone's ordinary shares were undervalued, represented a good value or investment, or that such expenditures were a wise use of Vodafone's corporate resources; rather, such buy-backs were being engaged in by defendants to support and, if possible, artificially inflate Vodafone's stock price and assist key insiders in unloading large numbers of their Vodafone shares at inflated and, for them, highly profitable prices;

(j)      Contrary to defendants' representations, Vodafone's German and Italian operations were not succeeding in spite of increased and intensifying competition; in fact, to the contrary, those operations were faltering and losing ground to competitors, such that it was increasingly unlikely that Vodafone would ever be able to recover its investment in those operations; and

(k)      Due to the foregoing adverse factors which were negatively impacting Vodafone's operations and financial performance, defendants knew that the levels of financial performance being forecast for Vodafone for F06 and F07 would not and could not be achieved and that those forecasts were actually false when made.

69.     On 10/1/04, Vodafone issued a release stating:

CHANGE IN US GAAP ACCOUNTING FOR INTANGIBLE ASSETS – NO IMPACT ON VODAFONE'S RESULTS UNDER UK GAAP

On 29 September 2004 the Staff of the United States Securities and Exchange Commission ("SEC") announced new guidance in the interpretation of accounting principles generally accepted in the United States ("US GAAP") in relation to accounting for intangible assets.

**The new SEC guidance will not affect the presentation of Vodafone Group Plc's ("Vodafone") results or the carrying values of any assets under UK GAAP (or, in the future, under IFRS).**

70.     On 10/13/04, Vodafone issued the following release:

BOARD CHANGES AND NEW ORGANISATIONAL STRUCTURE AT VODAFONE

\*       \*       \*

Vodafone will simplify its existing regional structure with major countries and business areas reporting into the Chief Executive. All first line management functions in the Operating Companies will have a dual reporting line to the respective functions at Group level.

Arun Sarin, Chief Executive said: **"We are creating an organisation that is better positioned to respond to the high expectations of our customers. Faster execution will enable us to extend our lead within the mobile industry and deliver the benefits to customers, our employees and our shareholders."**

\*       \*       \*

Vodafone's operating company structure **will be streamlined to ensure effective and fast decision-making, enabling improved time to market across a number of business initiatives.** Consequently, the following operating companies and business areas will report directly into the Chief Executive:

\*       \*       \*

•       Germany . . . ;

•       Italy . . . ;

\*       \*       \*

•       . . . **Japan** . . . .

62

71.    On 11/10/04, Vodafone issued a release announcing the launch of its 3-G service:

**Global launch of Vodafone live! with 3G**

Vodafone today announces the global launch of Vodafone live! with 3G across an unrivalled 13 countries.  Vodafone live! with 3G will be available in Austria, France, Germany, Greece, Ireland, Italy, Japan, the Netherlands, Portugal, Spain, Switzerland and the UK.

- Extensive range of 10 new 3G handsets offering a wide choice for customers

*    *    *

Arun Sarin, Chief Executive, Vodafone, said:

"Today is an important day for Vodafone and the ***start of a new era in mobile communications***.

"Vodafone live! with 3G will dramatically change the way our customers experience their Vodafone services and ***we are confident that Vodafone live! with 3G will be a success***. . . .

***"Vodafone live! with 3G provides Vodafone with a new platform for profitable growth."***

*    *    *

**Handsets**

Vodafone will offer an initial, extensive range of 10 new 3G handsets for the Christmas period from Sharp, Motorola, Sony Ericsson, NEC, Nokia and Samsung. Seven of the handsets are exclusive to Vodafone and the range has been designed to offer a wide customer choice of high, mid and low tier priced 3G devices.  Seven handsets from this range will be available in Japan, with nine available in Europe.

Individual Vodafone operating companies have selected the most appropriate handsets for their local customer needs from this range.

The handsets have been designed in close collaboration with Vodafone's manufacturing partners to ensure easy to use service delivery with the now improved Vodafone live! portal.

