\*     \*     \*

*Costs in our German mobile business continued to be managed very diligently. . . .*

*. . . This strong control over cost and drive for efficiency has delivered a continued uplift in EBITDA margin, which now stands at nearly 47%. Germany has turned in a very solid performance during the first half, and is poised for continued growth and improvement in margin year-on-year.*

Now to Italy. *Our Italian business has continued to perform well in all key areas.*

\*     \*     \*

[SARIN:]        . . . You've now heard the story of Vodafone in the last 6 months. I'm here to tell you a little bit about the outlook, where we're going from here and what does next year look like.

*. . . So on revenue growth we're in the high single digits, on EBITDA margins we're broadly stable. . . and on free cash flow we're around £7b.*

\*     \*     \*

*So fundamentally we're growing in the high single digits. . . .*

\*     \*     \*

*. . . One Vodafone is doing well. We've reorganized the Company so that we can provide more organizational efficiency and direct line of sight to the customer.*

\*     \*     \*

[HYDON:]        . . . Do we have a provision in the balance sheet for tax payable on a dividend from Italy? No, we don't.

Is there a tax payable on a dividend from Italy? In principle, yes. *We've got a lot of very clever tax people in the tax area in Vodafone, so they'll be working hard to optimize the situation. And so today it's impossible to say how much that tax might be, not only for the reason that we're working on it but also no one has declared a dividend yet, no one has asked for a dividend. . . . So that's not predictable really today.*

74.        On 11/16/04, Deutsche Bank issued a report on Vodafone, stating:

*Vodafone reported a solid set of H1 04/05 results.*

67

\*     \*     \*

**Guidance:** . . . *Guidance for 2005/06 is slightly ahead of consensus at high single digit revenue growth (consensus is at c5%) with margins to remain flat (we had forecast a 10 bps reduction in margin).*

**Summary:** *a solid set of numbers, we have gained comfort from the company's guidance. . . .*

75.     The statements issued between 10/1/04 and 11/16/04 were false and misleading when made.  The statements were affirmatively false in misstating facts regarding Vodafone's business and finances.   In addition, the statements were false and misleading in failing to disclose the following true facts – then known to or recklessly disregarded by defendants:

(a)     As detailed herein, Vodafone's F04 and 1stQ and 2ndQ F05 financial statements and reports, as disseminated to the investing public, its shareholders and as filed with the SEC, were materially falsified and overstated, including a massive overstatement of its assets and its goodwill (intangible assets) and shareholder equity, and its EBITDA and operating earnings were inflated due to the over-valuation of its German, Italian and Japanese operations;

(b)     Vodafone's Mannesmann (German) operations had not been successfully integrated into Vodafone's overall operations and were suffering from significant operational problems, inefficiencies and a lack of growth and profitability adequate to permit Vodafone to recover its investment in Mannesmann;

(c)     Vodafone's Italian operations were also substantially overvalued and suffering from operational problems, inefficiencies and a lack of growth adequate to permit Vodafone to recover its investment in that operation;

(d)     Contrary to Vodafone's representations that its Japanese operations could, would and were being turned around, in fact, Vodafone's Japanese operations were not only severely

troubled but those problems were getting materially worse, which would require massive additional capital expenditures in an effort to salvage that business, or the sale of that business at a huge loss;

(e)  Vodafone's Japanese operations were materially overvalued on Vodafone's financial statements due to the failure to hold or gain sufficient market share so as to permit Vodafone to recover its investment in its Japanese operations;

(f)  Vodafone's introduction of 3-G service and products was a failure in Japan, where the level of service was defective and far worse than that of competitors, which, combined with the extremely poor quality and functionality of Vodafone's new 3-G handsets, was leading to increased customer dissatisfaction and rejection of Vodafone's service in Japan and a lack of adequate market share and growth in that operation sufficient to justify Vodafone ever recapturing its investment in its Japanese operation;

(g)  Vodafone's worldwide scale of operations did not give it a competitive advantage; in fact, it placed Vodafone at a considerable competitive disadvantage, burdening it with excessive costs, infrastructure and bureaucracy, which inhibited the implementation of business decisions and strategies necessary for Vodafone to achieve the type of growth and success its executives were forecasting for it;

(h)  Vodafone's "One Vodafone" cost savings and operational efficiency initiative was not succeeding or achieving any significant cost savings and would not result in Vodafone achieving anywhere near the £2.5 billion improvement (pre-tax) in cash flow by F07-F08, as was being forecast;

(i)  Vodafone knew from discussions and interactions with tax authorities in several countries that it would have to make multi-billion dollar cash tax payments beginning in F06

69

or F07, which would amount to over $1.5 billion per year, for several years, meaning that Vodafone could not possibly achieve the levels of cash flow being forecast for F07, F08 and beyond;

(j)    Vodafone's top management was in a state of dissention and disarray, virtually paralyzed by bitter in-fighting between Gent, Sarin, MacLaurin and others, such that business and strategic decisions were being deferred or not properly or promptly implemented, which was hurting Vodafone's business;

(k)    The large stock buy-back activities which defendants were causing Vodafone to implement were not being done because defendants actually believed that Vodafone's ordinary shares were undervalued, represented a good value or investment, or that such expenditures were a wise use of Vodafone's corporate resources; rather, such buy-backs were being engaged in by defendants to support and, if possible, artificially inflate Vodafone's stock price and assist key insiders in unloading large numbers of their Vodafone shares at inflated and, for them, highly profitable prices;

(l)    Contrary to defendants' representations, Vodafone's German and Italian operations were not succeeding in spite of increased and intensifying competition; in fact, to the contrary, those operations were faltering and losing ground to competitors, such that it was increasingly unlikely that Vodafone would ever be able to recover its investment in those operations; and

(m)    Due to the foregoing adverse factors which were negatively impacting Vodafone's operations and financial performance, defendants knew that the levels of financial performance being forecast for Vodafone for F06 and F07 would not and could not be achieved and that those forecasts were actually false when made.

70

76. On 1/20/05, Vodafone issued a release stating:

UPDATE ON ADOPTION OF INTERNATIONAL
FINANCIAL REPORTING STANDARDS

Vodafone Group Plc ("Vodafone") is preparing for the adoption of International Financial Reporting Standards ("IFRS") as its primary accounting basis for the year ending 31 March 2006. . . .

Vodafone will report under UK Generally Accepted Accounting Practice ("UK GAAP") for the year ending 31 March 2005, and will subsequently present this financial information in accordance with IFRS.

\*        \*        \*

Ken Hydon, Financial Director, commented:

*"The financial information provided today shows how IFRS impacts on Vodafone's recent results in advance of its adoption in the next financial year. The most significant change is that Vodafone will no longer amortise goodwill, resulting in a clearer presentation of underlying business performance.*

\*        \*        \*

a)        Goodwill and acquired intangible asset amortisation

IAS 38, "Intangible Assets" requires that goodwill is not amortised.  Instead it is subject to an annual impairment review.  As the Group has elected not to apply IFRS 3 retrospectively to business combinations prior to the opening balance sheet date under IFRS, the UK GAAP goodwill balance at 31 March 2004 (£96,931m) has been included in the opening IFRS consolidated balance sheet and is no longer amortised.

\*        \*        \*

*IFRS 1 requires that an impairment review of goodwill be conducted in accordance with IAS 36, "Impairment of Assets" at the date of transition irrespective of whether an indication exists that goodwill may be impaired.  No impairments were necessary as at 1 April 2004 following the review carried out in accordance with this standard.*

77. On 1/20/05, Vodafone held a conference call for analysts to discuss the impact of

IFRS:

Ken [Hydon:]  Hello everyone, good afternoon.  And thank you for joining this call.  With me today is Robbie Barr, the Group Financial Controller and Paul Stevenson, the Director of Financial Reporting. . . .  It's now only ten weeks before the Group's primary reporting moves to IFRS. . . .  Robbie Barr will highlight certain

71

important features of the transition to IFRS, particularly . . . the key impacts on the financial statements. . . . I will then take you through our IFRS outlook statements which should leave us with plenty of time for questions.

*     *     *

Operator:     The next question comes from Mr. Paul Howard, please state your company name followed by your question.

Paul:     Uh, thank you.  Paul Howard at Cosmo.  Uh, two questions.  Just going forward uh, **you're obviously carrying still a large intangible asset base.  Is there any change to the methodology about impairment tax going forward under IFRS, anything we should think about in that respect?**  Uh and then secondly, uh, I note that the adjustment for current deferred tax in the half-year ending September, actually you gave your positive contribution compared to the usual negative contribution in the year before.  Is that what we should expect for the full year March '05 before we see this sort of half to one percent increase uh in effective tax rates going forward?

Unknown:     Thank you, Paul.  What Robbie thinks about the deferred tax.  The short answer to our question on impairment reviews and the methodology by which the carrying value of good will is assessed.  They're unchanged between uh UK GAAP and IFRS.  **So, we bring forward the UK GAAP good will figures into our IFRS balance sheet and the impairment review is conducted in just the same way as it has been in the past.**

*     *     *

Unknown:     So, Robbie would like you to verify deferred tax?

Robbie:     Uh, in deferred tax, you're right.  We have got a large deferred tax balance.  Some of that will reverse as we go forward in relation to, some of it relates to uh issues that we have with, in jurisdictions in terms of the timing it takes us for to [sic] resolve our tax issues **and we'll unwind in due course. . . . [O]ff the top of my head, you know, can't give you a split on, you know, how much of that we can say will be indefinitely carried forward, how much will be split or give you an accurate timing on that.  It is very difficult to predict the exact timing of uh tax unwinds given the, it depends on tax authorities and also depends on future capital expenditure plans.**

78.     The statements issued on 1/20/05 were false and misleading when made.  The statements were affirmatively false in misstating facts regarding Vodafone's business and finances.  In addition, the statements were false and misleading in failing to disclose the following true facts – then known to or recklessly disregarded by defendants:

72

(a)      As detailed herein, Vodafone's F04 and interim F05 financial statements and reports, as disseminated to the investing public, its shareholders and as filed with the SEC, were materially falsified and overstated, including a massive overstatement of its assets and its goodwill (intangible assets) and shareholder equity, and its EBITDA and operating earnings were inflated due to the over-valuation of its German, Italian and Japanese operations;

(b)      Vodafone's Mannesmann (German) operations had not been successfully integrated into Vodafone's overall operations and were suffering from significant operational problems, inefficiencies and a lack of growth and profitability adequate to permit Vodafone to recover its investment in Mannesmann;

(c)      Vodafone's Italian operations were also substantially overvalued and suffering from operational problems, inefficiencies and a lack of adequate growth to permit Vodafone to recover its investment in that operation;

(d)      Contrary to Vodafone's representations that its Japanese operations could, would and were being turned around, in fact, Vodafone's Japanese operations were not only severely troubled but those problems were getting materially worse, which would require massive additional capital expenditures in an effort to salvage that business, or the sale of that business at a huge loss;

(e)      Vodafone's Japanese operations were materially overvalued on Vodafone's financial statements due to the failure to hold or gain sufficient market share so as to permit Vodafone to recover its investment in its Japanese operations;

(f)      Vodafone's introduction of 3-G service and products was a failure in Japan where the level of service was defective and far worse than that of competitors, which, combined with the extremely poor quality and functionality of Vodafone's new 3-G handsets, was leading to increased customer dissatisfaction and rejection of Vodafone's service in Japan and a lack of

73

adequate market share and growth in that operation sufficient to justify Vodafone ever recapturing its investment in its Japanese operation;

(g)    Vodafone's worldwide scale of operations did not give it a competitive advantage; in fact, it placed Vodafone at a considerable competitive disadvantage, burdening it with excessive costs, infrastructure and bureaucracy which inhibited the implementation of business decisions and strategies necessary for Vodafone to achieve the type of growth and success its executives were forecasting for it;

(h)    Vodafone's "One Vodafone" cost savings and operational efficiency initiative was not succeeding or achieving any significant cost savings and would not result in Vodafone achieving anywhere near the £2.5 billion improvement (pre-tax) in cash flow by F07-F08, as was being forecast;

(i)    Vodafone knew from discussions and interactions with tax authorities in several countries that it would have to make multi-billion dollar cash tax payments beginning in F06 or F07, which would amount to over $1.5 billion per year, for several years, meaning that Vodafone could not possibly achieve the levels of cash flow being forecast for F07, F08 and beyond;

(j)    Vodafone's top management was in a state of dissention and disarray, virtually paralyzed by bitter in-fighting between Gent, Sarin, MacLaurin and others, such that business and strategic decisions were being deferred or not properly or promptly implemented, which was hurting Vodafone's business;

(k)    The large stock buy-back activities which defendants were causing Vodafone to implement were not being done because defendants actually believed that Vodafone's ordinary shares were undervalued, represented a good value or investment, or that such expenditures were a wise use of Vodafone's corporate resources; rather, such buy-backs were being engaged in by

defendants to support and, if possible, artificially inflate Vodafone's stock price and assist key insiders in unloading large numbers of their Vodafone shares at inflated and, for them, highly profitable prices;

(l)    Contrary to defendants' representations, Vodafone's German and Italian operations were not succeeding in spite of increased and intensifying competition; in fact, to the contrary, those operations were faltering and losing ground to competitors, such that it was increasingly unlikely that Vodafone would ever be able to recover its investment in those operations; and

(m)    Due to the foregoing adverse factors which were negatively impacting Vodafone's operations and financial performance, defendants knew that the levels of financial performance being forecast for Vodafone for F06 and F07 would not and could not be achieved and that those forecasts were actually false when made.

