**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
THE CITY OF EDINBURGH COUNCIL ON
BEHALF OF THE LOTHIAN PENSION          :
FUND, On Behalf of Itself and All Others
Similarly Situated,                                 :

                    Plaintiff,      :   Civil Action No. 07 Civ. 9921 (PKC)

        v.                                     :

                                 :
VODAFONE GROUP PUBLIC LIMTED
COMPANY, et al.,                              :

                   Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**EXHIBIT G TO THE DECLARATION OF JORDAN T. RAZZA**



# VODAFONE GROUP PUBLIC LTD CO
(VOD)

VODAFONE HOUSE
THE CONNECTION
NEWBURY, BERKSHIRE, X0 RG14 2FN
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-
http://www.vodafone.com/

## 20-F

Filed on 06/08/2005 – Period: 03/31/2005
File Number 001-10086



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Form 20-F

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended:  March 31, 2005

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from:_____to_____

Commission file number:  1-10086

## VODAFONE GROUP PUBLIC LIMITED COMPANY
(formerly VODAFONE AIRTOUCH PUBLIC LIMITED COMPANY)
*(Exact name of Registrant as specified in its charter)*

**England**
*(Jurisdiction of incorporation or organization)*

**Vodafone House, The Connection, Newbury, Berkshire RG14 2FN, England**
*(Address of principal executive offices)*

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Ordinary shares of $0.10 each | New York Stock Exchange* |

* Listed, not for trading, but only in connection with the registration of American Depositary Shares, pursuant to the requirements of the Securities and Exchange Commission.

Securities registered or to be registered pursuant to Section 12(g) of the Act:
**None**

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:
**None**

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report.

| | |
|---|---:|
| Ordinary Shares of $0.10 each | 64,566,632,941 |
| 7% Cumulative Fixed Rate Shares of £1 each | 50,000 |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days:

Yes ☒       No ☐

Indicate by check mark which financial statements item the registrant has elected to follow:

Item 17 ☐       Item 18 ☒

# Cautionary Statement Regarding Forward-Looking Statements

This document contains "forward-looking statements" within the meaning of the US Private Securities Litigation Reform Act of 1995 with respect to the Group's financial condition, results of operations and businesses and certain of the Group's plans and objectives. In particular, such forward-looking statements include statements with respect to Vodafone's expectations as to launch and roll-out dates for products, services or technologies offered by Vodafone; intentions regarding the development of products and services introduced by Vodafone or by Vodafone in conjunction with initiatives with third parties; the ability to integrate our operations throughout the Group in the same format and on the same technical platform and the ability to be operationally efficient; the development and impact of new mobile technology; anticipated benefits to the Group of the One Vodafone programme; the results of Vodafone's brand awareness and brand preference campaigns; growth in customers and usage, including improvements in customer mix; future performance, including turnover, average revenue per user ("ARPU"), cash flows, costs, capital expenditures and margins, non-voice services and their revenue contribution; share purchases; the rate of dividend growth by the Group or its existing investments; expectations regarding the Group's access to adequate funding for its working capital requirements; expected effective tax rates and expected tax payments; the ability to realise synergies through cost savings, revenue generating services, benchmarking and operational experience; future acquisitions, including increases in ownership in existing investments and pending offers for investments; future disposals; contractual obligations; mobile penetration and coverage rates; the impact of regulatory and legal proceedings involving Vodafone; expectations with respect to long-term shareholder value growth; Vodafone's ability to be the mobile market leader, overall market trends and other trend projections.

Forward-looking statements are sometimes, but not always, identified by their use of a date in the future or such words as "anticipates", "aims", "could", "may", "should", "expects", "believes", "intends", "plans" or "targets". By their nature, forward-looking statements are inherently predictive, speculative and involve risk and uncertainty because they relate to events and depend on circumstances that will occur in the future. There are a number of factors that could cause actual results and developments to differ materially from those expressed or implied by these forward-looking statements. These factors include, but are not limited to, the following:

- changes in economic or political conditions in markets served by operations of the Group that would adversely affect the level of demand for mobile services;

- greater than anticipated competitive activity requiring changes in pricing models and/or new product offerings or resulting in higher costs of acquiring new customers or providing new services;

- the impact on capital spending from investment in network capacity and the deployment of new technologies, or the rapid obsolescence of existing technology;

- slower customer growth or reduced customer retention;

- the possibility that technologies, including mobile Internet platforms, and services, including 3G services, will not perform according to expectations or that vendors' performance will not meet the Group's requirements;