Enhanced handset features now include:

- Better imaging capabilities: Europe's first 2 mega pixel camera phone

- Improved audio: stereo speakers, full track music download

63

- Expandable memory storage: 32MB provided as standard

    *      *      *

**Networks**

Core to the delivery of Vodafone live! with 3G are Vodafone's 3G networks. *Vodafone has invested significantly to ensure its customers have 3G services of the highest quality. Vodafone customers have seamless handover of voice and data services from 3G to 2G, ensuring high quality service delivery of Vodafone live! with 3G.*

Vodafone's strategy is to deploy 3G network coverage which delivers a *high quality service*. . . .

72.    On 11/16/04, Vodafone issued a release reporting its results for the six months ended

9/30/04, stating:

- Group operating profit, before goodwill amortisation and exceptional items, of £5.7 billion, with organic growth at constant exchange rates of 5%

- Earnings per share, before goodwill amortisation and exceptional items, increased by 10% to 5.28 pence.

    *      *      *

Arun Sarin, Chief Executive, commented:

*I am very pleased to present a robust set of half year results demonstrating a strong overall operational performance. . . . [W]e are excited about our growth opportunities and ability to leverage global scale and scope advantages.*

    *      *      *

Chief Executive's Statement

Our first half results demonstrate *a robust operational performance, which reflects Vodafone's industry leading position and a global footprint.*

    *      *      *

*We continue to be excited about the future growth opportunities for our businesses. . . . Our 3G launch . . . significantly improves our competitive position in Japan.*

    *      *      *

64

Another core focus of the Group *is to leverage our scale and scope advantage* through the One Vodafone programme.

\*     \*     \*

*Overall the business is performing well and on track with our expectations at the beginning of the year.  For the full year, we expect . . . free cash flow of around £7 billion.*

\*     \*     \*

Germany

*Vodafone is well positioned in the German mobile market . . . [and] is significantly ahead of the other two operators.  Profitability . . . has improved and Vodafone Germany's EBITDA margin represents the highest in the market.*

\*     \*     \*

Italy

\*     \*     \*

*The increasing customer base continued to be the main driver of service revenue growth,* with average customers for the period 9% higher than the comparative period.

\*     \*     \*

Japan

\*     \*     \*

*An ongoing transformation plan is expected to improve Vodafone Japan's performance and competitive position in the market.  This is focusing on cost reductions through leveraging the Group's global scale and scope. . . .  In most areas of the plan, positive results are expected in the next financial year, though good progress has been achieved in the consolidation of the regional structure and cost reductions.*

\*     \*     \*

One Vodafone

*The One Vodafone programme continues to make strong progress. . . .*

73. On 11/16/04, Vodafone held a conference call to discuss its interim six month results.

During this call, the following occurred:

65

[SARIN:]    . . . *[O]ur businesses are performing well*. . . .  [I]n *Japan* or in *Germany* or in *Italy* . . . *our businesses are performing well.  And it's on that basis that we are giving your guidance that we are reiterating this year's guidance for the rest of the year.*

The second thing that's exciting is that we have launched 3G. . . .  *[T]he product is good, the services are good, the content is good, the pricing is good, and frankly, we are feeling very good about the fact that it's out in the marketplace and it's doing well.*

*The third thing that's exciting is that we are making really good progress on our One Vodafone. . . .  [W]e are beginning to realize some of the benefits that we've talked to you about in the past.*

\*          \*          \*

*The bottom line is we are growing nicely.  Our margins are relatively stable, our businesses are performing well.*

If you then go to free cash flow . . . *[w]e're well on our way to producing the £7b.*

\*          \*          \*

*One Vodafone is an important program*. . . .  We have told you that by the year 2007/2008 we expect £2.5b in pre-tax cash flows on an annual benefit basis to be realized by the Group being one company.  *That's a big number.  We're going hard for it.  As you know, £1.4b of that is coming from capital expenditure, operating expenditure, hand sets, those kinds of cost issues.  And £1.1b is coming from revenue and market share.*

\*          \*          \*

[HYDON]:    . . . *[O]ur financial results show good operational growth, and a healthy financial position.*

\*          \*          \*

Before I finish, I'd just like to provide you with a brief update on our transition to International Finance Reporting Standards.  This project continues to go well.  Further to the IFRS update we provided at our recent investor day, *I can confirm that our existing UK GAAP goodwill balances will be the same under IFRS as they are under UK GAAP*. . . .

\*          \*          \*

[HORN-SMITH:]        . . . *This has been a good operational performance during the first half.*

66