79.    On 1/25/05, Vodafone issued the following release:

VODAFONE REACHES 150 MILLION CUSTOMERS –
STRONGEST QUARTER SINCE DECEMBER 2000

*        *        *

Arun Sarin, Chief Executive of Vodafone, commented:

"I am very pleased to announce another impressive quarter for customer and revenue growth. ***We have seen consistently strong performance across Europe***. . . .

*        *        *

Germany

Net customer additions of 843,000 demonstrated continued strong growth in Germany and resulted in a closing base of 26.9 million customers, with churn remaining stable compared to the previous quarter. . . .

*        *        *

***Strong customer growth*** was the primary driver behind a 6% increase in service revenue for the quarter compared to the same quarter last year.

75

\*      \*      \*

Italy

    Proportionate net customer additions were 359,000 in the quarter, leading to a total proportionate customer base of over 17 million. . . .

    Service revenue for the quarter increased 8% compared to the same period last year. . . .

    Net acquisition and retention costs as a percentage of service revenue in the quarter were higher than the same period last year, reflecting the increase in competitive activity in the Italian market. ***However, these costs remain at very low levels when compared to the rest of the Group.***

\*      \*      \*

Japan

\*      \*      \*

***The Group will continue to focus on executing a successful turnaround programme in Japan throughout 2005 and into 2006.***

80.    On 1/26/05, Morgan Stanley issued a report on Vodafone:

Top Line Momentum Intact

    Quick Comment:  Vodafone's 3Q05 KPI's surpised [sic] positively with stronger than expected subscriber growth across all markets, and better than expected ARPU readings in most markets.

\*      \*      \*

    We believe these numbers should provide the impetus for Vodafone to outperform over the coming months, as they can alleviate the market's concerns regarding Vodafone's competitive positioning.

\*      \*      \*

**Strong performance in continental Europe . . .**

    The general trend of strong subscriber growth and stable ARPUs translated to positive service revenue trends in all the major markets.  Subscriber growth surprised on the upside virtually across the board. . . .

- **Germany – solid fundamentals. . . .**

- **Italy – Competitive impact not yet felt.**

81.     On 3/10/05, Deutsche Bank issued a report on Vodafone based on discussions with the new CFO of Vodafone, defendant Halford:

> We met with the new **CFO of Vodafone** (Andy Halford) and CEO Arun Sarin. . . .  Vodafone's management **appeared up beat**. . . .

- Vodafone's management stated that the business is performing well. . . .

*        *        *

- **Japan.**  Management stated that it was 10 months into its 18-24 month turnaround which it **believes should be complete by May '06 and is expected to be evidenced both by greater market competitiveness (net additions market share) as well as improved margins.**

82.     On 3/11/05, Morgan Stanley issued a report on Vodafone based on meeting with Vodafone's CFO Halford and CEO Sarin:

*An Encouraging Meeting with Vodafone*

> **Quick Comment:**  We attended a meeting with Vodafone CEO Arun Sarin and incoming CFO Andy Halford yesterday. . . .

> We think that over the next 12-18 months, the market will be surprised by Vodafone's ability to sustain revenue growth in the range of 5%-8% without materially depressing OpFCF margins or returns on capital. . . .  **We found the meeting encouraging overall**.

*        *        *

**Japan: We are in month 10 of 24 month turnaround process**

> Japan will remain the main drag within Vodafone's portfolio of operations in the near term, we believe.  **Outdoor coverage and handsets were identified by management as the main challenges facing the company.  Management expects to have addressed this coverage issue completely within the next ten months.**

83.     On 3/11/05, Investec issued a report on Vodafone based on a meeting with CFO Halford and CEO Sarin:

Reassuring Meeting with New FD

- **Overview  *Yesterday we had a reassuring meeting with the new Group FD Andy Halford.  The meeting was with other sell-side analysts and was also attended by CEO Arun Sarin***.

77

\*        \*        \*

- **March '06 Guidance**  As expected, **there was no change to the preliminary '06 guidance given in November.**

84.    The statements issued between 1/25/05 and 3/11/05 were false and misleading when made.  The statements were affirmatively false in misstating facts regarding Vodafone's business and finances.   In addition, the statements were false and misleading in failing to disclose the following true facts – then known to or recklessly disregarded by defendants:

(a)    As detailed herein, Vodafone's F04 and interim F05 financial statements and reports, as disseminated to the investing public, its shareholders and as filed with the SEC, were materially falsified and overstated, including a massive overstatement of its assets and its goodwill (intangible assets) and shareholder equity, and its EBITDA and operating earnings were inflated due to the over-valuation of its German, Italian and Japanese operations;

(b)    Vodafone's Mannesmann (German) operations had not been successfully integrated into Vodafone's overall operations and were suffering from significant operational problems, inefficiencies and a lack of growth and profitability adequate to permit Vodafone to recover its investment in Mannesmann;

(c)    Vodafone's Italian operations were also substantially overvalued and suffering from operational problems, inefficiencies and a lack of growth adequate to permit Vodafone to recover its investment in that operation;

(d)    Contrary to Vodafone's representations that its Japanese operations could, would and were being turned around, in fact, Vodafone's Japanese operations were not only severely troubled but those problems were getting materially worse, which would require massive additional capital expenditures in an effort to salvage that business, or the sale of that business at a huge loss;

(e)     Vodafone's Japanese operations were materially overvalued on Vodafone's financial statements due to the failure to hold or gain sufficient market share so as to permit Vodafone to recover its investment in its Japanese operations;

(f)     Vodafone's introduction of 3-G service and products was a failure in Japan where the level of service was defective and far worse than that of competitors, which, combined with the extremely poor quality and functionality of Vodafone's new 3-G handsets, was leading to increased customer dissatisfaction and rejection of Vodafone's service in Japan and a lack of adequate market share and growth in that operation sufficient to justify Vodafone ever recapturing its investment in its Japanese operation;

(g)     Vodafone's worldwide scale of operations did not give it a competitive advantage; in fact, it placed Vodafone at a considerable competitive disadvantage, burdening it with excessive costs, infrastructure and bureaucracy, which inhibited the implementation of business decisions and strategies necessary for Vodafone to achieve the type of growth and success its executives were forecasting for it;

(h)     Vodafone's "One Vodafone" cost savings and operational efficiency initiative was not succeeding or achieving any significant cost savings and would not result in Vodafone achieving anywhere near the £2.5 billion improvement (pre-tax) in cash flow by F07-F08, as was being forecast;

(i)     Vodafone knew from discussions and interactions with tax authorities in several countries that it would have to make multi-billion dollar cash tax payments beginning in F06 or F07, which would amount to over $1.5 billion per year, for several years, meaning that Vodafone could not possibly achieve the levels of cash flow being forecast for F07, F08 and beyond;

(j)    Vodafone's top management was in a state of dissention and disarray, virtually paralyzed by bitter in-fighting between Gent, Sarin, MacLaurin and others, such that business and strategic decisions were being deferred or not properly or promptly implemented, which was hurting Vodafone's business;

(k)    The large stock buy-back activities which defendants were causing Vodafone to implement were not being done because defendants actually believed that Vodafone's ordinary shares were undervalued, represented a good value or investment, or that such expenditures were a wise use of Vodafone's corporate resources; rather, such buy-backs were being engaged in by defendants to support and, if possible, artificially inflate Vodafone's stock price and assist key insiders in unloading large numbers of their Vodafone shares at inflated and, for them, highly profitable prices;

(l)    Contrary to defendants' representations, Vodafone's German and Italian operations were not succeeding in spite of increased and intensifying competition; in fact, to the contrary, those operations were faltering and losing ground to competitors, such that it was increasingly unlikely that Vodafone would ever be able to recover its investment in those operations; and

(m)    Due to the foregoing adverse factors which were negatively impacting Vodafone's operations and financial performance, defendants knew that the levels of financial performance being forecast for Vodafone for F06 and F07 would not and could not be achieved and that those forecasts were actually false when made.

85.    On 5/24/05, Vodafone issued a release regarding its results for the year ended 3/31/05:

Vodafone today announces preliminary results for the year ended 31 March 2005, *which meet or exceed stated targets for the Group's global operations across every metric.  The highlights of the results are:*

Strong financial performance:

*     *     *

- *Earnings per share, before goodwill amortisation and exceptional items, increased by 14% to 10.41 pence.*

*     *     *

Arun Sarin, Chief Executive, commented:

*These strong results highlight both our operational and financial strength. We have met or exceeded all of our stated targets and significantly increased returns to shareholders.  Whilst competitive pressures are increasing, there is clear evidence that our global scale and scope is enabling us to deliver innovative customer propositions and to produce superior results.*

Chief Executive's Statement

*Vodafone Group has posted a strong set of annual results, highlighting both operational and financial strength.  I am pleased to report that the Group met or exceeded our stated targets on every metric.*

*     *     *

In our core European *markets, good performances were also recorded by Italy and Germany. . . despite a very competitive backdrop.*

*     *     *

*We are on track to derive significant benefits from the "One Vodafone" programme and to deliver £2.5 billion additional pre-tax operating free cash flow by the 2008 financial year.*

*     *     *

GROUP RESULTS

*     *     *

Before goodwill amortisation and exceptional items, total Group operating profit increased by 1% to £10,904 million, with underlying organic growth of 5%, broadly in line with the growth in turnover.

*     *     *

GERMANY

\*        \*        \*

*Vodafone has built on its strong position in the German mobile market following the successful launch of 3G services.  The EBITDA margin improved compared to the previous year and continues to represent the highest of all mobile network operators.*

A 9% growth in the average customer base compared to the prior year was the main driver of the 5% increase in service revenue in local currency.  *Customer growth was strong* . . . .

\*        \*        \*

ITALY

\*        \*        \*

*Vodafone continued to perform robustly in Italy . . . .*

86.    On 5/24/05, Vodafone held a conference call for analysts and investors to discuss its

3/31/05 year-end results:

[SARIN:] . . . *[W]e have produced very strong operational and financial performance in the last year. . . .  The thing that is most pleasing is that here in Europe we are outperforming our competitors.*

The second thing that is exciting about our business is that we are creating a platform for growth in the future. . . .  *And we have One Vodafone embedded in our business. Both of these things will position us well for the future*.

\*        \*        \*

*In Germany, we outperformed T-Mobile by 1.6%.  In Italy, we grew faster than TIM, and increased our relative share by 1.5%.*

\*        \*        \*

Turning to EBITDA and EBITDA margin performance, again, we performed well against our peer group.  In our major markets, *margins were up in Germany [and] in Italy* . . . .