- changes in the projected growth rates of the mobile telecommunications industry;

- the Group's ability to realise expected synergies and benefits associated with 3G technologies and the integration of our operations and those of acquired companies;

- future revenue contributions of both voice and non-voice services offered by the Group;

- lower than expected impact of GPRS, 3G and Vodafone live! and other new or existing products, services or technologies on the Group's future revenue, cost structure and capital expenditure outlays;
- the ability of the Group to harmonise mobile platforms and any delays, impediments or other problems associated with the roll-out

- and scope of 3G technology and services and Vodafone live! and other new or existing products, services or technologies in new markets;

- the ability of the Group to offer new services and secure the timely delivery of high-quality, reliable GPRS and 3G handsets, network equipment and other key products from suppliers;

- greater than anticipated prices of new mobile handsets;

- the ability to realise benefits from entering into partnerships for developing data and Internet services and entering into service franchising and brand licensing;

- the possibility that the pursuit of new, unexpected strategic opportunities may have a negative impact on one or more of the measurements of our financial performance and may affect the level of dividends;

- any unfavourable conditions, regulatory or otherwise, imposed in connection with pending or future acquisitions or dispositions;

- changes in the regulatory framework in which the Group operates, including possible action by regulators in markets in which the Group operates or by the European Commission regulating rates the Group is permitted to charge;

- the Group's ability to develop competitive data content and services which will attract new customers and increase average usage;

- the impact of legal or other proceedings against the Group or other companies in the mobile telecommunications industry;

- the possibility that new marketing campaigns or efforts are not an effective expenditure;

- the possibility that the Group's integration efforts do not increase the speed to market for new products or improve the Group's cost position;

- changes in exchange rates, including particularly the exchange rate of pounds sterling to the euro, US dollar and the Japanese yen;

- the risk that, upon obtaining control of certain investments, the Group discovers additional information relating to the businesses of that investment leading to restructuring charges or write-offs or with other negative implications;

- changes in statutory tax rates and profit mix which would impact the weighted average tax rate;

- changes in tax legislation in the jurisdictions in which the Group operates;

- final resolution of open issues which might impact the effective tax rate;

- timing of tax payments relating to the resolution of open issues; and,

- loss of suppliers or disruption of supply chains.

Furthermore, a review of the reasons why actual results and developments may differ materially from the expectations disclosed or implied within forward-looking statements can be found under "Risk Factors and Legal Proceedings – Risk Factors". All subsequent written or oral forward-looking statements attributable to the Company or any member of the Group or any persons acting on their behalf are expressly qualified in their entirety by the factors referred to above. No assurances can be given that the forward-looking statements in this document will be realised. Neither Vodafone nor any of its affiliates intends to update these forward-looking statements.

Back to Contents

## Risk Factors and Legal Proceedings

### Risk Factors

**Regulatory decisions and changes in the regulatory environment could adversely affect the Group's business.**

Because the Group has ventures in a large number of geographic areas, it must comply with an extensive range of requirements that regulate and supervise the licensing, construction and operation of its telecommunications networks and services. In particular, there are agencies which regulate and supervise the allocation of frequency spectrum and which monitor and enforce regulation and competition laws which apply to the mobile telecommunications industry. Decisions by regulators regarding the granting, amendment or renewal of licences, to the Group or to third parties, could adversely affect the Group's future operations in these geographic areas. The Group cannot provide any assurances that governments in the countries in which it operates will not issue telecommunications licences to new operators whose services will compete with it. In addition, other changes in the regulatory environment concerning the use of mobile phones may lead to a reduction in the usage of mobile phones or otherwise adversely affect the Group. Additionally, decisions by regulators could further adversely affect the pricing for services the Group offers. Further details on the regulatory framework, in certain regions in which the Group operates, and on regulatory proceedings can be found in "Business Overview – Regulation".

**Increased competition may reduce market share or revenue.**

The Group faces intensifying competition. Competition could lead to a reduction in the rate at which the Group adds new customers and to a decrease in the size of the Group's market share as customers choose to receive mobile services, or other competing services, from other providers.

The focus of competition in many of the Company's markets continues to shift from customer acquisition to customer retention as the market for mobile telecommunications has become increasingly penetrated. Customer deactivations are measured by the Group's churn rate. There can be no assurance that the Group will not experience increases in churn rates, particularly as competition intensifies. An increase in churn rates could adversely affect profitability because the Group would experience lower revenue and additional selling costs to replace customers, although such costs would have a future revenue stream to mitigate the impact.