\*        \*        \*

*In our view, the out-performance is because of our global scale and scope finally showing through.*

82

\*      \*      \*

*One Vodafone.   We are progressing well. . . .   This year we are implementing on our plans and we have got limited benefits flowing through our financial statements.   Next year we will deliver more benefits and more improvements.  And by '07/'08, we will deliver the annual targets that we have set, which was £2.5b pre-tax cash flow improvement because of One Vodafone.*

\*      \*      \*

*Moving onto Japan . . . .   Last year we made progress by launching 3G, strengthening management [and] controlling costs . . . .*

\*      \*      \*

*Japan is fundamentally a good business.*

\*      \*      \*

*[HALFORD:]* **Let me start with Vodafone Germany, which had a very successful year, consistently taking good market share of customer net addition.**

\*      \*      \*

**In total, Vodafone Germany increased its share of mobile market revenues by 1.6% against the principle competitor.  This strong growth did not come at the expense of profitability.  Operating expenses and combined customer acquisition and retention costs were both lower as a percentage of revenue.  This resulted in an increase in EBITDA margin of 1.4%, and importantly we now have the largest share of the EBITDA in the market again.**

**Now over to the Italian market, which became increasingly competitive during the year with the continued impact of Hutchison.  Our core strategy of targeted promotional and seasonal campaigns and focused customer retention initiatives continues to prove successful and has been a good driver of both usage and customer growth.**

\*      \*      \*

**We saw no impact from regulated price cuts during the year, but do anticipate a 16% termination rate reduction this summer.**

\*      \*      \*

**Now I would like to focus on our One Vodafone initiative . . . .**

\*      \*      \*

83

*I confirm that by 2007/8, we are on track to deliver . . . mobile capital intensity under 10%.*

\*        \*        \*

[SARIN:]        I would like to summarize by saying that . . . *[y]ou can expect from us continued out-performance versus our competition here in Europe.*

87.        On 5/24/05, *The Financial Times* and FT.com reported:

The company said it now expected revenue growth of 6-9 per cent, down from "high single digits" and said margins would be flat or down 1 percentage point. It said margins would be "broadly stable".

Arun Sarin, chief executive, said the change in guidance *"reflects a more competitive backdrop" but he insisted the change was made only to give management more flexibility to compete in key markets: Japan, Germany, Italy and the UK.*

88.        On 5/26/05, Deutsche Bank issued a report on Vodafone reporting on a meeting with Sarin and Halford:

We met with Arun Sarin (CEO) and Andy Halford (CFO) of Vodafone. The major points from the meeting were:

\*        \*        \*

–        *Italy is going well given the high margins . . . .*

        *. . . Germany (stable with O2 gaining share from TMOB)*

–        *The cost reduction program appears to be progressing well . . . .*

89.        In 6/05, Vodafone issued its 2005 Annual Report. The 2005 Annual Report contained a letter from defendant MacLaurin, stating:

It is my pleasure to report another year of achievement for your company . . . .

        *. . . I believe we have made significant progress, particularly with the consumer launch of 3G and the ongoing implementation of our One Vodafone programme.*

\*        \*        \*

84

In October, the merger of Vodafone Holdings K.K. and Vodafone K.K. in Japan was completed following our successful tender offer to increase our shareholdings in both companies. ***This clearly demonstrates our long-term commitment to the strategically important mobile market in Japan***. The merger has created a simplified company structure which has already contributed towards greater operational effectiveness and financial efficiencies and, although the business is currently not performing as well as we would wish, ***I am confident that, in time, our investment will prove to be very rewarding***.

90.     The 2005 Annual Report contained a letter from CEO Sarin, stating:

> ***This has been another successful year for Vodafone.***
>
> *        *        *
>
> Our results are built on the base ***of a strong overall Group operational performance that has delivered on all our key targets.***
>
> *        *        *
>
> ***Our operating performance in Europe remains robust. . . .***
>
> ***We face challenges in Japan, where we are half way through a two year plan to turnaround our business. This plan has three main objectives: to improve the attractiveness of 3G handsets and content in that market, to increase the effectiveness of our distribution channels and to improve the coverage of our 3G network.***
>
> ***Japan remains a strategically important mobile market for us and is a significant profit generator for the Group, contributing £0.8 billion of operating profit before goodwill amortisation in the last year. However, the pace of change and advanced state of 3G there requires additional focus to improve our competitive position. . . . [W]e have strengthened the management team and remain focused on a successful execution of our recovery plan.***
>
> As we look forward, we see both greater opportunities and greater challenges. . . . ***[P]enetration levels in many of our markets are now reaching saturation and competition is intensifying through existing network operators and the introduction of many more low cost operators and resellers. . . . We are also seeing continued regulatory led termination rate reductions.***
>
> ***In this environment, we see winners and losers. We believe Vodafone is uniquely positioned to succeed through our scale and scope. . . .***
>
> *        *        *
>
> Another key goal is to deliver fully the benefits of our scale and scope. As the Group has expanded over the past few years, we have been able to achieve some

significant scale benefits. . . . ***The One Vodafone programme builds on this to further integrate our businesses and create sustainable competitive advantage.***

\*    \*    \*

During the year to March 2005, we have established objectives, plans and the supporting organisation to deliver on our programme. ***Whilst we are in the early stages, some initiatives are more advanced than others***.

\*    \*    \*

***For the year ahead, our focus will be on implementing our plans and beginning to deliver improvements. The net benefit to us in the short term will be limited as we will incur costs in centralising certain activities. The first substantial benefits are expected in the year to March 2007, with the programme fully up and running in the year to March 2008.***

\*    \*    \*

***The One Vodafone programme is targeted to deliver £2.5 billion of incremental pre-tax operating free cash flow improvements in the year ending March 2008.***

\*    \*    \*

**Outlook**

*For the year ahead . . . [f]ree cash flow is anticipated to be in the £6.5 billion to £7 billion range. . . .*

91.    The 2005 Annual Report stated:

**Goodwill and intangible assets**

\*    \*    \*

At 31 March 2005, intangible assets, including goodwill attributable to the acquisition of interests in associated undertakings, amounted to £99,718 million. . . .

92.    The 2005 Annual Report indicated that Vodafone had recorded an impairment of the carrying value of goodwill relating to Vodafone Sweden of £315 million. No impairment was recorded for impaired goodwill in other countries, including Germany.

93.    Vodafone's 2005 Annual Report also contained the following certifications required by Sarbanes Oxley:

86

RULE 13a-14(a) CERTIFICATION

I, Arun Sarin, certify that:

1.      I have reviewed this annual report on Form 20-F of Vodafone Group Plc (the "Company");

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.      The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

        (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

        (b)      Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        (c)      Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.      The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

        (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarise and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: June 8, 2005
/s/ Arun Sarin
Arun Sarin
Chief Executive

*        *        *

RULE 13a-14(b) CERTIFICATION

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), the undersigned officer of Vodafone Group Plc, a company incorporated under the laws of England and Wales (the "Company"), hereby certifies, to such officer's knowledge, that:

The Annual Report on Form 20-F for the year ended March 31, 2005 (the "Report") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: June 8, 2005
/s/ Arun Sarin
Arun Sarin
Chief Executive

*        *        *

RULE 13a-14(a) CERTIFICATION

I, Kenneth J. Hydon, certify that:

1.    I have reviewed this annual report on Form 20-F of Vodafone Group Plc (the "Company");

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.    The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b)    Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)    Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.    The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarise and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: June 8, 2005
/s/ Kenneth J. Hydon
Kenneth J. Hydon
Financial Director

*        *        *

RULE 13a-14(b) CERTIFICATION

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), the undersigned officer of Vodafone Group Plc, a company incorporated under the laws of England and Wales (the "Company"), hereby certifies, to such officer's knowledge, that:

89

The Annual Report on Form 20-F for the year ended March 31, 2005 (the "Report") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: June 8, 2005
/s/ Kenneth J. Hydon
Kenneth J. Hydon
Financial Director

94.    The statements issued between 5/24/05 and 6/8/05 were false and misleading when made. The statements were affirmatively false in misstating facts regarding Vodafone's business and finances. In addition, the statements were false and misleading in failing to disclose the following true facts – then known to or recklessly disregarded by defendants:

(a)    As detailed herein, Vodafone's F04 and F05 financial statements and reports, as disseminated to the investing public, its shareholders and as filed with the SEC, were materially falsified and overstated, including a massive overstatement of its assets and its goodwill (intangible assets) and shareholder equity, and its EBITDA and operating earnings were inflated due to the over-valuation of its German, Italian and Japanese operations;

(b)    Vodafone's Mannesmann (German) operations had not been successfully integrated into Vodafone's overall operations and were suffering from significant operational problems, inefficiencies and a lack of growth and profitability adequate to permit Vodafone to recover its investment in Mannesmann;

(c)    Vodafone's Italian operations were also substantially overvalued and suffering from operational problems, inefficiencies and a lack of growth adequate to permit Vodafone to recover its investment in that operation;

(d)    Contrary to Vodafone's representations that its Japanese operations could, would and were being turned around, in fact, Vodafone's Japanese operations were not only severely

90

troubled but those problems were getting materially worse, which would require massive additional capital expenditures in an effort to salvage that business, or the sale of that business at a huge loss;

(e)    Vodafone's Japanese operations were materially overvalued on Vodafone's financial statements due to the failure to hold or gain sufficient market share so as to permit Vodafone to recover its investment in its Japanese operations;

(f)    Vodafone's introduction of 3-G service and products was a failure in Japan, where the level of service was defective and far worse than that of competitors, which, combined with extremely poor quality and functionality of Vodafone's new 3-G handsets, was leading to increased customer dissatisfaction and rejection of Vodafone's service in Japan and a lack of adequate market share and growth in that operation sufficient to justify Vodafone ever recapturing its investment in its Japanese operation;

(g)    Vodafone's worldwide scale of operations did not give it a competitive advantage; in fact, it placed Vodafone at a considerable competitive disadvantage, burdening it with excessive costs, infrastructure and bureaucracy, which inhibited the implementation of business decisions and strategies necessary for Vodafone to achieve the type of growth and success its executives were forecasting for it;

(h)    Vodafone's "One Vodafone" cost savings and operational efficiency initiative was not succeeding or achieving any significant cost savings and would not result in Vodafone achieving anywhere near the £2.5 billion improvement (pre-tax) in cash flow by F07-F08, as was being forecast;

(i)    Vodafone knew from discussions and interactions with tax authorities in several countries that it would have to make multi-billion dollar cash tax payments beginning in F06

or F07, which would amount to over $1.5 billion per year, for several years, meaning that Vodafone could not possibly achieve the levels of cash flow being forecast for F07, F08 and beyond;

(j)     Vodafone's top management was in a state of dissention and disarray, virtually paralyzed by bitter in-fighting between Gent, Sarin, MacLaurin and others, such that business and strategic decisions were being deferred or not properly or promptly implemented, which was hurting Vodafone's business;

(k)     The large stock buy-back activities which defendants were causing Vodafone to implement were not being done because defendants actually believed that Vodafone's ordinary shares were undervalued, represented a good value or investment, or that such expenditures were a wise use of Vodafone's corporate resources; rather, such buy-backs were being engaged in by defendants to support and, if possible, artificially inflate Vodafone's stock price and assist key insiders in unloading large numbers of their Vodafone shares at inflated and, for them, highly profitable prices;

(l)     Contrary to defendants' representations, Vodafone's German and Italian operations were not succeeding in spite of increased and intensifying competition; in fact, to the contrary, those operations were faltering and losing ground to competitors, such that it was increasingly unlikely that Vodafone would ever be able to recover its investment in those operations; and

(m)     Due to the foregoing adverse factors which were negatively impacting Vodafone's operations and financial performance, defendants knew that the levels of financial performance being forecast for Vodafone for F06 and F07 would not and could not be achieved and that those forecasts were actually false when made.