Increased competition has also led to declines in the prices the Group charges for its mobile services and is expected to lead to further price declines in the future. Competition could also lead to an increase in the level at which the Group must provide subsidies for handsets. Additionally, the Group could face increased competition should there be an award of additional licences in jurisdictions in which a member of the Group already has a licence, whether 2G or 3G.

**Delays in the development of handsets and network compatibility and components may hinder the deployment of new technologies.**

The Group's operations depend in part upon the successful deployment of continuously evolving mobile telecommunications technologies. The Group uses technologies from a number of vendors and makes significant capital expenditures in connection with the deployment of such technologies. There can be no assurance that common standards and specifications will be achieved, that there will be inter–operability across Group and other networks, that technologies will be developed according to anticipated schedules, that they will perform according to expectations or that they will achieve commercial acceptance. Commercially viable 3G handsets may not be available in the timeframe required or in the amounts needed, which may reduce the potential revenue benefits from 3G services. The introduction of software and other network components may also be delayed. The failure of vendor performance or technology performance to meet the Group's expectations or the failure of a technology to achieve commercial

acceptance could result in additional capital expenditures by the Group or a reduction in profitability.

### Expected benefits from the One Vodafone programme may not be realised.

The One Vodafone programme represents the Group's plan to achieve full integration of its global operations and is designed to maximise the benefits of Vodafone's scale and scope. The programme is premised on six core initiatives, further details of which can be found on page 13. The Group has previously stated publicly that it expects to realise operational cash flow benefits by the financial year ending 31 March 2008. These expected benefits have been formulated by management on the assumption that all of the core initiatives which comprise the One Vodafone programme generate the results anticipated and that the Group is able to take advantage of its size and exploit the associated economies of scale to their fullest extent. Management still considers these targeted cost savings and revenue enhancements to be achievable. However, no assurance can be given that the full extent of the anticipated benefits of the One Vodafone programme will be realised.

### Challenging environment in Japan.

Vodafone continues to encounter difficult market conditions in Japan due to the strength of competitor offerings, specifically in 3G customer propositions. The Group has strengthened Vodafone Japan's management team and continues with the ongoing transformation plan. However, in a constantly evolving competitive environment, no assurance can be provided with respect to Vodafone's ability to perform in Japan either operationally or as a management team and secure a local competitive advantage.

### The Group's business would be adversely affected by the non-supply of equipment and support services by a major supplier.

Companies within the Group source their mobile network infrastructure and related support services from third party suppliers. The removal from the market of one or more of these third party suppliers would adversely affect the Group's operations and could result in additional capital expenditures by the Group.

### The Company's strategic objectives may be impeded by the fact that it does not have a controlling interest in some of its ventures.

Some of the Group's interests in mobile licences are held through entities in which it is a significant but not controlling owner. Under the governing documents for some of these partnerships and corporations, certain key matters such as the approval of business plans and decisions as to the timing and amount of cash distributions require the consent of the partners. In others, these matters may be approved without the Company's consent. The Company may enter into similar arrangements as it participates in ventures formed to pursue additional opportunities. Although the Group has not been materially constrained by the nature of its mobile ownership interests, no assurance can be given that its partners will not exercise their power of veto or their controlling influence in any of the Group's ventures in a way that will hinder the Group's corporate objectives and reduce any anticipated cost savings or revenue enhancement resulting from these ventures.

### Expected benefits from investment in networks, licences and new technology may not be realised.

The Group has made substantial investments in the acquisition of 3G licences and in its mobile networks, including the rollout of 3G networks. The Group expects to continue to make significant investments in its mobile networks due to increased usage and the need to offer new services and greater functionality afforded by 3G technology. Accordingly, the rate of the Group's capital expenditures in future years could remain high or exceed that which it has experienced to date.

## Risk Factors and Legal Proceedings continued

Please see "Business Overview – Licences and network infrastructure" for more information on expenditures in connection with the acquisition of 3G licences and expected expenditure in connection with the roll−out of 3G services. There can be no assurance that the introduction of 3G services will proceed according to anticipated schedules or that the level of demand for 3G services will justify the cost of setting up and providing 3G services. Failure or a delay in the completion of networks and the launch of new services, or increases in the associated costs, could have a material adverse effect on the Group's operations.

### The Group may experience a decline in revenue per customer notwithstanding its efforts to increase revenue from the introduction of new services.