92

95.     On 7/14/05, Vodafone held a conference in Dusseldorf for analysts to discuss

Vodafone's German operations:

> [SARIN:] . . . ***Vodafone Germany is an outstanding company measured on any basis, whether it's around customers, whether it's around shareholder returns, whether it's around management practices, whether it's around employee satisfaction, we have a first-rate company. . . .***
>
> The principal speakers today are going to be Jurgen von Kuczkowski, who is the Chief Executive; Fritz Joussen, who is currently our Chief Operating Officer and will become Chief Executive in October; and Albert Weismuller, who is our Chief Financial Officer.
>
> *     *     *
>
> ***Our company here is outperforming our competition***. . . . EBITDA market share is up 3.7% in the 12 months that we've just closed.
>
> *     *     *
>
> [VON KUCZKOWSKI:]     ***This chart shows you that we are the profitability leader here in Germany, demonstrating how we can combine close wireless controlling costs.  As a company, we still see good local scale efficiency opportunities combined with a huge potential of thriving benefits from being in the heart of Europe and One Vodafone.***
>
> *     *     *
>
> Albert Weismuller – Vodafone Group – Chief Financial Officer
>
> *     *     *
>
> Despite rising revenues, we are keeping our operating costs well under control.  And this hasn't started only this year or the last year, it's a measurement task over the last year within our management team in Germany. . . .
>
> And despite a competitive marketplace, customer costs actually decreased as a percentage of service revenues.
>
> *     *     *
>
> So in summary, we continue to grow EBITDA. . . .  The result of all this was the full year EBITDA margin of 46.4% which is an increase by 1.4% year on year.

96.     On 7/15/05, Citigroup issued a report on Vodafone discussing the "German day"

presentation:

93

- ***German day shows the strength of this division, contributing 23% of free cash flow: good execution looks likely to continue***

97.     On 7/15/05, Morgan Stanley issued a report on Vodafone's "German Investor Day":

***Vodafone hosted an upbeat investor meeting yesterday to present its German operation,*** which accounts for a leading 16% of the group's proportionate EBITDA . . . .

98.     On 7/15/05, JP Morgan issued a report on Vodafone's German presentation:

***Confident messages from Germany***

*         *         *

- ***Management appears very comfortable that the combination of revenue market share gains and margin resilience it has delivered in Germany over the past year can be sustained.***

- ***We came away reassured that our forecasts are readily achievable. . . .***

    1.     ***Management seems untroubled about competitive trends in Germany.***

*         *         *

***Management appears very comfortable that the combination of revenue market share gains and margin resilience it has delivered in Germany over the past year can be sustained.***

99.     The statements issued on 7/14/05 were false and misleading when made.  The statements were affirmatively false in misstating facts regarding Vodafone's business and finances.  In addition, the statements were false and misleading in failing to disclose the following true facts – then known to or recklessly disregarded by defendants:

    (a)     Vodafone's Mannesmann (German) operations had not been successfully integrated into Vodafone's overall operations and were suffering from significant operational problems, inefficiencies and a lack of growth and profitability adequate to permit Vodafone to recover its investment in Mannesmann;

94

(b)     Vodafone's worldwide scale of operations did not give it a competitive advantage; in fact, it placed Vodafone at a considerable competitive disadvantage, burdening it with excessive costs, infrastructure and bureaucracy, which inhibited the implementation of business decisions and strategies necessary for Vodafone to achieve the type of growth and success its executives were forecasting for it;

(c)     Vodafone knew from discussions and interactions with tax authorities in several countries – including Germany – that it would have to make multi-billion dollar cash tax payments beginning in F06 or F07, which would amount to over $1.5 billion per year, for several years, meaning that Vodafone could not possibly achieve the levels of cash flow being forecast for F07, F08 and beyond; and

(d)     Contrary to defendants' representations, Vodafone's German and Italian operations were not succeeding in spite of increased and intensifying competition; in fact, to the contrary, those operations were faltering and losing ground to competitors, such that it was increasingly unlikely that Vodafone would ever be able to recover its investment in those operations.

100.     On 7/25/05, Vodafone issued a release reporting on its recent operating performance, stating:

> "*We have seen strong performances across Europe* . . . and we continue to focus on improving our business in Japan.

> \*          \*          \*

> *Overall these KPIs are in line with our expectations and we are therefore reiterating our guidance for the full year to March 2006.*

> Germany

> *Vodafone Germany delivered a quarter of strong customer growth* . . . .

> \*          \*          \*

Italy

Proportionate net customer additions were 204,000 in the quarter. The total proportionate customer base was 17.5 million at the end of June. 6.4% higher year on year on an organic basis. Blended annual ARPU increased to 360 for the year to June compared to 359 for the year to March. Annual churn increased slightly when compared to March.

Service revenue for the quarter increased 6.5% compared to the same period last year, with continued customer growth being the primary driver. . . .

Net acquisition and retention costs as a percentage of service revenue in the quarter were higher than the same period last year and the quarter to March, reflecting the increase in competitive activity in the Italian market and a particular focus on attracting and retaining high value customers. ***However, these costs still remain at very low levels when compared to the rest of the Group***.

101.    On 7/25/05, Vodafone held a conference call for analysts and investors to discuss its

business:

[SARIN:]    . . . ***As you have seen from our announcement earlier this morning, we've started the year well, and the business is running fully in line with our expectations. We set out in May, our guidance for this financial year, and we are reiterating that guidance to you today.*** As a reminder, we said that we would expect proportionate organic mobile revenue growth of 6% to 9%, proportionate mobile EBITDA margins of flat to minus 1% . . . and free cash flow in the range of 6.5 to 7 billion pounds.

*            *            *

*Turning now to some of our major operations within Europe, we saw good, stable progress in all our major businesses when compared to the previous quarter and the comparable period a year ago*. In Germany we saw continued good customer growth in both contract and prepay, which was the principal driver behind the 4.1% increase in service revenues year on year.

*            *            *

***In Italy, we continue to see good customer growth with over 200,000 net adds for the quarter. . . . While we see a very competitive environment in Italy, we are also seeing good success in maintaining and growing our business through effective CRM and targeted promotions as well as delivery of a superior product suite.***

*            *            *

***To summarize for you the recent quarter has been excellent.***

96

102.    On 8/3/05, Vodafone filed a Prospectus Supplement with the SEC for the sale of $750 million in 5% Notes due 2015, which would be sold to underwriters who would then sell the Notes to the public.  The Prospectus Supplement incorporated by reference Vodafone's false financial statements previously reported, including the Company's Form 20-F for the year ended 3/31/05.

103.    On 9/19/05, Vodafone held a conference call for analysts and investors.

[SARIN:]        . . . Last year at this time we quantified One Vodafone for you.  We outlined certain programs, you'll hear a lot about that today in terms of where are we and we're making very good progress.  ***We're implementing most of these initiatives this year and we'll start seeing the benefits next year and the years afterward.  The progress is good***.  We're very focused on turning around our business in Japan.  As we've told you, it's a multi-year program and clearly this is likely to suppress margins in the near- to medium-term, but we're rebuilding the confidence both of our employees in Japan and, most importantly, our customers.

*        *        *

So how is this year going so far?  . . . ***The trends in Europe are that our companies are pressing down on 3G, accelerating growth.  Our companies are taking share.***  I have to tell you that competition is there and frankly in the next six months we can expect greater competition from . . . T-Mobiles in Germany and DoCoMo and AU in Japan.

Regulatory intervention also continues in that we continuously see termination rate cuts in most of our markets.  T***his is not a surprise because we've got these baked into our business plans, but equally the termination rate cuts continue.  In Japan I'd say that competitive intensity still stays pretty strong and the turnaround is on track . . . .***

*        *        *

The next section is going to be about our Company in Italy . . . .  At this stage, I would like to invite Pietro Guindani . . . to come join me on the podium here.

*        *        *

Pietro Guindani - *Vodafone Italy* - CEO

*        *        *

***During the last year, as well as in more recent months, the market in Italy has recorded accelerated growth, with more gross and net additions than in previous periods.***

97

\*        \*        \*

**In a fast growing market, Vodafone Italy keeps outperforming Telecom Italia Mobile.**

\*        \*        \*

In the business space, **we have won our battle for growth and value**, matching for the first time the marketshare of our principal competitor.

\*        \*        \*

**As a result, of our strong, very strong . . . competitive position**, in the last fiscal year, as you know, we have grown our customers by 6% with stable ARPU and stable inactivity rates.  A real success, I believe, in a market with 114% penetration and despite the aggressive strategies of Hutchinson.  Our revenue growth of 7% allowed us to gain the largest share, as you can see on the pie chart, of the total market revenue growth; *i.e.*, 37% of the total, solidly ahead of any other competitors.

To sum up all what I have been saying . . . **Vodafone in Italy keeps enjoying undisputed customer satisfaction leadership.  Secondly, we have outperformed Telecom Italia Mobile through differentiation; and the marketshare gap between us and our principal competitor keeps shrinking year in, year out.  We have promptly and I believe successfully fenced off Hutchinson's attack.  Finally, we believe that we have continued to build solid foundations to compete and succeed in the Italian market also in the future.**

\*        \*        \*

[SARIN:]        Coming up next is Japan.  So I would like to invite Bill Morrow and Tsuda-san up to the stage here. . . .

Bill Morrow has been the Chief Executive for a few months in Japan.

\*        \*        \*

Bill Morrow - *Vodafone Japan* - President

Thank you, Tsuda-san; and now good afternoon, everyone.  So as you recall from our presentation in May, we gave you an overview of our improvement plan. **I'm pleased to say that we are on track and we have already observed some encouraging results**.

\*        \*        \*

So we know well what is in front of us.  We're dealing with this.  We have reorganized around our targeted customer segments.  We have brought in a stronger

local senior management team, hiring executives from Sony, Japan Telecom, DoCoMo, and Fandango. . . .

So I hope you can see we're confident in our turnaround plan, but it is not yet complete. ***The first half of this year will be better than what we had expected***. But I would like to reiterate what we said before, in that we should be in a stable, monthly customer net growth position sometime during the second half of this financial year.

*       *       *

Fritz Joussen - *Vodafone Germany* – CEO Designate

*       *       *

I want to highlight that the German market is attractive and it is growing. Second, we are the market leader in the German market; ***a very good position to be in, in respect to service revenue [and] profitability*** . . . .

*       *       *

[SARIN:]       Thomas and Mike, thank you very much. . . . Andy Halford is next. Andy Halford as you know is our new Chief Financial Officer. He will be talking to us about One Vodafone. . . .

. . . [HALFORD:] ***One Vodafone***, if I want to just leave one message with you – and hopefully this has been coming our of almost all the presentations today – a year ago we set out our targets. Six months ago we were busy in the planning stage. ***Now we are in implementation. All six streams are now absolutely up and running***.

*       *       *

We said that we would track that by our combined OpEx and CapEx in '07/'08, being broadly(ph) stable with (technical difficulty) '03/'04; *i.e.* we would keep them fairly constant over a four-year period, notwithstanding the increase in the size of the business over that time frame. Secondly, we said that we will outperform the revenue marketshare of our principal competitors by at least 1% over that period.

*       *       *

So that is a quick whistle-stop tour through the progress on One Vodafone. ***Key takeaways, this is absolutely now moved into execution mode. We are absolutely on track for delivering our flat OpEx and CapEx in '07/'08 compared with '03/'04. and we're absolutely on track for delivering 1% market revenue share outperformance against our principal established competitors.***

*       *       *

[SARIN:]          . . .  ***One Vodafone is going well*** . . . .