As part of its strategy to increase usage of its networks, the Group will continue to offer new services to its existing customers, and seek to increase non−voice service revenue as a percentage of total service revenue. However, the Group may not be able to introduce commercially these new services, or may experience significant delays due to problems such as the availability of new mobile handsets or higher than anticipated prices of new handsets. In addition, even if these services are introduced in accordance with expected time schedules, there is no assurance that revenue from such services will increase ARPU.

### The Group's business and its ability to retain customers and attract new customers may be impaired by actual or perceived health risks associated with the transmission of radiowaves from mobile telephones, transmitters and associated equipment.

Concerns have been expressed in some countries where the Group operates that the electromagnetic signals emitted by mobile telephone handsets and base stations may pose health risks at exposure levels below existing guideline levels and may interfere with the operation of electronic equipment. In addition, as described under "Legal Proceedings" below, several mobile industry participants, including the Company and Verizon Wireless, have had lawsuits filed against them alleging various health consequences as a result of mobile phone usage, including brain cancer. While the Company is not aware that such health risks have been substantiated, there can be no assurance that the actual, or perceived, risks associated with radiowave transmission will not impair its ability to retain customers and attract new customers, reduce mobile telecommunications usage or result in further litigation. In such event, because of the Group's strategic focus on mobile telecommunications, its business and results of operations may be more adversely affected than those of other companies in the telecommunications sector.

## Legal Proceedings

The Company and its subsidiaries are currently, and may be from time to time, involved in a number of legal proceedings, including inquiries from or discussions with governmental authorities, that are incidental to their operations. However, save as disclosed below, the Company and its subsidiaries are not involved currently in any legal or arbitration proceedings (including any governmental proceedings which are pending or known to be contemplated) which are expected to have, or have had in the twelve months preceding the date of this report, a significant effect on the financial position or profitability of the Company and its subsidiaries.

The Company is a defendant in four actions in the United States alleging personal injury, including brain cancer, from mobile phone use. In each case, various other carriers and mobile phone manufacturers are also named as defendants. These actions are at an early stage and no accurate quantification on any losses which may arise out of the claims can therefore be made as at the date of this report. The Company is not aware that the health risks alleged in such personal injury claims have been substantiated and will be vigorously defending such claims.

Between 18 September and 29 November 2002, nine complaints were filed in the United States District Court for the Southern District of New York against the Company and Lord MacLaurin, the Chairman of the Company, and Sir Christopher Gent, Sir Julian Horn−Smith and Mr. Kenneth Hydon,

executive officers of the Company. The actions were brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission. The complaints, which purport to be brought on behalf of all purchasers of ADSs of Vodafone between 7 March 2001 and 28 May 2002, alleged that Vodafone's financial statements and certain Vodafone financial disclosures were materially false and misleading. More specifically, the complaints alleged that, between 7 March 2001 and 28 May 2002, defendants made various material misrepresentations relating to Vodafone's investments in fixed–wire operations, goodwill, and prior acquisitions in an effort to inflate artificially the price of Vodafone securities. The complaints sought compensatory damages in an unspecified amount, interest, reasonable costs including attorneys' fees and experts' fees, and equitable and/or injunctive relief as permitted by law.

The plaintiffs filed a consolidated class action complaint on 6 June 2003. On 14 October 2003, the Court ordered that the complaint be dismissed, with leave for the plaintiffs to re–plead. On 20 October 2003, the plaintiffs entered into a Stipulation dismissing the complaint against Lord Ian MacLaurin without prejudice. On 10 November 2003 the plaintiffs filed a second consolidated amended class action complaint against Vodafone, Sir Christopher Gent, Sir Julian Horn–Smith and Mr. Kenneth Hydon. On 26 March 2004, the Court dismissed without prejudice the remaining individual defendants from this action. On 7 May 2004, the plaintiffs filed a third consolidated amended class action complaint naming only the Company as a defendant. Thereafter, the parties entered into substantive discussions regarding the possibility of settling the action. Those discussions led to a mediation, following which the parties reached an agreement–in–principle to settle the claims against all defendants in exchange for a settlement payment of $24.5 million to a settlement class (the "Settlement Class") comprised of all purchasers of Vodafone ADSs during the period from 7 March 2001 to 28 May 2002 (other than those class members that exclude themselves, or automatically are excluded, from the class). Following the mediation, Vodafone and its insurers paid $24.5 million into an escrow account to fund the settlement in the event that (i) the parties reached a definitive settlement agreement and (ii) that agreement received final approval by the Court after issuance of the necessary notices and the conduct of the necessary hearings. On 4 March 2005, the parties entered into definitive settlement documents and, on that date, participated in a conference and hearing before the Court, at which they submitted a motion for preliminary certification of the Settlement Class and preliminary approval of the settlement. On 15 March 2005, the Court entered an Order that, among other things, preliminarily certified the Settlement Class, preliminarily approved the settlement, set 23 May 2005 as the deadline for the submission by class members of objections to the settlement or requests for exclusion from the Settlement Class, and scheduled a Settlement Fairness Hearing for 22 June 2005.