104.     The statements issued between 7/25/05 and 9/19/05 were false and misleading when made.  The statements were affirmatively false in misstating facts regarding Vodafone's business and finances.  In addition, the statements were false and misleading in failing to disclose the following true facts – then known to or recklessly disregarded by defendants:

(a)      As detailed herein, Vodafone's F04, F05 and interim F06 financial statements and reports, as disseminated to the investing public, its shareholders and as filed with the SEC, were materially falsified and overstated, including a massive overstatement of its assets and its goodwill (intangible assets) and shareholder equity, and its EBITDA and operating earnings were inflated due to the over-valuation of its German, Italian and Japanese operations;

(b)      Vodafone's Mannesmann (German) operations had not been successfully integrated into Vodafone's overall operations and were suffering from significant operational problems, inefficiencies and a lack of growth and profitability adequate to permit Vodafone to recover its investment in Mannesmann;

(c)      Vodafone's Italian operations were also substantially overvalued and suffering from operational problems, inefficiencies and a lack of growth adequate to permit Vodafone to recover its investment in that operation;

(d)      Contrary to Vodafone's representations that its Japanese operations could, would and were being turned around, in fact, Vodafone's Japanese operations were not only severely troubled but those problems were getting materially worse, which would require massive additional capital expenditures in an effort to salvage that business, or the sale of that business at a huge loss;

(e)      Vodafone's Japanese operations were materially overvalued on Vodafone's financial statements due to the failure to hold or gain sufficient market share so as to permit Vodafone to recover its investment in its Japanese operations;

100

(f)     Vodafone's introduction of 3-G service and products was a failure in Japan, where the level of service was defective and far worse than that of competitors, which, combined with the extremely poor quality and functionality of Vodafone's new 3-G handsets, was leading to increased customer dissatisfaction and rejection of Vodafone's service in Japan and a lack of adequate market share and growth in that operation sufficient to justify Vodafone ever recapturing its investment in its Japanese operation;

(g)     Vodafone's worldwide scale of operations did not give it a competitive advantage; in fact, it placed Vodafone at a considerable competitive disadvantage, burdening it with excessive costs, infrastructure and bureaucracy, which inhibited the implementation of business decisions and strategies necessary for Vodafone to achieve the type of growth and success its executives were forecasting for it;

(h)     Vodafone's "One Vodafone" cost savings and operational efficiency initiative was not succeeding or achieving any significant cost savings and would not result in Vodafone achieving anywhere near the £2.5 billion improvement (pre-tax) in cash flow by F07-F08, as being forecast;

(i)     Vodafone knew from discussions and interactions with tax authorities in several countries that it would have to make multi-billion dollar cash tax payments beginning in F06 or F07, which would amount to over $1.5 billion per year, for several years, meaning that Vodafone could not possibly achieve the levels of cash flow being forecast for F07, F08 and beyond;

(j)     Vodafone's top management was in a state of dissention and disarray, virtually paralyzed by bitter in-fighting between Gent, Sarin, MacLaurin and others, such that business and strategic decisions were being deferred or not properly or promptly implemented, which was hurting Vodafone's business;

(k)     The large stock buy-back activities which defendants were causing Vodafone to implement were not being done because defendants actually believed that Vodafone's ordinary shares were undervalued, represented a good value or investment, or that such expenditures were a wise use of Vodafone's corporate resources; rather, such buy-backs were being engaged in by defendants to support and, if possible, artificially inflate Vodafone's stock price and assist key insiders in unloading large numbers of their Vodafone shares at inflated and, for them, highly profitable prices;

(l)     Contrary to defendants' representations, Vodafone's German and Italian operations were not succeeding in spite of increased and intensifying competition; in fact, to the contrary, those operations were faltering and losing ground to competitors, such that it was increasingly unlikely that Vodafone would ever be able to recover its investment in those operations; and

(m)     Due to the foregoing adverse factors which were negatively impacting Vodafone's operations and financial performance, defendants knew that the levels of financial performance being forecast for Vodafone for F06 and F07 would not and could not be achieved and that those forecasts were actually false when made.

105.     On 11/15/05, Vodafone stunned the securities markets by revealing that it faced $8.7 billion (£5.1 billion) in cash tax payments over the next few years, as well as lower than previously forecast revenue growth and a decline in EBITDA and profit margins due to negative factors, including increased capital expenditures in Japan that would result in "***reduced,***" *i.e.,* lower than forecasted, cash flow and "***outweigh***" the benefits of the One Vodafone program. These Company-specific startling revelations caused Vodafone's ordinary and ADRs to plunge lower – their largest one-day declines in over seven years – falling to as low as £1.26 and $21.90, respectively. These

102

revelations contradicted prior Class Period representations, and as this truth entered the market, some

of the prior artificial price inflation in Vodafone's publicly traded securities came out of these

securities, damaging prior Class Period purchasers.  However, because defendants did not make full

and complete truthful disclosures and continued to make misrepresentations and false and

misleading statements, Vodafone's publicly traded securities continued to trade at artificially inflated

prices.

106.    On 11/15/05, FT.com and *The Financial Times* reported:

> ***Vodafone shares suffered their sharpest one-day fall for more than seven years on Tuesday, after the UK mobile phone operator warned that margins would drop next year, hit by continued heavy investment in its troubled Japanese arm and intensifying competition in core European markets.***
>
> ***Investor confidence was further undermined by the group's disclosure that it expected to see GBP5bn ($8.7bn) in tax liabilities crystallise in the net three years.***
>
> ***. . . One analyst identified the disclosure of the tax liabilities as the "thing that put the skids under the share price", saying it could cut GBP4bn from the valuation of the business.***
>
> ***The extra investment in Japan also surprised investors. . . .***
>
> ***There has been speculation that Vodafone could pull out of Japan, but Mr. Sarin insisted on Tuesday that the group was there "for the long term".***

107.    Also on 11/15/05, FT.com and *The Financial Times* reported:

> Vodafone warned of a slow down in top-line growth next year and a drop in margins due to the increasing saturation and competition in many of its markets and continued regulatory intervention.  The shares were down more than 6 per cent in early trading at 135lp as investors reacted with disappointment . . . .
>
> . . . The operator also said further cuts by regulators in so-called termination rates, where one operator pays a fee to another for a call that "terminates" on the latter's network, would also have an impact.  ***Both factors would outweigh the impact of the group's cost-saving programme dubbed "One Vodafone".***  The termination rate cuts and the higher customer acquisition costs would also hit revenue growth, which would be "slightly lower" than the 6 to 9 per cent growth rate forecast for the current year.  In Japan, Vodafone said it was confident of rebuilding its market share next year but warned it would come at a cost and forecast a "further

significant reduction" in ebitda margin. . . .  A new management team went in earlier this year to try to turn the business around and Arun Sarin, chief executive, said the three year plan was *"on course."* Mr. Sarin has given his new team till the middle of 2007 to show progress.  He said the team was already *"slightly ahead"* of target after the subsidiary reported three months of net subscriber growth.  *"Vodafone Group continued to prosper in a competitive and challenging environment," said Mr. Sarin.  "I am very satisfied with progress and believe that the group is uniquely placed to take advantage of the many opportunities to deliver shareholder value in the future."*

108.    On 11/16/05, *The New York Times* reported:

Facing fierce competition in Europe and poor results in Japan, *the Vodafone Group warned Tuesday that its profit margins would narrow through early 2007*.

Vodafone . . . issued its cautionary statement as it announced lower earnings for the latest six-month period.  Its stock tumbled 10.9 percent in London, its steepest one-day drop since September 1998.

Vodafone said that compared with the period a year earlier, organic profit margins, after interest and taxes, for the fiscal year ending in March would be in the "flat to 1 percent lower range," leaning toward the lower end.

For the fiscal year ending in March 2007, the company also predicted narrowing profit margins as well as *"slightly lower"* revenue growth than it had anticipated for fiscal 2006.

*The warning unnerved the markets . . . .*

\*        \*        \*

Vodafone's chief executive, Arun Sarin, however, said during a conference call that the company's turnaround plan in Japan was *on track and that profits margins would increase in Japan in the fiscal year ending March 2008*.

109.    On 11/16/05, *The Financial Times* reported:

*More than Pounds 9bn was wiped from Vodafone's market value yesterday as the telecommunications group endured its worst one-day performance for more than seven years.*

Shares in Vodafone, the world's largest mobile phone group, fell 10.9 per cent to 129 1/4p as it *unnerved the market with a warning of a slowdown in top-line growth next year and weakening margins.*

\*        \*        \*

*A massive 2.2bn Vodafone shares changed hands . . . .*

104

110.    On 11/16/05, *The Financial Times* also reported:

If Arun Sarin, now just over two years into his job as chief executive of Vodafone, was smarting at his group's worst day on the stock market in seven years, he tried hard not to show it.

**In the market, the mood was much darker.**

**Vodafone's share price fell 11 per cent on worries about European growth and prospects for the group's business in Japan.**

*            *            *

The head of the world's largest mobile phone operator by revenues identified . . . reasons why the company's shares fell so sharply.

**First, the likelihood that Pounds 5bn in tax liabilities would crystallise over three years, he conceded, had surprised investors, despite the fact that the company carried a Pounds 9bn reserve on its balance sheet. . . .**

Second, he acknowledged that the extra spending in the troubled business in Japan in the next financial year **"would be a little bit of a surprise"** . . . .

111.    On 11/16/05, Oppenheimer issued a report on Vodafone:

**Vodafone's outlook for FY 2006/7 ended in a disaster, as the stock lost about 10% on one day.** Saying that Japanese business would suffer another significant decline . . . .

*            *            *

**Outlook for 2006/7 was dull, as Vodafone says it expects free cash flow decline compared to this FY due to margin pressure, higher capex, as well as higher tax payments.**

**. . . BUT OUTLOOK SHOCKING**

**This bundle of bad news shocked markets . . . .**

112.    On 11/16/05, Investec issued a report on Vodafone:

We are **downgrading** . . .Vodafone . . . :

1.    Lowered forecasts, and reduced earnings visibility – We have cut our 2006 to 2008 EBITDA, PBT and EPS forecasts . . . .

*            *            *

105

The key factors behind the changes are sharply lower margins in Japan, reduced margins in Europe and *a higher effective P&L tax rate*.

113.   On 11/16/05, Deutsche Bank issued a report on Vodafone:

Taxing the patience: ***Rating Lowered*** . . .

> *Unexpected timing on tax unwind & Japan weakens again*

> *Ourselves, analysts and investors were surprised by the magnitude (£5bn) and moreover timing (spread over 3 years) of a releasing of tax deferrals through the cash flow.  In addition, guidance for Japan disappointed . . . .  Vodafone's problems looking into 2006 are structural (market competition in Europe, Japanese distribution channel) and as such we see limited operational momentum. . . .  [R]educ[ing] our recommendation . . . .*

> . . . FCF fell 13% short of forecasts reflecting higher cash tax and capex. . . .

**Surprise in the guidance due to cash tax, Japan**

> *Vodafone's management highlighted a potential incremental £5bn cash tax to be paid over 3 years (from '06/07E) which, combined with a further deterioration in margins in Japan and to a lesser extent, Europe, resulted in the company stating '06/07E guidance would be lower than that '05/06E.*

*        *        *

> *The clear surprise to us, investors and other analysts was the magnitude of the FCF drop expected in '06/07E.  The majority of the delta between our old FCF forecast of £7.1bn and our new target of £5.2bn reflects the addition of £1.5bn of tax . . . .*

> *The company has stated the slow down in revenue growth reflects primarily lower termination rate charges across Europe and an increased competitive environment.  The markets where significant rate cuts are expected are Germany (-15% December) . . . and Italy (-19% September).*

114.   On 11/16/05, CS First Boston issued a report on Vodafone:

- ·     *. . . Vodafone appears to see a worsening outlook next year* . . . .

- ·     *Add to this guidance yet more downgrades to Vodafone Japan, higher CAPEX, higher tax accruals and up to £5bn of extra cash tax from previous schemes being challenged, and consensus forecasts are moving substantially down.*

Later, on 2/20/06, CS First Boston issued a report on Vodafone stating "*Our FCF forecasts fall 5%.*

*. . .  We do not expect Vodafone to return to FYMar06E FCF levels until FYMar2012E.*"

106

115.    J.P. Morgan wrote on 11/16/05:  "*[M[ost of the reduction seems to relate to a significant increase in cash tax.  VOD revealed for the first time yesterday that Str5bn of tax provisions are likely to unwind over the next three years as settlements are reached with national tax authorities.*"  Bear Stearns noted "*Our historic conversations on deferred tax liabilities with the Company suggested that any imminent unwinding was not likely to occur.*"

116.    ABN Amro analyst Brad McMaster told *The Sunday Times* that "*Credibility is quite extensively damaged – to the point where Sarin has been advised to apologise for any misconceptions there might have been.*" Sarin's '*bullshit spin*' was too smooth, he said.