A subsidiary of the Company, Vodafone 2, is responding to an enquiry by the UK Inland Revenue with regard to the UK tax treatment of its Luxembourg holding company, Vodafone Investments Luxembourg SARL ("VIL"), under the Controlled Foreign Companies section of the UK's Income and Corporation Taxes Act 1988 ("the CFC Regime"). The enquiry by the UK Inland Revenue relates to the tax treatment of profits earned by the holding company for the accounting period ended 31 March 2001. The CFC Regime serves to subject a UK resident company to corporation tax in the UK in respect of the profits of a controlled foreign company in certain circumstances.

Vodafone 2's position is that it is not liable to corporation tax in the UK under the CFC Regime in respect of VIL on the basis that the CFC Regime is contrary to EU law. An application for closure of the enquiry (inter alia) was made by Vodafone 2 to the Special Commissioners of the UK Inland Revenue on 1 October 2004 on the basis that the enquiry could not reasonably be continued as it is premised on UK legislation (the CFC

Regime) which is contrary to EU law and thus invalid. In summary, it is argued that imposition of corporation tax under the CFC Regime amounts to unlawful discrimination or an unlawful restriction on the exercise of fundamental freedoms under the EU Treaty (particularly Articles 43 and 56).

On 3 May 2005 the Special Commissioners referred the matter to the European Court of Justice (the "ECJ") requesting that a number of questions in relation to the invalidity argument be determined as a preliminary matter. Pending resolution of such questions, Vodafone 2's application for closure of the enquiry (and, effectively, the enquiry itself) has been stayed. It is not expected that the ECJ will deliver a judgment in this matter until, at the earliest, mid 2006. The ECJ does not have jurisdiction to determine the outcome of Vodafone 2's application rather the Special Commissioners will apply the ECJ's judgment to the particular facts of Vodafone 2's application.

If the ECJ decides that the CFC Regime in its entirety is invalid under EU law, then no charge to UK corporation tax can arise to Vodafone 2 with respect to VIL under the CFC Regime and the Special Commissioners will order that the Inland Revenue's enquiry be closed. If the CFC Regime is held by the ECJ to be valid, either in part or as a whole, then it will be a matter for the Special Commissioners to apply the ECJ's reasoning to the particular circumstances of Vodafone 2's case. Although it is not possible to address all possible outcomes under such a scenario, it should be noted that even if the CFC Regime is held by the ECJ to be entirely lawful, Vodafone 2 would continue to resist the imposition of corporation tax liability on other grounds.

The Company has taken provisions, which at 31 March 2005 amounted to £1,757 million, for the potential UK corporation tax liability and related interest expense that may arise if the Company is not successful in its challenge of the CFC Regime. The provisions relate to the accounting period which is the subject of the proceedings and accounting periods after 31 March 2001 to date. Please see note 8 to the Company's Consolidated Financial Statements. The Company considers these provisions are sufficient to settle any assessments that may arise from the enquiry. However, the amount ultimately paid by the Company (if any) upon resolution of the enquiry may differ materially from the amount accrued and, therefore, could have a significant effect on the profitability or cash flows of the Group in future periods. In the absence of any material unexpected developments, the Company expects to reassess the amount of this provision when the views of the ECJ become known, which is expected to be during 2006.

A number of Vodafone subsidiaries acquired 3G licences through auctions in 2000 and 2001. An appeal was filed by Vodafone UK, along with other UK mobile network operators which were granted a 3G licence, with the VAT and Duties Tribunal on 18 October 2003 for recovery of VAT on the basis that the amount of the licence fee was inclusive of VAT. The amount of this claim is approximately £888 million. In August 2004, these claims were referred, jointly, to the ECJ although no hearing date has yet been listed. A decision from the ECJ is not expected before 2006. The Group has not recognised any amounts in respect of this matter to date. In addition, the Group has made a claim for recovery of VAT in relation to 3G licence fees in Portugal and may pursue similar claims in certain other European jurisdictions.