117.    Notwithstanding the revelation of 11/15/05, on 11/15/05, Vodafone made a number of false reassurances both in a release and in a conference call that day.  Vodafone's 11/15/05 release stated:

> VODAFONE GROUP PLC
> INTERIM RESULTS FOR THE SIX MONTHS ENDED
> 30 SEPTEMBER 2005
>
> *            *            *
>
> **Robust financial performance**
>
> *            *            *
>
> *    Adjusted basic earnings per share increased by 8.5% to 5.37 pence.  Basic earnings per share were 4.36 pence.  Profit before taxation for the period was £4.1 billion after an impairment charge of £0.5 billion.
>
> *            *            *
>
> Arun Sarin.  Chief Executive, commented:
>
> **"I am pleased to announce another strong set of results. . . .  We continue to outperform our competitors in most of our markets . . . ."**
>
> Chief Executive Statement
>
> **Vodafone Group has posted another good set of results for the first half of this financial year, underpinned by a strong operational performance.**

\*       \*       \*

>    *In Japan, execution of our turn-around is on track and I am pleased with the progress we are making.*

(Footnote omitted.)

118.    During Vodafone's 11/15/05 conference call for analysts to discuss Vodafone's finances and business, defendants repeated their reassurances:

>    [SARIN:]      If you look at it on an operating basis, out of Japan, the Company is performing really well . . . .

\*       \*       \*

[W]e are reiterating guidance.  ***We are reiterating guidance for this financial year in terms of revenues and margins and free cash flow, and also we are indicating for the next financial year that we will have similar underlying trends.***

\*       \*       \*

Now, a word or two about Japan.  Back in May, we stood before you and we said this is what we see in Japan in '05/'06, our turnaround will require us to have sustained monthly adds in the positive category in the second half.  And, as you know from the results published in the last few months, that we are actually in positive territory now, even though the numbers are modest.

>    ***We were on track to hit the various milestones.  Our handsets have improved.  Our pricing has improved.  Our content has improved.  Our network quality has improved.  We are coming onto the front foot in Japan, and the margin decline is simply the investment that we're making in our customers.***  And frankly, this investment will continue through the rest of the year into next year, when we see number portability.

>    ***There are other trends that are positive. . . .   The whole Company in Japan is more invigorated and if you looked on the things that we said we would do in '05/'06, they're beginning to happen.***

\*       \*       \*

>    ***So, in terms of outlook, I'd say we are going to see slightly lower organic proportionate mobile revenue growth, principally because of termination rates, as compared to this year.***

>    ***In terms of margins, EBITDA margins, first without Japan, we see a small reduction in the organic proportionate mobile EBITDA margin, principally because of competitve activity.  As you know, our margins in Italy and Germany***

*are quite robust . . . .  These margins may come under attack as our competitors compete aggressively in those two markets and so we may come off a little bit outside Japan.*

\*          \*          \*

[HALFORD:] . . . I want to give you a short overview of the financial results for the first half of the year . . . .

\*          \*          \*

Starting in Europe, *Germany continues to deliver strong customer growth*, principally from pre-pay customers. Taken together with the reduction in termination rates in December last year, service revenue grew by 3% in the first half. In an increasingly competitive market, the margin improved as further efficiencies in overheADR offset additional customer investment, particularly in retention.

*In Italy, strong data revenue growth and focused customer propositions resulted in sustained levels of service revenue growth of 6% in the first half.* The one-month termination rate cuts in September impacted growth in the second quarter by 2%, reinforcing the underlying strong performance. The EBITDA margin was also slightly higher as lower interconnect costs through on-net promotions offset higher customer costs, which still remain very low by Group standards.

\*          \*          \*

[ANALYST:] It's Terry Sinclair from Citigroup. I appreciate that you wanted to isolate Japan from the operational story you're painting, but the problem is that we have to value your business including Japan, unless you indicate to us that you intend to sell it, which I think is not what you're saying.

So there are two questions. First of all, when you were speaking earlier you said that Japan is less than 10% of the value of the business. On what basis do you make that assertion?

And secondly, *when you last conducted an impairment test for Japan, did you include the margin and CapEx guidance that you've indicated today?*

\*          \*          \*

[HALFORD:] *Yes.  We obviously do impairment tests from time to time. We will do it on the best available information we have got as to our views of the prospects for the business.  Those views are entirely consistent with what we have given in our outline guidance today.*

[SARIN:]          *Terry, every six months we do a mini impairment; at the end of the year we do a full impairment.  We share these numbers with our Board.  So absolutely, the numbers we are sharing with you are numbers that we've shared*

*with our Board.  We have looked at the impairment tests, and it is a business that is a good ongoing business.*

\*       \*       \*

*[S]o we do an impairment test, and the value that we're showing on our books is consistent with the value from a discounted present value approach, and so there's no reason for impairment here.*

119.    On 11/17/05, FT.com reported:

Arun Sarin, chief executive of Vodafone, on ***Thursday apologised to investors for the mobile operator's failure this week to communicate some of the financial information he felt contributed to the worst slump in the company's share price in seven years.***

The shares of the world's largest mobile operator by revenues are still in the doldrums after falling almost 11 percent on Tuesday, when the group revealed that margins would fall next year because of increased spending at its Japanese unit and intensifying competition in Europe.

Vodafone believes investor confidence was further undermined by the group's disclosure that it expected to see GBP5bn ($8.6bn) in tax liabilities crystallise in the next three years.  Mr. Sarin, addressing investors at a Morgan Stanley conference in Barcelona, ***admitted that guidance on the tax issue could have been better: "Maybe the messaging wasn't good and for that I take responsibility."***

\*       \*       \*

Mr. Sarin . . . sought to reassure the market over his Japanese strategy.  "***The Japanese company is going to be just fine in the next 18 to 24 months," he said, repeating his assertion that the recovery programme was ahead of schedule.***  He told his audience that, fundamentally, nothing had changed at Vodafone overall to cast it in a negative light.  "***I just want to reassure all our investors our company is just as strong today as it was a week ago.***"

120.    On 11/20/05, *The Sunday Times (London)* reported:

***Sarin said he was "completely confident" that Vodafone KK [Japan] would be a success.  "The whole noise about selling Japan has turned down," he said.  "Everybody understands today that if we sell Japan we are selling at a low point. We are not traders, we are operators."***

121.    On 1/24/06, the Company issued a press release entitled "Vodafone Reports Third Quarter KPIs and Reiterates Guidance," which stated, in part:

110

Vodafone Group Plc today announces key performance indicators for the quarter ended 31 December 2005. The main highlights are:

- ***Good overall operating performance in challenging markets***

  \*      \*      \*

- Vodafone reiterates its current year guidance. The Group expects organic growth for this financial year in proportionate mobile revenue in the middle of the 6% to 9% range. Vodafone also expects the organic proportionate mobile EBITDA margin for this financial year to be at the lower end of the flat to 1 percentage point lower range

- Vodafone's preliminary outlook for the next financial year remains unchanged

Arun Sarin, Chief Executive of Vodafone, commented:

"Vodafone has delivered a good operational performance in a challenging environment. . . . *We expect to deliver full year results in line with our existing guidance and our preliminary outlook for next year remains unchanged.*"

122.    On 1/24/06, Vodafone held a conference call to discuss its business:

[SARIN:]    Now, I'd like to say a word about Japan. We are pleased to achieve somewhat higher net gains in each of November and December, and while January net gains will not be quite as strong, *we are still confident that we will achieve our stated aim of delivering sustained, positive net additions in the second half of this fiscal year.*

\*      \*      \*

**Paul Howard** – *Cazenove Group – Analyst*

It's Paul Howard at Cazenove. A couple of questions – firstly, on the margin guidance, the guidance overall is unchanged but the pressure does seem to be growing very much in Germany and Italy. *Was this anticipated, or is it being offset elsewhere? In terms of longer-term outlook, would you expect the Italian and German margins to remain above those in other markets, or do you see convergence happening?*

\*      \*      \*

[SARIN:] . . . In terms of margin guidance, I think the competitive activity that we are seeing in Germany and Italy in particular is one the heavier side of what we are forecasting, but equally, the Company has many other assets and in the whole, in the main, we have said previously that we would come in at the lower end of our 0 to 1% - minus 1% margin range, and we are reiterating that.

111

In terms of longer-term Germany/Italy margins, which are 47, 52% respectively, I do expect these margins to be above the average, for example the group average, but equally, we will see margins coming off a little bit. *It would say yes; I can see margins coming off a little bit, but not in a dramatic fashion in the near term.*

\* \* \*

*In Japan, we have indicated that, for the balance of this year, we would expect to see good, solid, positive net gains. In the middle of the year and kind of the following fiscal year, '06/'07, we would expect our net gain position to strengthen a bit more than what we have seen this year.*

123.    The statements issued between 11/15/05 and 1/24/06 were false and misleading when made. The statements were affirmatively false in misstating facts regarding Vodafone's business and finances.  In addition, the statements were false and misleading in failing to disclose the following true facts – then known to or recklessly disregarded by defendants:

(a)    As detailed herein, throughout the Class Period, Vodafone's financial statements and reports, as disseminated to the investing public, its shareholders and as filed with the SEC, were materially falsified and overstated, including a massive overstatement of its assets and its goodwill (intangible assets) and shareholder equity, and its EBITDA and operating earnings were inflated due to the over-valuation of its German, Italian and Japanese operations;

(b)    Vodafone's Mannesmann (German) operations had not been successfully integrated into Vodafone's overall operations and were suffering from significant operational problems, inefficiencies and a lack of growth and profitability adequate to permit Vodafone to recover its investment in Mannesmann;

(c)    Vodafone's Italian operations were also substantially overvalued and suffering from operational problems, inefficiencies and a lack of growth adequate to permit Vodafone to recover its investment in that operation;

(d)    Contrary to Vodafone's representations that its Japanese operations could, would and were being turned around, in fact, Vodafone's Japanese operations were not only severely

troubled but those problems were getting materially worse, which would require massive additional capital expenditures in an effort to salvage that business, or the sale of that business at a huge loss;

(e)     Vodafone's Japanese operations were materially overvalued on Vodafone's financial statements due to the failure to hold or gain sufficient market share so as to permit Vodafone to recover its investment in its Japanese operations;

(f)     Vodafone's introduction of 3-G service and products was a failure in Japan, where the level of service was defective and far worse than that of competitors, which, combined with the extremely poor quality and functionality of Vodafone's new 3-G handsets, was leading to increased customer dissatisfaction and rejection of Vodafone's service in Japan and a lack of adequate market share and growth in that operation sufficient to justify Vodafone ever recapturing its investment in its Japanese operation;

(g)     Vodafone's worldwide scale of operations did not give it a competitive advantage; in fact, it placed Vodafone at a considerable competitive disadvantage, burdening it with excessive costs, infrastructure and bureaucracy, which inhibited the implementation of business decisions and strategies necessary for Vodafone to achieve the type of growth and success its executives were forecasting for it;

(h)     Vodafone's "One Vodafone" cost savings and operational efficiency initiative was not succeeding or achieving any significant cost savings and would not result in Vodafone achieving anywhere near the £2.5 billion improvement (pre-tax) in cash flow by F07-F08, as was being forecast;

(i)     Vodafone's top management was in a state of dissention and disarray, virtually paralyzed by bitter in-fighting between Gent, Sarin, MacLaurin and others, such that

113

business and strategic decisions were being deferred or not properly or promptly implemented, which was hurting Vodafone's business;

(j)    The large stock buy-back activities which defendants were causing Vodafone to implement were not being done because defendants actually believed that Vodafone's ordinary shares were undervalued, represented a good value or investment, or that such expenditures were a wise use of Vodafone's corporate resources; rather, such buy-backs were being engaged in by defendants to support and, if possible, artificially inflate Vodafone's stock price and assist key insiders in unloading large numbers of their Vodafone shares at inflated and, for them, highly profitable prices;

(k)    Contrary to defendants' representations, Vodafone's German and Italian operations were not succeeding in spite of increased and intensifying competition; in fact, to the contrary, those operations were faltering and losing ground to competitors, such that it was increasingly unlikely that Vodafone would ever be able to recover its investment in those operations; and

(l)    Due to the foregoing adverse factors which were negatively impacting Vodafone's operations and financial performance, defendants knew that the levels of financial performance being forecast for Vodafone for F06 and F07 would not and could not be achieved and that those forecasts were actually false when being made.

124.    On 2/27/06, Vodafone again shocked the markets by revealing a massive goodwill write-down in the goodwill for Vodafone Germany ("most . . . attributable to Vodafone Germany"), Vodafone Italy and, particularly, Vodafone Japan, "*in the range of £23 billion to £28 billion [$40-$50 billion], reflecting a lower view of growth prospects, particularly in the medium to long term, than those it had used previously*" – *this was one of the largest goodwill asset wipeouts in the*

114

*history of public company financial reporting, which would adversely impact Vodafone's "operating" profits and eliminated – in one day – 25% of Vodafone's equity base!*

125.     As *The Evening Standard* reported on 2/27/06:

Mobile phones giant Vodafone *stunned the stock market today by saying it will make a massive writedown on the value of its business and warning that revenues and profit margins in the coming year will be at the bottom end of expectations.*

The shock announcement comes just three months after Vodafone shares plunged more than 10% when it revealed a potential Pounds 5 *billion tax* bill and warned of a slowdown in growth with its half-year results in November.

\*        \*        \*

It added that it had incorporated in its 10-year plan a "*lower view of growth prospects for a number of key operating companies, particularly in medium to long term, than those used previously.*"

126.     On 2/27/06, Citigroup issued a report on Vodafone:

–     *Vodafone has issued an unexpected warning today.  This can be split into two components: 1) an impairment charge, and 2) reduced YTM07 guidance*

–     The impairment charge amounts to a £23-£28bn reduction in asset value. *This is equivalent to 25% of the equity base*

–     *The main reason is lower growth.  The majority will come from Vodafone Germany, but also Italy and potentially Japan*

127.     On 2/27/06, Morgan Stanley issued a report on Vodafone:

**Quick Comment**: Vodafone has announced a write-down of acquisition goodwill of £23-£28bn to be taken in March 2006.

\*        \*        \*

*It is unclear why the write-down did not occur with the opening IFRS balance sheet or at the half year stage (market valuations of these businesses have been lower than the goodwill carrying values for some time).*

128.     On 2/28/06, Oppenheimer issued a report on Vodafone:

*NEGATIVE NEWS FLOW CONTINUES*

115

*Vodafone once again gave investors another reason for disappointment, indicating GBP23-28bn goodwill impairment for the current year due to lower growth prospects in the mid to long term. . . .*

GOODWILL IMPAIRMENT OF UP TO GBP28BN

*Vodafone said that it will likely announce goodwill impairment of about GBP23-28bn due to lower growth assumptions in its 2007 budget for markets in Germany, Italy and likely also Japan. . . . Management announced this news at a very late stage and lost further credibility after the profit warning in November.*

OUTLOOK DETERIORATES FURTHER

. . . [G]uidance for 2006/7 is implicitly down, as the company indicates 5%-6.5% proportionate mobile revenue growth (excl. Japan and acquisitions) and 1% decline in EBITDA margins.

\*       \*       \*

Most of the impairment is attributable to the German business after the acquisition of former Mannesmann . . . .

*. . . [I]t certainly does not help management to build up confidence, which also suffered after the profit warning in November last year.*

129.     On 2/28/06, *The Financial Times* reported:

Vodafone's epic battle for Mannesmann, the German mobile operator, signified a swaggering self-confidence that seemed awfully distant yesterday.

\*       \*       \*

When the Pounds 101bn deal completed, Vodafone was the fourth most highly valued company in the world. *Its balance sheet groaned under Pounds 80bn of Mannesmann-related goodwill*.

Yesterday's write-down of up to Pounds 28bn of assets, most of which were inherited from Mannesmann, is the *clearest financial acknowledgement yet of just how hubristic the deal was*.

\*       \*       \*

*The write-down is one of the largest re-evaluations of past excesses in corporate history, but yesterday's announcement may be remembered instead for what it says about Vodafone's view of its future.*

\*       \*       \*

Yesterday's announcement came just a month after the group told investors its profit margins would be at the lower end of expectations, and three months after news of an unexpected tax bill, combined with margin pressure, knocked it share price by 11 per cent in a day.

Those earlier warnings were a catalyst for investor concerns about Vodafone's global strategy under Arun Sarin, who replaced Sir Christopher Gent as chief executive in 2003.

***Yesterday's bolt from the blue*** prompted the further questions from shareholders about whether Vodafone has fully appreciated the extent to which its markets and prospects have changed since the boom years.

This is the latest "reality check", says one shareholder. "The company's recent history is that it is too optimistic."

\*        \*        \*

Some shareholders say that, if yesterday's announcement is the beginning of a new realism of Vodafone about its growth pressures, it may be an encouraging sign of capital discipline. This, though, may not remove the pressure on Mr. Sarin, given his close association with Vodafone's pursuit of growth.

"If the company is moving down this road and acknowledging that growth is hard to come by, then how credible will be Mr. Sarin in delivering the message?" one shareholder says. "He is on shaky ground."

130.    On 3/4/06, *The Times (London)* reported:

Vodafone's torrid five-year experience in the world's most technologically advanced mobile phone market has been a litany of dismal business failures and wasted opportunities . . . .

"Confused management and wrong-headed decisions," one senior Tokyo-based fund manager said, had made what could have been a brilliant strategic move a heavy drag on the overall ambitions of the group.

Vodafone's embarrassing pullout from the Japanese market comes as a new blast of competition was about to make its life in Japan even harder.

\*        \*        \*

In 2004 Arun Sarin, the chief executive, promised that by March 2006 Vodafone would have ten million global-third generation customers, of whom half would be based in Japan. The Japanese unit managed to stem heavy customer losses only last summer, and the pick-up in 3G subscriber numbers has never come close to the required rate.

117

\*     \*     \*

The British company has watched helplessly as its big Japanese competitors have beaten it to the introduction of countless innovations, including the Edy or Suica payment systems built into the handsets of rival operators that allow cash free purchases of anything from canned drinks to a three-course lunch.

*Japan has also been the scene of one of Vodafone's most spectacular errors of judgment – the decision to introduce a range of clunky 3G Nokia handsets from the European market.  Japanese customers ignored the phones, dealing a heavy blow to Vodafone's already delayed 3G roll-out.*

\*     \*     \*

Last year Vodafone was forced to announce the investment of more than £1.3 billion in a desperate attempt to bring its often weak-signalled 3G network up to scratch with rivals.

131.     The revelations of 11/15/05, which indicated that Vodafone's European operations were more troubled than had previously been revealed, were compounded on 2/27/06, when Vodafone revealed a $49 billion asset write-down due to the impaired value of its German (Mannesmann), Italian and Japanese operations, admissions that the operations in those countries were much less successful (or capable of being turned around) than had previously been represented and that the value of these assets on Vodafone's F04-F06 financial statements had been vastly overstated and thus Vodafone had actually been suffering large operating losses in these operations due to the excessive valuations at which it carried them on its books.  This led to a further decline in Vodafone's ADRs to $19.51 per share and in its ordinary shares to £1.09 per share, inflicting further damage on prior Class Period purchasers of those securities, taking the prices of these securities back down to the levels they had been at when the fraudulent scheme to inflate them began.  Shortly thereafter, Vodafone confirmed its inability to turn around its Japanese operation and that operation's lack of long-term viability by selling those Japanese operations – incurring a huge $8.6 billion loss!  As a result of this debacle, MacLaurin, Gent, Hazen, Vodafone's Deputy Chairman,

Bamford and Horn-Smith left the Company and there was the implementation of yet another "*new*" organizational structure of the management of the Company.

132.    After the end of the Class Period, Vodafone admitted it had "*a lower view of growth prospects, particularly in the medium to long term*." Sarin admitted the previously forecast growth and cost savings would not be achieved in the stated timeframes and, in fact, capital expenditures would increase, not fall, while free cash flow would fall sharply to as low as £4 billion in F07 due to the higher tax payments and higher capital expenditures. Many large Vodafone shareholders have demanded Sarin's ouster due to this disaster.

### FALSE FINANCIAL STATEMENTS DURING THE CLASS PERIOD

133.    In order to overstate its earnings in F04-F06, Vodafone violated IFRS, U.K. and U.S. GAAP and SEC rules by failing to properly record tens of billions of dollars of impaired goodwill (intangible assets) to reflect the diminished future economic benefits associated with its investments in operations in Mannesmann (Germany), Japan, Italy, Sweden and elsewhere. Vodafone has now admitted that the value of the goodwill is dramatically impaired and has taken a $49 billion write-down (including $8 billion impairment related to Japan), one of the largest write-downs in history.

134.    Vodafone reported the following financial results during the Class Period:

|  | Year ended 3/31/04 | 6 months ended 9/30/04 | Year ended 3/31/05 | 6 months ended 9/30/05 |
|---|---|---|---|---|
| Turnover | £33.55B | £16.79B | £34.13B | £18.25B |
| EBITDA | £12.64B | £6.51B | £13.04B | £6.71B |
| Profit (loss) | (£9.01B) | (£3.19B) | (£7.54B) | £2.81B |
| Intangible assets | £93.62B | £90.39B | £83.46B | £97.79B |

These results were materially false due to Vodafone's failure to write off the billions of dollars in goodwill (intangible assets) on its books at each of the above financial reporting periods.

119

135.    Statements of International Accounting Standards issued by the Board of the International Accounting Standards Committee ("IASC") between 1973 and 2001 are designated "International Accounting Standards" ("IAS").  The International Accounting Standards Board ("IASB") announced in 4/01 that its accounting standards would be designated IFRS.  Also in 4/01, the IASB announced that it would adopt all of the IAS issued by the IASC.  The Interpretations of IAS issued by the International Financial Reporting Interpretations Committee (formerly, the "Standing Interpretations Committee") do not have the same status as IAS, but, in accordance with IAS No. 1, ¶11, "financial statements should not be described as complying with International Accounting Standards unless they comply with all the requirements of each applicable Standard and each applicable interpretation of the Standing Interpretations Committee."

136.    U.S. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. §210.4-01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

137.    IFRS require that goodwill be tested for impairment at least annually and when indicators are identified that an asset may be impaired.  IFRS require that companies compare the carrying value of an asset to the recoverable amount, on fair value.  Any shortfall should be recorded as a loss.

138.    U.S. GAAP, as set forth in FASB Statement of Financial Accounting Standard ("SFAS") No. 142, require that companies recognize an impairment loss for goodwill when the carrying amount exceeds its fair value.  SFAS No. 142 states, in part:

19.    The first step of the goodwill impairment test, used to identify potential impairment, compares the fair value of a reporting unit with its carrying amount including goodwill. . . .  If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test shall be performed to measure the amount of impairment loss, if any.

20.    The second step of the goodwill impairment test, used to measure the amount of impairment loss, compares the implied fair value of reporting unit goodwill with the carrying amount of that goodwill.  The guidance in paragraph 21 shall be used to estimate the implied fair value of goodwill.  If the carrying amount of reporting unit goodwill exceeds the implied fair value of that goodwill, an impairment loss shall be recognized in an amount equal to that excess. . . .

21.    The implied fair value of goodwill shall be determined in the same manner as the amount of goodwill recognized in a business combination is determined.  That is, an entity shall allocate the fair value of a reporting unit to all of the assets and liabilities of that unit (including any unrecognized intangible assets) as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was the price paid to acquire the reporting unit.  The excess of the fair value of a reporting unit over the amounts assigned to its assets and liabilities is the implied fair value of goodwill. . . .

22.    If the second step of the goodwill impairment test is not complete before the financial statements are issued and a goodwill impairment loss is probable and can be reasonably estimated, the best estimate of that loss shall be recognized in those financial statements.

(Footnotes omitted.)

139.    By the time it reported its interim F04 results, Vodafone's goodwill investment in Germany (Mannesmann), Italy and Japan had deteriorated dramatically as compared to the value at the acquisition dates, including when Vodafone paid hundreds of billion of dollars for Mannesmann in early 2000.  In addition to the businesses not growing as expected when acquired, even the cost of Mannesmann looked increasingly inflated by 2004, at the latest, due to the lack of growth in that

business and similar businesses.  Thus, the defendants were increasingly aware that the impairment indicators existed.

140.    In any event, Vodafone had no margin of error with Mannesmann due to the extremely high price it had paid for the Company.  Vodafone merged with Mannesmann in early 2000 in a hostile takeover.  Mannesmann management agreed to the merger only after: (a) Vodafone sweetened the offer from offering Mannesmann shareholders 42% of the combined company to more than 49%; (b) Vodafone entered an agreement with French company Vivendi to prevent Vivendi from serving as a white knight[7]; and (c) Vodafone's stock appreciated significantly.  To accomplish the last condition (Vodafone's stock appreciation), Gent attended "hundreds" of shareholder meetings talking up the value of the merger.

141.    Thus, once the German results were even the slightest bit disappointing, impairment would exist.  From 2002 to 2004, German semi-annual sales grew only from £2.0 billion to £2.6 billion and, more alarmingly, EBITDA for each six-month period remained stubbornly below £1 billion.  This was not much of a return for the £100+ billion merger.  By 2002, Vodafone had seen a downward trend in the number of German customers and significant "inactive" customers that were not generating new revenue to Vodafone.  By 2003, the average revenue per user ("ARPU") for contract customers was not improving, due to lower spending contract customers.

142.    Vodafone did record impairment in 2002 for German operations, but this was primarily for Arcor-Mannesmann's fixed-line business.  This had been a part of the business Vodafone was not that interested in anyway.  The mobile business had been the target of Vodafone's acquisition.  This was the part of the acquisition that was not generating anywhere near the returns

---

[7]      One analyst termed the Vodafone-Vivendi agreement as follows: "It is an excellent deal for Vivendi shareholders."  "Vodafone has given 50% of the (future) value away."

anticipated at the time of the acquisition. Yet Vodafone failed to record any impairment related to disappointing German wireless operations. The German telecom market did nothing but deteriorate from the time of the Mannesmann acquisition through 2004, and ultimately through 2005. Note the price chart of Deutsche Telecom, which dropped from €100 per share in 2000 to below €20 per share from 2002 through the end of the Class Period:



143.    Italian results and Japanese operations were also disappointing, reflecting impairment, but Vodafone recorded no impairment for the assets associated with these business. In Japan, Vodafone's mobile subscribers had actually declined for the first time in 8/04, yet no write-off was taken. Further demonstrating Vodafone's overstatement of the Japanese assets is the fact that after Softbank acquired Vodafone's Japanese business (at a loss to Vodafone), Softbank immediately wrote down the assets by half, or some $4.5 billion. As *The Wall Street Journal* reported on August 28, 2006:

123

Green-eyeshade crew, take a bow: Japan's biggest Internet conglomerate cut by half the value of the unit's assets, an accounting move that lowered the mobile-phone operations' costs and raised its margins.

\*    \*    \*

Softbank spokesman Katsumasa Tochihara declined to comment on criticisms of a lack of transparency but said the move was tied to **outdated estimates** of the value of fixed assets it acquired earlier this year from Vodafone Group PLC of the United Kingdom. "We acted properly in accordance with the advice of our auditor" about the way the company handled every aspect of revaluing those assets," he said.

\*    \*    \*

When it was owned by Vodafone, the mobile service was plagued by an exodus of customers who were fed up with its spotty coverage and pricey services.

\*    \*    \*

Vodafone had valued the mobile unit's fixed assets – its network, transmission towers and other infrastructure – at a little more than $9 billion. But when Softbank released its first-quarter earnings on Aug. 8, it declared the value to be about half that figure.

144.    Pursuant to IFRS and U.S. GAAP, the Company was required to recognize a loss to reflect the impairment in goodwill. Contrary to these standards, the Individual Defendants caused Vodafone to not reflect such losses, as to do so would have so reduced the Company's earnings during the Class Period as to be an admission that the Company's current business and future prospects in those countries were bleak, at best, and that the integration of the acquisitions was a failure. In fact, had Vodafone properly recorded goodwill impairment as required by the relevant accounting standards, its earnings during the Class Period would have been wiped out.

145.    Further, the undisclosed adverse information concealed by defendants during the Class Period, including failing to adequately disclose Vodafone's tax liability, is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is

known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## VODAFONE LACKED ADEQUATE INTERNAL CONTROLS

146.    Defendants were able to scheme Vodafone shareholders and inflate Vodafone stock prices through accounting improprieties that resulted in materially misstated financial statements by means of circumventing and failing to establish and maintain adequate internal accounting control over accounting for goodwill and recording impairment on a timely and adequate basis.

147.    Defendants issued false certifications as to Vodafone's internal controls with their SEC filings.  Sarbanes-Oxley applied to the Company and required truthful certifications by Sarin and Hydon as to their responsibility for Vodafone's internal controls.

148.    Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting company must:

> (A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> (B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> *        *        *
>
> (ii)    transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP].

149.    These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.  *SEC v. World-Wide Coin Inv.*, 567 F. Supp. 724, 746 (N.D. Ga. 1983).

150.    Defendants caused Vodafone to violate §13(b)(2)(A) of the 1934 Act by failing to maintain accurate records concerning its accounting for assets acquired among other accounting

improprieties. Vodafone's inaccurate and false records were not isolated or unique instances because they were improperly maintained for multiple reporting periods. Accordingly, Vodafone violated §13(b)(2)(A) of the 1934 Act.

151. In addition, defendants caused Vodafone to violate §13(b)(2)(B) of the 1934 Act by failing to implement procedures reasonably designed to prevent accounting irregularities. Vodafone failed to ensure that proper review and checks were in place to ensure that it was recording and properly reporting accounting for assets acquired. In fact, despite knowing the true dismal state of the Company's lack of adequate controls, defendants regularly issued quarterly financial statements throughout the Class Period without ever disclosing the deficiencies in Vodafone's internal accounting controls and falsely asserted that its financial statements complied with GAAP.

152. Financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly to the information in the financial statements. *See* FASB Statement of Financial Accounting Concepts No. 1, ¶7. For this reason, in addition to Vodafone's failure to make the required disclosures in its financial statements and in its SEC filings, Vodafone also shirked its duty to make such disclosures in its conference calls, its press releases and its Annual Reports. As defendants allowed and were responsible for initiating a gross lack of internal controls over financial reporting, defendants were able to scheme Vodafone shareholders and inflate stock prices through accounting improprieties which resulted in materially misstated publicly filed financial statements.

## DEFENDANTS' INSIDER TRADING

153. Defendants took advantage of the temporary inflation in Vodafone's stock price, selling 11.1 million shares of their Vodafone stock for proceeds of $29 million. Defendants made the following sales:

126

| Defendant | Date | Shares Sold | Price (USD) | Proceeds | Percent Sold |
|---|---|---|---|---|---|
| Bamford | 7/1/2004 | 485,384 | $2.16 | $1,048,429 | |
| | 8/4/2004 | 600,000 | $2.12 | $1,274,400 | |
| | 12/13/2004 | 210,000 | $2.57 | $540,540 | |
| | | 1,295,384 | | $2,863,369 | 84.37% |
| Donovan | 8/3/2005 | 263,759 | $2.65 | $697,906 | |
| | 8/3/2005 | 428,777 | $2.65 | $1,134,544 | |
| | | 692,536 | | $1,832,450 | 65.69% |
| Geitner | 7/1/2004 | 396,340 | $2.16 | $856,094 | |
| | 7/8/2005 | 396,340 | $2.50 | $991,643 | |
| | | 792,680 | | $1,847,737 | 64.72% |
| Harper | 8/2/2005 | 2,931,242 | $2.65 | $7,756,066 | |
| | | 2,931,242 | | $7,756,066 | 80.50% |
| Horn-Smith | 7/1/2004 | 55,295 | $2.16 | $119,437 | |
| | 8/31/2005 | 1,155,164 | $2.74 | $3,160,529 | |
| | | 1,210,459 | | $3,279,966 | 36.69% |
| von Kuczkowski | 8/23/2005 | 2,091,802 | $2.77 | $5,798,475 | 99.85% |
| Sarin | 12/15/2004 | 2,110,000 | $2.70 | $5,697,000 | |
| | | 2,110,000 | | $5,697,000 | 30.34% |
| TOTALS: | | 11,124,103 | | $29,075,064 | |

154.    During the Class Period, as part of the defendants' fraudulent scheme and course of conduct, they caused Vodafone to spend $13.2 billion to purchase 5.3 billion of Vodafone's ordinary shares on the open market to help inflate Vodafone's stock price, using corporate funds to purchase shares they knew were inflated so they could more easily unload their own personal shares of Vodafone stock.  Defendants lied, stating that the shares were a good investment and value to justify

the expenditure of corporate funds when, in fact, the shares were overvalued and defendants' true purpose was to support and inflate the stock price while they were bailing out.

## LOSS CAUSATION/ECONOMIC LOSS

155.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Vodafone's stock price and operated as a fraud or deceit on Class Period purchasers of Vodafone stock by misrepresenting the Company's financial results, business success and future business prospects.  Defendants achieved this façade of success, growth and strong future business prospects by blatantly concealing the Company's huge tax liabilities, concealing its difficulties in Germany and Japan, and falsifying the Company's financial statements by failing to record goodwill impairment.  Later, however, when defendants' prior misrepresentations and fraudulent conduct began to be disclosed and became apparent to the market, Vodafone stock fell as the prior artificial inflation came out of Vodafone's ADRs and ordinary share prices.  As a result of their purchases of Vodafone shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

## COUNT I

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

156.    Plaintiff incorporates ¶¶1-154 by reference.

157.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

158.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Vodafone publicly traded securities during the Class Period.

159.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Vodafone publicly traded securities. Plaintiff and the Class would not have purchased Vodafone publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

160.    As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Vodafone publicly traded securities during the Class Period.

### COUNT II

#### For Violation of §20(a) of the 1934 Act
#### Against All Defendants

161.    Plaintiff incorporates ¶¶1-159 by reference.

162.    The Individual Defendants acted as controlling persons of Vodafone within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Vodafone, and their ownership of Vodafone stock, the Individual Defendants had the power and authority to cause Vodafone to engage in the wrongful conduct complained of herein. Vodafone

controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants and Vodafone are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

163.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Vodafone's publicly traded securities, including ADRs and ordinary shares, on the open market during the Class Period (the "Class"). Excluded from the Class are defendants.

164.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Vodafone had billions of ADRs and shares of stock outstanding, owned by thousands of persons.

165.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate  over questions which may affect individual Class members include:

(a)    Whether the 1934 Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the prices of Vodafone's publicly traded securities were artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

166.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from defendants' wrongful conduct.

167.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

168.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## STATUTORY SAFE HARBOR

169.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false forward-looking statements pleaded in this Complaint. The safe harbor does not apply to Vodafone's allegedly false financial statements.  Many of Vodafone's oral presentations to analysts, investors and the like did not include any Safe Harbor warning of any kind, including the 9/29/04, 11/16/04, 1/20/05, 5/24/05 and 9/19/05 presentations. Meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements did not accompany forward-looking statements.  Each of the forward-looking statements alleged herein to be false was authorized by an executive officer of Vodafone and was actually known by each of the Individual Defendants to be false when made.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiff and the members of the Class compensatory damages;

C.    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: March 26, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiff*

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
PATRICK W. DANIELS
DAVID C. WALTON
MARK SOLOMON
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

*Attorneys for Plaintiff*

132

## CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that on March 26, 2008, I caused a true and correct copy of the attached:

Amended Complaint for Violation of the Federal Securities Laws

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to all counsel on the attached service list.

*/s/ Samuel H. Rudman*

Samuel H. Rudman

VODAFONE 07

Service List - 1/10/2008     (07-0242)

Page 1 of  1

**Counsel For Defendant(s)**

Theodore  Edelman

Sullivan & Cromwell LLP

125 Broad Street

New York, NY  10004-2498

   212/558-4000

   212/558-3588 (Fax)


**Counsel For Plaintiff(s)**

Samuel H. Rudman

David A. Rosenfeld

Coughlin Stoia Geller Rudman & Robbins LLP

58 South Service Road, Suite 200

Melville, NY  11747

   631/367-7100

   631/367-1173 (Fax)