UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x
THE CITY OF EDINBURGH COUNCIL ON :   Civil Action No. 1:07-cv-09921-PKC
BEHALF OF THE LOTHIAN PENSION :
FUND, On Behalf of Itself and All Others :   <u>CLASS ACTION</u>
Similarly Situated, :
                            Plaintiff, :
:
      vs. :
:
VODAFONE GROUP PUBLIC LIMITED :
COMPANY, et al., :
:
                         Defendants. :
——————————————————— x

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ...................................................................................1

II. STATEMENT OF FACTS ........................................................................................2

    A.  The Company .................................................................................................2

    B.  Events Leading Up to the Start of the Class Period ......................................2

    C.  Defendants Embark on a Scheme to Inflate Vodafone's Securities ...............4

    D.  The Truth Is Disclosed ...................................................................................5

III. ARGUMENT ...........................................................................................................6

    A.  Legal Standard on a Motion to Dismiss ........................................................6

    B.  The AC Sufficiently Alleges Fraud with Particularity ..................................6

        1.  The AC Identifies Defendants' False and Misleading Statements and the Basis for Their Falsity .......................................7

        2.  The AC Adequately Alleges that Defendants Failed to Timely Disclose that Vodafone Faced Massive Multi-Billion Dollar Tax Payments Over the Next Several Years .......................................8

        3.  The AC Adequately Alleges that Defendants Failed to Disclose that Vodafone Did Not Timely Write-Down Its Impaired Assets ..............9

    C.  The Statements Identified As False and Misleading Are Actionable ...................13

        1.  The AC Does Not Allege Mismanagement ...............................13

        2.  Forward-Looking Statements .................................................15

        3.  Puffery .................................................................................16

        4.  Statements of Third Parties ...................................................17

    D.  This Court Has Subject Matter Jurisdiction Over Lothian's Claims ...................17

        1.  Lothian Satisfies the "Conduct Test" ....................................18

    E.  The AC Adequately Pleads Scienter .....................................................21

**Page**

1.    The AC Alleges Strong Circumstantial Evidence of Defendants'
Conscious Misbehavior or Recklessness ....................................................21

2.    The AC Alleges Facts Demonstrating Motive and Opportunity ..............26

F.    The AC Adequately Pleads a Claim for Control Person Liability........................30

IV.    CONCLUSION.................................................................................................30

## CASES

*Acito v. IMCERA Group*,
    47 F.3d 47 (2d Cir. 1995) ............................................................................29

*Bell Atl. Corp. v. Twombly*,
    127 S. Ct. 1955 (2007)..................................................................................6

*Caiafa v. Sea Containers Ltd.*,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007)........................................................12

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
    321 F. Supp. 2d 1342 (N.D. Ga. 2004) ................................................11, 12

*Chill v. GE*,
    101 F.3d 263 (2d Cir. 1996)........................................................................23

*City of Sterling Heights Police & Fire Retirement Sys. v. Abbey Nat'l*,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006)..................................................23, 24

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989) ...........................................................................24

*Crowell v. Ionics, Inc.*,
    No. 03-10393-WGY, 2004 U.S. Dist. LEXIS 22254
    (D. Mass. Nov. 3, 2004)..............................................................................28

*Darquea v. Jarden Corp.*,
    No. 06 CV 0722 (CLB), 2007 U.S. Dist. LEXIS
    40247 (S.D.N.Y. May 31, 2007)................................................................16

*Davidco Investors, LLC v. Anchor Glass Container Corp.*,
    No. 8:04-cv-2561-T-24 EAJ, 2006 U.S. Dist. LEXIS 11527
    (M.D. Fla. Mar. 6, 2006).............................................................................10

*Degulis v. LXR Biotechnology, Inc.*,
    928 F. Supp. 1301 (S.D.N.Y. 1996)...........................................................10

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005)....................................................................................21

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ......................................................................27

*Filetech S.A. v. France Telecom S.A.*,
    157 F.3d 922 (2d Cir. 1998)........................................................................19

**Page**

*Fishbaum v. Liz Clairborne, Inc.*,
  189 F.3d 460 (2d Cir. 1999)............................................................29

*Havenick v. Network Express*,
  981 F. Supp. 480 (E.D. Mich. 1997)...................................................7

*In re Acterna Corp. Sec. Litig.*,
  378 F. Supp. 2d 561 (D. Md. 2005)....................................................12

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
  398 F. Supp. 2d 244 (S.D.N.Y. 2005).................................................9

*In re Aegon N.V. Sec. Litig.*,
  No. 03 CIV 0603 (RWS), 2004 WL 1415973
  (S.D.N.Y. June 23, 2004)...............................................................25

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 402 (S.D.N.Y. 2005).................................................13

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004).................................................15

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)............................................22, 23

*In re Autodesk, Inc. Sec. Litig.*,
  132 F. Supp. 2d 833 (N.D. Cal. 2000) ...............................................7

*In re BISYS Sec. Litig.*,
  397 F. Supp.2d 430 (S.D.N.Y. 2005)..................................................29

*In re Duane Reade Inc. Sec. Litig.*,
  No. 02 Civ. 6478(NRB), 2003 U.S. Dist. LEXIS 21319
  (S.D.N.Y. Nov. 25, 2003)...............................................................26

*In re Eastman Kodak Co. Sec. Litig.*,
  No. 6:05-cv-6326-MAT, 2006 WL 3149361
  (W.D.N.Y. Nov. 1, 2006)................................................................16

*In re Entrust Sec. Litig.*,
  No. 2:00CV119, 2002 WL 31968321
  (E.D. Tex. Sept. 30, 2002) ..............................................................7

**Page**

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006).......................................13, 24

*In re First Chicago Corp. Sec. Litig.*,
789 F. Supp. 919 (N.D. Ill. 1992) .................................................2

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
308 F. Supp. 2d 249 (S.D.N.Y. 2004)..............................................12

*In re Global Crossing, Ltd. Sec. Litig.*,
322 F. Supp. 2d 319 (S.D.N.Y. 2004).........................................10, 11

*In re Guilford Mills, Inc. Sec. Litig.*,
No. 98 Civ. 7739 (CLB), 1999 U.S. Dist. LEXIS 21690
(S.D.N.Y. July 21, 1999) ........................................................27

*In re IBM Corporate Sec. Litig.*,
163 F.3d 102 (2d Cir. 1998).....................................................15

*In re Initial Pub. Offering Sec. Litig.*,
241 F. Supp. 2d 281 (S.D.N.Y. 2003).........................................7, 14

*In re K-Tel Int'l Inc. Sec. Litig.*,
107 F. Supp. 2d 994 (D. Minn. 2000) ...........................................12

*In re Keyspan Corp. Sec. Litig.*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...........................................28

*In re Nokia Corp. Sec. Litig.*,
No. 96 Civ. 3752 (DC), 1998 U.S. Dist. LEXIS 4100
(S.D.N.Y. Apr. 1, 1998)..........................................................13

*In re Nortel Networks Corp. Sec. Litig.*,
238 F. Supp. 2d 613 (S.D.N.Y. 2003)............................................16

*In re NTL Inc. Sec. Litig.*,
347 F. Supp. 2d 15 (S.D.N.Y. 2004)........................................7, 14, 15

*In re Oxford Health Plans, Inc. Sec. Litig.*,
187 F.R.D. 133 (S.D.N.Y. 1999) ................................................27

*In re ProNetLink Sec. Litig.*,
403 F. Supp. 2d 330 (S.D.N.Y. 2005)............................................13

**Page**

*In re Qwest Commc'ns Int'l Sec. Litig.*,
    396 F. Supp. 2d 1178 (D. Colo. 2004)...........................................................................28

*In re Regeneron Pharms., Inc. Sec. Litig.*,
    No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350
    (S.D.N.Y. Feb. 3, 2005) .................................................................................................7

*In re Revlon, Inc. Sec. Litig.*,
    No. 99 Civ. 10192 (SHS), 2001 U.S. Dist. LEXIS 3265
    (S.D.N.Y. Mar. 27, 2001) .............................................................................................17

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)...................................................................................7, 26, 27

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)...........................................................................30

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ........................................................................16

*In re Sina Corp. Sec. Litig.*,
    No. 05 Civ. 2154 (NRB), 2006 WL 2742048
    (S.D.N.Y. Sept. 26, 2006) .........................................................................................7, 29

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
    No. 00 Civ. 1041 (DLC), 2000 WL 1234601
    (S.D.N.Y. Aug. 31, 2000) ........................................................................................16, 26

*In re Take-Two Interactive Sec. Litig.*,
    No. 06 Civ 803 (SWK), 2008 WL 1757823
    (S.D.N.Y. Apr. 16, 2008)..............................................................................................29

*In re Tower Auto. Sec. Litig.*,
    483 F. Supp. 2d 327 (S.D.N.Y. 2007)...........................................................................30

*In re Vivendi Universal*,
    No. 02 Civ. 5571 (RJH), 2004 U.S. Dist. LEXIS 21230
    (S.D.N.Y. Oct. 22, 2004) .........................................................................................18, 20

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................................7, 20, 24

**Page**

*In re Winstar Commc'ns,*
No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618
(S.D.N.Y. Feb. 27, 2006) ........................................................................22

*In re Yukos Oil Co. Sec. Litig.,*
No. 04 Civ. 5243 (WHP), 2006 U.S. Dist. LEXIS 78067
(S.D.N.Y. Oct. 25, 2006) ........................................................................19

*Kalnit v. Eichler,*
264 F.3d 131 (2d Cir. 2001).....................................................................29

*Kreindler v. Chemical Waste Mgmt., Inc.,*
877 F. Supp. 1140 (N.D. Ill. 1995) .....................................................2, 10

*Lapin v. Goldman Sachs & Co.,*
506 F. Supp. 2d 221 (S.D.N.Y. 2006)...............................................13, 16

*Marcus v. Frome,*
275 F. Supp. 2d 496 (S.D.N.Y. 2003)......................................................26

*Mills v. Polar Molecular Corp.,*
12 F.3d 1170 (2d Cir. 1993).......................................................................7

*Milman v. Box Hill Sys. Corp.,*
72 F. Supp. 2d 220 (S.D.N.Y. 1999)........................................................13

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000).......................................................... *passim*

*Ortman v. Stanray Corp.,*
371 F.2d 154 (7th Cir. 1967) ....................................................................21

*Phelps v. Kapnolas,*
308 F.3d 180 (2d Cir. 2002).......................................................................6

*Provenz v. Miller,*
102 F.3d 1478 (9th Cir. 1996),
*cert. denied,* 522 U.S. 808 (1997)...........................................................27

*Rolf v. Blyth, Eastman Dillon & Co.,*
570 F.2d 38 (2d Cir. 1978).......................................................................22

*Rombach v. Chang,*
355 F.3d 164 (2d Cir. 2004)........................................................13, 16, 26

**Page**

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)..........................................................................21, 22, 26, 29

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ......................................................................................27

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*,
    75 F.3d 801 (2d Cir. 1996)........................................................................................29

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)..................................................................................................14

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974)....................................................................................................6

*Schiller v. Physicians Resource Group, Inc.*,
    No. 3:97-CV-3158-L, 2002 WL 318441
    (N.D. Tex. Feb. 26, 2002)........................................................................................12

*SEC v. Berger*,
    322 F.3d 187 (2d Cir. 2003)......................................................................................18

*Selbst v. McDonald's Corp.*,
    No. 04 C2422, 2005 U.S. Dist. LEXIS 23093
    (N.D. Ill. Sept. 21, 2005) ....................................................................................11, 12

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ......................................................................................7

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)........................................................................................27

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001)........................................................................................14

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506
    (S.D.N.Y. Sept. 6, 2005)...........................................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)..............................................................................................21

**Page**

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78u-4 .................................................................................................................6
    § 78u-5(c)(1)(A)(i) ............................................................................................15

28 U.S.C.
    §1367 ...............................................................................................................21

Federal Rules of Civil Procedure

    Rule 8 ..............................................................................................................30
    Rule 9(b) ..................................................................................................6, 7, 10
    Rule 12(b)(6) ......................................................................................................6

17 C.F.R.
    §240.10b-5 ........................................................................................................21

Lead Plaintiff The City of Edinburgh Council on Behalf of the Lothian Pension Fund ("Lothian") and named plaintiff City of Sterling Heights Police & Fire Retirement System (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss the amended complaint (the "AC," cited herein as "¶__") filed by Defendants ("Def. Mem. at ___").

## I.    PRELIMINARY STATEMENT

This is a federal securities class action brought on behalf of all persons who purchased the publicly-traded securities, including common/ordinary stock and American Depositary Receipts ("ADRs"), of Vodafone Group Public Limited Company ("Vodafone" or the "Company") between June 10, 2004 and February 27, 2006 (the "Class Period"), against Vodafone and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934.

This case centers around one of the largest impairment charges ever taken by a publicly-traded corporation. As alleged in the AC, during the Class Period, Defendants made numerous misleading statements about the state of Vodafone's operations in Germany, Italy and Japan and about the fact that it was carrying tens of billions of dollars of assets on its balance sheet that were severely impaired and should have been written off, but were not. The AC details how Defendants either knew about the Company's impaired assets or why they were reckless in not knowing about them. The AC further describes how Vodafone's new management was struggling to "right the ship" at the Company after its earlier mishaps, and delayed disclosing any further bad news for as long as possible. Lastly, the AC alleges that, during the Class Period, Defendants concealed that they were in active negotiations with various tax authorities that would require the Company to make payments of billions of dollars in taxes over a multi-year period, causing a serious drain on the Company's free cash flow during that time.

In the face of these well-plead allegations, Defendants have filed a motion to dismiss,

primarily arguing that there are insufficient facts plead about the impairment charge, such as when

such a charge should have been taken and for how much.  The AC, however, adequately pleads that,

in light of the information that was known to Defendants, or recklessly disregarded by them, the

impairment charge should have been taken by the start of the Class Period.  As detailed herein, since

the impairment charge was "'so apparent' to [defendants] before the announcement, [] a failure to

take an earlier write-down amounts to fraud."  *Kreindler v. Chemical Waste Mgmt., Inc.*, 877 F.

Supp. 1140, 1154 (N.D. Ill. 1995) (quoting *In re First Chicago Corp. Sec. Litig.*, 789 F. Supp. 919,

922 (N.D. Ill. 1992)).  The balance of Defendants' arguments question the attainability of certain

statements, whether scienter has been adequately plead and whether there is subject matter

jurisdiction for Lothian's claim.  As discussed herein, these arguments are also without merit.

Accordingly, for these reasons, and as set forth below in further detail, Defendants' motion to

dismiss should be denied in its entirety.

## II.     STATEMENT OF FACTS[1]

### A.     The Company

Vodafone operates as a mobile telecommunications company principally in the U.S., Europe,

and Asia Pacific.  ¶25. Vodafone grew rapidly through acquisitions, the largest and most notable of

which was the acquisition of Mannesmann in Germany in 2000 for $170 billion, one of the largest

acquisitions in business history.  ¶¶44-45.

### B.     Events Leading Up to the Start of the Class Period

After suffering through a series of financial mishaps in the bursting telecom bubble in 2002

---

[1]  A chart depicting the timing of the statements made by Defendants and the corresponding insider sales is attached as Exhibit A to the accompanying Declaration of David A. Rosenfeld ("Rosenfeld Decl., Ex. _"); *see also* ¶17.

and 2003, Vodafone led investors to believe that it was finally on track with its turnaround. ¶¶46-48. It had new management in place, headed up by defendant Arun Sarin ("Sarin"), that was focused on capturing the economies of scale in Vodafone's huge size and global scale and successfully integrating Vodafone's past acquisitions. ¶5. Its goal was to improve Vodafone's operations and generate increasing free cash flow. *Id*.

In 2002, prior to the start of the Class Period, Vodafone supposedly took all of the asset write-downs necessary to reflect the current fair value of its prior acquisitions, including some $7 billion for its Mannesmann acquisition, such that the goodwill shown on Vodafone's balance sheet was not inflated, meaning Vodafone's future operating earnings would not be hurt by further huge asset (goodwill) write-downs. ¶6. In connection with Vodafone's Mannesmann write-down, Vodafone wrote down only Mannesmann's ground line assets – not its mobile assets, which Vodafone insisted were fairly valued – representing to investors that no further asset impairment write-downs were required for Mannesmann. *Id*.

Despite the problems the Company experienced with its earlier acquisitions, in early 2004, its new management attempted to make yet another gigantic telecom acquisition. ¶7. Investors reacted very negatively to this acquisition attempt by driving the Company's stock price lower, which forced defendants Lord Ian MacLaurin ("MacLaurin"), Vodafone's Chairman, and Sarin, its CEO, to abandon it. *Id*. This stock price decline also significantly impaired the value of stock options held by Sarin and other members of the Sarin/MacLaurin management team and made it unlikely that they would be able to obtain the type of multi-million dollar bonuses from Vodafone they desired, the amount of which depended in part on whether Vodafone achieved targeted performance indicators, including Vodafone stock price appreciation. *Id*. These factors put tremendous pressure on Sarin, the new, high-profile CEO of Vodafone, and MacLaurin, Vodafone's long-time Chairman,

who had spearheaded Vodafone's prior growth strategy and hand-picked Sarin as CEO, to show concrete operative and financial progress in their management of Vodafone and to pacify Vodafone stockholders and boost Vodafone's share and ADR prices. *Id.* This would not only restore value to the Vodafone executives' stock options, but also enable Sarin and MacLaurin and their top cohorts to hold onto their lucrative executive positions, allowing them to pocket millions of dollars a year in pay and performance bonuses. *Id.*

      **C.     Defendants Embark on a Scheme to Inflate Vodafone's Securities**

After its failed acquisition at the start of 2004, management embarked on a plan to try to stem the decline in Vodafone shares and push those shares up higher in price. ¶9. During this period, Defendants repeatedly extolled the success of Vodafone's German and Italian operations, the "One Vodafone" program (by which Vodafone's international operations were supposedly being integrated and streamlined), which would generate $2.5 billion in additional yearly free cash flow by 2007-2008, and the successful introduction of its new 3-G phones and service, especially in Japan. ¶10. To make it appear that Vodafone was succeeding and thus further their fraudulent scheme and course of conduct, Defendants caused Vodafone to report false and misleading (and artificially manipulated and inflated) financial results during the Class Period, which overstated Vodafone's operating profits, EBITDA, assets and net worth by several billion dollars due to Defendants' failure to timely recognize and take the required write-downs for the impaired value of Vodafone's German, Italian and Japanese operations resulting, in part, from previous acquisitions in those zones at inflated prices. *Id.* This manipulated financial reporting occurred while Defendants were falsely assuring investors that Vodafone's German and Italian operations were succeeding and growing, despite increasingly competitive conditions and decreases in termination fees imposed by regulators, and that its Japanese operations, while troubled, were being turned around in a manner that would not require substantially increased capital expenditures to be incurred or any asset (goodwill)

impairment charge to be recognized. *Id.* They also concealed that Vodafone was going to incur additional cash tax payments of approximately $7 billion during fiscal 2006-2008, which would materially impair its free operating cash flow during those periods. *Id.*

### D. The Truth Is Disclosed

On November 15, 2005, Defendants shocked investors by disclosing, among other things, that Vodafone would be facing at least $7 billion in cash flow impairments due to tax payments to be made in fiscal 2006-2008 and that the EBITDA of its Japanese operations would fall sharply in fiscal 2006 due to higher capital expenditures. Following this announcement, shares of Vodafone's stock and ADRs collapsed from $25.30 on November 14 to $21.90 on November 16, while its common/ordinary shares collapsed from £1.46 on November 14 to £1.26 on November 16 – a Company-specific price decline of 20%. ¶14.

Defendants continued to reassure investors that Vodafone's Japanese turnaround plan was still "on plan" and "on course," and that the carrying value of its Japanese assets was not impaired and thus Vodafone's ADRs and ordinary shares continued to trade at artificially inflated, albeit lower, prices. *Id.*

Then, on February 27, 2006, Vodafone revealed a $40-$49 billion asset write-down due to the impaired value of its German (Mannesmann), Italian and Japanese operations, admissions that the operations in these countries were much less successful (or less capable of being turned around) than had previously been represented, that the value of these assets on Vodafone's fiscal 2004-2006 financial statements had been vastly overstated, and that Vodafone had actually been suffering large operating losses in these operations due to the excessive valuations at which it carried them on its books. *Id.* This led to a further decline in Vodafone's ADRs to $19.51 per share and in its ordinary shares to £1.09 per share, inflicting further damage on prior Class Period purchasers of those securities and taking the prices of these securities back down to the levels they had been when the

fraudulent scheme to inflate them began.[2] *Id.* Shortly thereafter, Vodafone confirmed its inability to turn around its Japanese operation and that operation's lack of long-term viability by selling the Japanese operations – incurring a huge $8.6 billion loss! *Id.*

Prior to these disclosures, Defendants sold 11.1 million shares of their personally-held Vodafone stock at artificially inflated prices for proceeds of $29 million. ¶153.

## III. ARGUMENT

### A. Legal Standard on a Motion to Dismiss

On a motion to dismiss, a plaintiff's allegations are presumed to be true and a plaintiff is entitled to the benefit of every favorable inference that can be drawn from its allegations. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). At issue on a 12(b)(6) motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.*; *Phelps v. Kapnolas*, 308 F.3d 180, 184-185 (2d Cir. 2002). Accordingly, a complaint "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but rather must simply provide the grounds of entitlement to relief and raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1959 (2007) (citations omitted).

### B. The AC Sufficiently Alleges Fraud with Particularity

Securities fraud actions are subject to the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, *et seq.*, and Rule 9(b), which require plaintiffs to identify "with particularity" the circumstances constituting the alleged fraud. Fed. R. Civ. P. 9(b). "To satisfy Rule 9(b), the complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were

---

[2] Defendants do not contest that Plaintiffs have adequately plead loss causation.

made, and (4) explain why the statements were fraudulent.'" *In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350, at *34-*35 (S.D.N.Y. Feb. 3, 2005) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  In other words, the complaint must identify the "who, what, where, when and how" of the fraud.  *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 358 (S.D.N.Y. 2003) ("*IPO*").[3]

As detailed below, the AC easily meets this standard.

### 1.    The AC Identifies Defendants' False and Misleading Statements and the Basis for Their Falsity

As detailed below, the AC identifies the numerous statements made by Defendants during the Class Period that are alleged to be materially false and misleading, ¶¶11, 14, 51-67, 69-74, 76, 77, 79, 81, 82, 85, 86, 90, 91, 93, 95, 100, 101, 103, 134, 137, 147, and explains why those statements are false and misleading.  ¶¶68, 75, 78, 84, 94, 99, 104, 123, 134, 139-145, 150, 152.  Defendants dispute Plaintiffs' claims and contend that the AC fails to "identify the statements that allegedly were fraudulent and the basis for alleging fraud."  Def. Mem. at 11.  Defendants are wrong.[4]

---

[3]  As the Second Circuit has confirmed, "[e]ven with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (citation omitted).  Accordingly, "[the PSLRA] does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based.  Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs." *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000).

[4]  The cases cited to by Defendants, *Havenick v. Network Express*, 981 F. Supp. 480, 526 (E.D. Mich. 1997), *In re Sina Corp. Sec. Litig.*, No. 05 Civ. 2154 (NRB), 2006 WL 2742048, at *6 (S.D.N.Y. Sept. 26, 2006), *In re Entrust Sec. Litig.*, No. 2:00CV119, 2002 WL 31968321, at *3-*4 (E.D. Tex. Sept. 30, 2002), *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) and *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 841-42 (N.D. Cal. 2000), are all inapposite because, unlike here, the complaints in those actions did not specifically identify which portion of the defendants' public statements were alleged to be materially false and misleading.  Moreover, the characterization of the AC as "endless amusement for the jigsaw puzzle aficionado," Def. Mem. at 1, is the type of depiction routinely rejected by courts in this District. *See, e.g.*, *In re NTL Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22 (S.D.N.Y. 2004) (rejecting argument that complaint was a "puzzle pleading"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 170 (S.D.N.Y. 2003) ("*Vivendi I*") (same).

Indeed, ¶¶11 and 14 of the AC identify misleading portions of the public statements cited to later in the AC, broken out in the different categories of alleged wrongdoing. *See* Rosenfeld Decl., Ex. B (chart stating the source for the materially false and misleading statements made by Defendants during the Class Period). Moreover, the AC identifies the reason as to why the statements identified in the AC were materially false and misleading. *See* ¶¶68, 75, 78, 84, 94, 99, 104, 123, 134, 139-145, 150, 152. Thus, there is simply no legitimate basis for Defendants' contention that the AC fails to identify the false and misleading statements and the basis for their falsity.

2.    **The AC Adequately Alleges that Defendants Failed to Timely Disclose that Vodafone Faced Massive Multi-Billion Dollar Tax Payments Over the Next Several Years**

The AC alleges that Defendants knew from discussions with tax authorities in several countries during the Class Period that the Company would be required to make multi-billion dollar cash tax payments beginning in fiscal 2006 or 2007. As these payments were to be paid out over a number of years, they would reduce the Company's free cash flow during that period by billions of dollars per year. ¶¶105, 106, 108, 111, 113, 115. The AC identifies the statements made by Defendants concerning the amount of the Company's anticipated free cash flow, as well as statements concerning the Company's accrued tax liability and when future payments would have to be made, ¶¶9, 11(h), 77, 115, and states the reasons for their falsity. ¶¶106, 115, 116, 119.

The AC further alleges that it was precisely these positive Class Period statements by Defendants that caused investors to be shocked when, on November 15, 2005, the Company announced that it would be facing $8.7 billion (£5.1 billion) in cash tax payments over the next several years:

- *Bear Stearns*: "Our historic conversations on deferred tax liabilities with the Company suggested that ***any imminent unwinding was not likely to occur***." ¶115

- 8 -

- *ABN Amro analyst Brad McMaster*: "Credibility is quite extensively damaged – to the point where ***Sarin has been advised to apologise for any misconceptions there might have been***." ¶116

- *FT.com*: "Mr. Sarin, addressing investors at a Morgan Stanley conference in Barcelona, admitted that guidance on the tax issue could have been better: '***Maybe the messaging wasn't good and for that I take responsibility***.'" ¶119

Accordingly, Plaintiffs have adequately plead a claim with respect to Defendants' failure to timely disclose that: (i) the Company faced $8.7 billion in cash tax payments over the next several years; and (ii) the Company's free cash flow during those years would be reduced by approximately $1.5 billion per year in order to cover the tax payments.

> **3.      The AC Adequately Alleges that Defendants Failed to Disclose that Vodafone Did Not Timely Write-Down Its Impaired Assets**

Defendants contend that Plaintiffs have not adequately plead a claim with respect to the allegation that the huge $49 billion dollar write-down of the Company's impaired assets, which was first announced in February 2006, should have been taken earlier, *i.e.*, at the time that these assets first become impaired, as required by Statement of Financial Accounting Standard ("SFAS") No. 142 . In making their argument, Defendants advocate dismissal of this claim because "nowhere do Plaintiffs explain when and why the impairment should have occurred and in what amount." Def. Mem. at 12. As the details of this type of information are generally in the unique possession of defendants, courts do not require plaintiffs to allege such specifics in order to successfully plead a claim for fraud because it would be virtually impossible, or at the very least, exceedingly difficult, for any plaintiff to ever meet such a burden. *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244, 253 (S.D.N.Y. 2005) (quoting *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1310-11 (S.D.N.Y. 1996)) ("in cases of corporate fraud, the requirements of Rule 9(b) are relaxed as to matters particularly within the opposing party's knowledge. . . . This is particularly the case where, as here, discovery has not yet commenced.").

- 9 -

Instead, "[t]he standard is whether the need to write-down [the asset] . . . was 'so apparent' to [the defendant] before the announcement, that a failure to take an earlier write-down amounts to fraud." *Kreindler*, 877 F. Supp. at 1154; *see also Davidco Investors, LLC v. Anchor Glass Container Corp.*, No. 8:04-cv-2561-T-24 EAJ, 2006 U.S. Dist. LEXIS 11527, at \*49-\*50 (M.D. Fla. Mar. 6, 2006) (rejecting defendants' argument that plaintiffs failed to allege when assets should have been written down, which assets should have been written down, and by how much); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 344 (S.D.N.Y. 2004) (finding that complaint was sufficiently particular where plaintiffs alleged that an impairment was warranted and that the facts requiring the impairment were known to defendants). Here, Plaintiffs more than satisfy this standard.

As alleged in the AC, by the time the Company reported its interim fiscal 2004 results, its goodwill investments in Germany (Mannesmann), Italy and Japan had deteriorated dramatically, as compared to the value at the acquisition dates, because of the lack of growth in the acquired businesses and similar businesses. ¶139. Thus, Defendants were increasingly aware that the impairment indicators existed. Moreover, because of the high cost associated with completing the Mannesmann acquisition, once the German results were even the slightest bit disappointing, impairment would exist.[5] ¶141. Additionally, the German telecom market did nothing but deteriorate from the time of the Mannesmann acquisition through 2004, and ultimately through 2005, as evidenced by the deterioration in the stock price of Deutsche Telecom, Vodafone's chief

---

[5] The AC also alleges that, from 2002 to 2004, the Company's semi-annual sales in Germany grew only from £2.0 billion to £2.6 billion and, more alarmingly, EBITDA for each six-month period remained stubbornly below £1 billion – not much of a return for a £100+ billion merger. ¶141. Moreover, by 2002, Vodafone had seen a downward trend in the number of German customers and significant "inactive" customers that were not generating new revenue to Vodafone; by 2003, the Company's average revenue per user for contract customers was not improving, due to lower-spending contract customers. *Id.*

competitor in Germany, from the time of the Mannesmann acquisition and continuing throughout the Class Period. ¶142. In Japan, Vodafone's mobile subscribers had actually declined for the first time in August 2004, yet no write-off was taken. ¶143. And, after Softbank acquired Vodafone's Japanese business (at a loss to Vodafone), Softbank immediately wrote down the assets by half, or some $4.5 billion, because of "outdated estimates of the value of fixed assets it acquired earlier this year from Vodafone." *Id.*

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 321 F. Supp. 2d 1342 (N.D. Ga. 2004) ("*Carpenters*"), is particularly instructive. Like the case at hand, the plaintiffs in *Carpenters* alleged that defendants failed to timely take an impairment charge on certain assets because "***based on the negative economic environment***, an impairment review [of the company's] assets . . . would have required [the company] to record the[] charges a quarter earlier." *Id.* at 1352 (emphasis added). Concluding that plaintiffs plead their impairment claims with sufficient particularity, the court found that the "allegations made clear that the need to write down was so apparent to the defendants that a failure to take earlier write downs amounted to fraud." *Id.* (citation omitted).

Similarly, in *Selbst v. McDonald's Corp.*, No. 04 C2422, 2005 U.S. Dist. LEXIS 23093 (N.D. Ill. Sept. 21, 2005), plaintiffs alleged that defendants failed to comply with GAAP and timely take an impairment charge for a number of unidentified McDonald's restaurants that were impaired at the start of the class period because of, among other things, downturns in certain of the company's markets. In denying defendants' motion to dismiss, the court stated:

> While [defendants' argument] may or may not be true, at this point in the litigation, before discovery, ***it would be impossible for Plaintiffs to have access to such detailed facts or for this Court to make such a determination on a motion to dismiss***. The Court thus concludes that Plaintiffs have sufficiently alleged that Defendants failed to follow the proper procedures for testing McDonald's long-lived assets. By not doing so, McDonald's first and second quarter 2002 earnings statements were allegedly overstated by at least $402 million. Accordingly, the Court finds that Plaintiffs have set forth sufficient facts to plead an actionable

- 11 -

omission with respect to Defendants' failure to expense the above impairment charge.

*Id*. at *45 (emphasis added).

As in *Carpenters* and *Selbst*, Plaintiffs adequately plead that Vodafone's German, Japanese and Italian operations were impaired by the start of the Class Period and should have been written down well before the Company chose to do so. Accordingly, Defendants' statements during the Class Period about Vodafone's operations in these countries, and the carrying value of Vodafone's assets, were materially false and misleading and are actionable.

The cases relied on by Defendants do not alter this conclusion. In *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561 (D. Md. 2005), the court dismissed plaintiffs' allegation that defendants should have taken an announced write-down earlier where the plaintiff had alleged that the company had "'started doing the work for it [the write-off] ***but hadn't finished*** the analysis yet.'" *Id*. at 573 (emphasis added). Similarly, in *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249 (S.D.N.Y. 2004), plaintiff's claim was dismissed because he failed to "plead any facts that indicate this impairment charge should have been recognized sooner than it was." *Id*. at 265 (citation omitted).[6] Here, Plaintiffs do not allege that the Company was still in the process of evaluating the extent of the write-down; rather Plaintiffs allege facts and circumstances that support an inference that the write-down was long overdue and should have been taken much sooner. *See* ¶¶139-145.[7]

_____

[6] Unlike here, in *Schiller v. Physicians Resource Group, Inc.*, No. A. 3:97-CV-3158-L, 2002 WL 318441 (N.D. Tex. Feb. 26, 2002), *In re K-Tel Int'l Inc. Sec. Litig.*, 107 F. Supp. 2d 994 (D. Minn. 2000), and *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398 (S.D.N.Y. 2007), the other cases cited to by Defendants, plaintiffs failed to allege sufficient facts that a need for a write-down was "so apparent."

[7] Defendants cite to *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004), and *In re Nokia Corp. Sec. Litig.*, No. 96 Civ. 3752 (DC), 1998 U.S. Dist. LEXIS 4100, at *13 (S.D.N.Y. Apr. 1, 1998), to contend that they actually acted in good faith by announcing the estimated impairment write-down on February 26, 2006, which was slightly earlier than its standard year-end reporting time. Def. Mem. at 13, n. 6. However, unlike in *Rombach*, which involved the timing of the disclosure of a company's problems integrating a ***recent***

In sum, the AC's allegations of Defendants' false and misleading statements support a reasonable belief as to the misleading nature of each statement or omission, and nothing more is required at the pleading stage. *See Novak*, 216 F.3d at 314 n.1.[8]

## C.    The Statements Identified As False and Misleading Are Actionable

Defendants contend that many of their Class Period statements are not actionable because they: (i) lead only to claims of mismanagement; (ii) constitute nothing more than puffery; (iii) are forward-looking in nature (and accompanied by cautionary language); or (iv) are included in research analyst reports and media sources that do not properly attribute these statements to any of the Defendants. *See* Def. Mem. at 18-22. As detailed below, the statements identified in the AC as materially false and misleading are certainly actionable and do not fall within these exclusions.

### 1.    The AC Does Not Allege Mismanagement

Defendants reconstruct the allegations of the AC as being "allegations that Vodafone

---

acquisition, and *In re Nokia*, in which plaintiff "fail[ed] to explain why any of [the] information should have been previously disclosed," *Id.* at *38, the February 26 announcement here involved disclosure of an impairment charge related to assets that are alleged to have been impaired for several years and for which an earlier charge should have been taken. Thus, it is far from commendable that the Company finally – and very belatedly – acknowledged that the value of its impaired assets needed to be written down.

[8]  In a footnote, Defendants argue that if it was so clear that an impairment was necessary, then Plaintiffs should have been on inquiry notice of certain statements made about the goodwill impairment "as early as 2002, and no later than 2004" and, therefore, Plaintiffs' claims are time-barred. Def. Mem. at 16, n.8. Such an argument ignores the facts, as alleged. "A plaintiff may not be considered to be on inquiry notice, 'despite the presence of some ominous indicators,' when the 'warning signs are accompanied by reliable words of comfort from management.'" *Lapin v. Goldman Sachs & Co.*, 506 F. Supp. 2d 221, 234 (S.D.N.Y. 2006) (quoting *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005)). Not only did management here make positive representations about the Company's operations in Germany, Italy and Japan and the value of its assets, but when they took a $7 billion write-down for the Mannesmann acquisition, they represented to investors that no further impairment write-downs were required for Mannesmann. ¶6. Such statements tempering the effect of accusations of wrongdoing have been held to not put plaintiffs on inquiry notice. *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 285 (S.D.N.Y. 2006) (holding that inquiry notice was not triggered where defendants made statements designed to counter any "information that might otherwise give rise to inquiry notice"); *In re ProNetLink Sec. Litig.*, 403 F. Supp. 2d 330, 335 (S.D.N.Y. 2005) (holding similarly); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 229 (S.D.N.Y. 1999) (same).

overpaid for its acquisitions and should have realized sooner that increased competition supposedly would erode the carrying values of the German, Italian and Japanese operations." Def. Mem. at 17. Defendants, however, must take the AC as it is written. *IPO*, 241 F. Supp. 2d at 332-33. Here, the AC alleges that defendants ***made statements*** to investors that they knew to be false and misleading at the time they were made, ¶¶11, 14, 51-67, 69-74, 76, 77, 79, 81, 82, 85, 86, 90, 91, 93, 95, 100, 101, 103, 134, 137, 147, and not that there are "disagreements with Defendants' judgments concerning the long-term values of certain assets." Def. Mem. at 17.

In support of their argument, Defendants cite to the Supreme Court's holding in *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977). However, the Second Circuit, in *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001), narrowly interpreted *Santa Fe* and concluded that a complaint that alleges more than just "that they disagree with the business choices" of the defendant company, but rather that "defendants allegedly ***made an affirmative misrepresentation*** to plaintiffs" on which plaintiffs relied in making their purchase of the company's stock, has adequately stated a claim under the federal securities laws. *Id.* at 99 (emphasis added).

Similarly, in *In re NTL*, 347 F. Supp. 2d at 27, Judge Kaplan rejected defendants' argument that their alleged misleading statements were only limited to claims of mismanagement, and instead found that they were rooted in "alleged deception" and were therefore actionable. Specifically, Judge Kaplan held that:

> The essence of plaintiffs' claims here, to the extent they involve corporate mismanagement, is that ***the failure to disclose NTL's internal problems rendered statements that NTL did make misleading. Thus, they do not rely on mismanagement per se but on alleged deception. Defendants' argument therefore lacks merit***.

*Id.* (emphasis added).

Here, Plaintiffs' claim that Defendants failed to disclose the Company's operational problems, its impaired assets and its imminent payment of billions of dollars in unpaid taxes, thereby

- 14 -

"render[ing] statements that [Defendants] did make misleading." *Id*. Thus, Plaintiffs' claims are not claims of mismanagement, but are based on "alleged deception." *Id*.

### 2.    Forward-Looking Statements

Defendants argue that the "statements and portions of the statements in the [AC] that relate to Vodafone's future business and financial prospects are forward-looking statements" and are not actionable because they "contained the detailed cautionary language designed to qualify the statement for the PSLRA's safe harbor." Def. Mem. at 18-19. Assuming, *arguendo*, that some of the statements that Defendants made are forward-looking in nature, those statements are not protected by the PSLRA's safe harbor provision because, as demonstrated above, the Defendants knew that the statements were false and misleading at the time they were made. *See In re IBM Corporate Sec. Litig*., 163 F.3d 102, 107 (2d Cir. 1998) (statements actionable where "the speaker does not genuinely or reasonably believe them") (citations omitted); *see also In re AOL Time Warner, Inc. Sec. Sec. & "ERISA" Litig*., 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) (holding that "no degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made").

Moreover, Defendants fail to recognize that the PSLRA requires "***meaningful*** cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i) (emphasis added). Where Defendants knew their forward looking statements to be false, as is alleged here, "the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading, or, at the very least, clearly articulates the reasons why it is false or misleading." *In re SeeBeyond Techs. Corp. Sec.*

*Litig.*, 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003).[9]  Not surprisingly, Defendants' cautionary statements made neither of those representations.

Thus, because the AC alleges that Defendants knew of the Company's operational problems, its impaired assets and its imminent payment of billions of dollars in unpaid taxes, any cautionary language relied on by Defendants is not "meaningful" or sufficient to provide safe harbor protection.[10]

### 3.    Puffery

Defendants characterize a number of the statements in the AC as "puffery" or "expressions of optimism about Vodafone's future prospects."  Def. Mem. at 21.  However, "[w]hile Defendants were permitted to remain optimistic about the future and to maintain a hopeful outlook, their public statements of optimism should have been subject to what the current data indicated."  *Darquea v. Jarden Corp.*, No. 06 CV 0722 (CLB), 2007 U.S. Dist. LEXIS 40247, at *22 (S.D.N.Y. May 31, 2007) (citing to *Rombach*, 355 F. 3d at 174).  Indeed, "[t]he important limitation on these principles is that optimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted . . . or that the opinions imply certainty."  *Lapin*, 506 F. Supp. 2d at 239 (citation omitted); *see also Novak*, 216 F.3d at 315 (holding that statements that the inventory situation was "in good shape" or "under control" while defendants "allegedly knew that the contrary was true" are actionable statements and are not mere puffery).

---

[9]  *See also In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (holding that statements are not protected where the defendants "had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality") (citation omitted).

[10]  Defendants' reliance on *In re Eastman Kodak Co. Sec. Litig.*, No. 6:05-cv-6326-MAT, 2006 WL 3149361, at *4 (W.D.N.Y. Nov. 1, 2006), and *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000), is misplaced because, as detailed *infra* at §E.1., Plaintiffs have sufficiently alleged Defendants' knowledge.

Here, Plaintiffs have adequately alleged that Defendants knew or were reckless in not knowing of the Company's operational problems, its impaired assets and its imminent payment of billions of dollars in unpaid taxes, rendering Defendants' positive statements of optimism actionable. ¶¶115, 116, 119 and 139-143.

### 4.     Statements of Third Parties

Defendants also seek to distance themselves from statements that were made to analysts and then published in various analyst reports. Def. Mem. at 22. The quoted statements in the analyst reports, however, squarely fit into the test used by Judge Stein in *In re Revlon, Inc. Sec. Litig.*, No. 99 Civ. 10192 (SHS), 2001 U.S. Dist. LEXIS 3265 (S.D.N.Y. Mar. 27, 2001), for determining whether such statements are actionable. In *In re Revlon*, the statements in an analyst's report were found to be actionable where plaintiff alleged that:

> (1) senior Revlon executives . . . attended a specific analysts' conference on May 15, 1998; (2) the Revlon representatives made statements to analysts at that conference regarding "the current condition of the Company and known trends affecting the Company"; (3) the Revlon representatives failed to disclose certain material adverse information on those subjects, as discussed above, to the analysts; and (4) a specific analysts' report was issued based on the conference.

*Id.* at *24-*25 (citation omitted).

Similarly, for each analyst report quoted in the AC, the AC identifies: (i) the names of the executives that spoke with the analysts; (ii) the "specific analysts' conference" and when it took place; (iii) a description of the statements made to the analyst; (iv) an allegation that the executives "failed to disclose certain material adverse information on those subjects" to the analysts (¶¶68, 84, 94, 99); and (v) that "a specific analysts' report was issued based on the conference." *See* Rosenfeld Decl., Ex. C. Accordingly, all of these statements are actionable.

### D.     This Court Has Subject Matter Jurisdiction Over Lothian's Claims

Defendants argue that Lothian cannot establish subject matter jurisdiction because, in their

view, Lothian is a foreign investor who purchased the ADRs of an English company whose alleged

fraud occurred outside of the U.S.  Vodafone, however, is a NYSE-listed company that: (i) made

presentations at road shows in the U.S. where Defendants made materially false and misleading

statements; (ii) admits that it has "briefing meetings with its major institutional shareholders in the

[]US[]," ¶23; (iii) has its stock covered by analysts in the U.S.; (iv) files reports with the SEC, ¶22;

(v) owns a 45% stake in Verizon Wireless - the second largest cell phone operator in the U.S., ¶19;

and (vi) uses the Bank of New York as the custodian for its ADR program, ¶20.

    In  determining  whether  to  exercise  subject-matter  jurisdiction  over  securities  claims

premised on predominantly foreign transactions, subject-matter jurisdiction will be found to exist if

the action satisfies **either** the conduct test or the effects test.  *See SEC v. Berger*, 322 F.3d 187, 195

(2d Cir. 2003) (stating that where jurisdiction is established under the conduct test, the court "need

not consider whether jurisdiction over the instant action might also be grounded on the effects test")

(citation omitted).  As Lothian satisfies the conduct test, subject matter jurisdiction exists.

    **1.    Lothian Satisfies the "Conduct Test"**

    Under the conduct test, a "court may exercise subject matter jurisdiction over securities

claims asserted by foreigners if: (a) there was conduct in the U.S. that directly caused the foreigners'

losses; and (b) such conduct was more than "merely preparatory" to a securities fraud conducted

elsewhere."  *In re Vivendi Universal*, No. 02 Civ. 5571 (RJH), 2004 U.S. Dist. LEXIS 21230, at *10

(S.D.N.Y. Oct. 22, 2004) ("*Vivendi II*").  "The second prong of the conduct test is satisfied when the

final step of the fraud or acts of material importance that had significantly contributed to the fraud

occurred in the United States."  *Id.* (citation omitted).

    Here, Plaintiffs allege that, during the Class Period, Defendants engaged in a scheme and

course of conduct to artificially inflate Vodafone stock by issuing materially false and misleading

statements regarding: (i) the success of its German and Italian operations; (ii) the rebuilding of its

- 18 -

Japanese operations through the introduction of its new 3-G phones; (iii) the Company's ability to achieve strong profit growth and cost savings due to its "One Vodafone" operational plan; and (iv) the timing of future payments on its unpaid taxes. While Defendants argue that their alleged fraudulent conduct did not emanate from the U.S., a closer look at Defendants' conduct during the Class Period suggests otherwise.[11]

For example, on or about October 6, 2004, defendant Sarin made a presentation to analysts and investors at the Goldman Sachs Communacopia XIII Conference held in New York, New York, during which he discussed "key messages, outlook, segmented propositions, leadership in 3G, One Vodafone, and increasing returns to shareholders." *See* Rosenfeld Decl., Ex. D (attaching copy of October 6, 2004 presentation slides). Specifically, with regard to its "key messages" to the investing public, Defendants spoke about the Company's "commit[ment] to 3G," its intentions on "executing One Vodafone" and its desires for "increasing returns to shareholders." With regard to One Vodafone, the Company expressed how it could result in "£2.5 billion in annual pre tax cash flow benefits." *Id*. Also, on or about September 22, 2005, defendant Sarin made another presentation to analysts and investors at the Communacopia XIV Conference held in New York, New York, during which he discussed "Vodafone's unique competitive position, growth potential and more." *See* Rosenfeld Decl., Ex. E (attaching copy of September 22, 2005 presentation slides). With respect to its Japanese operations, Defendants touted the Company's "turnaround" in Japan by "rebuilding confidence and regaining traction in the market." *Id*. With regard to One Vodafone, Defendants

---

[11] The Court may properly consider additional facts that are not plead in the AC in order to establish subject matter jurisdiction. *See In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243 (WHP), 2006 U.S. Dist. LEXIS 78067, at *25 (S.D.N.Y. Oct. 25, 2006) ("in determining whether subject matter jurisdiction exists, 'the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings.'") (quoting *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998)).

proclaimed that the plan would "deliver[] benefits in FY07 and FY08." *Id*. Lastly, the Company reiterated its full year guidance. *Id*. As these appearances and presentations were of the type that were made at other times during the Class Period – and were done to maintain Vodafone's artificially high stock price – they were more than "merely preparatory" to a securities fraud conducted elsewhere.

Similarly, Judge Baer, in *Vivendi I*, denied defendants' motion to dismiss the claims of certain non-U.S. investors who purchased their shares of Vivendi (a French company) on foreign stock markets for lack of subject matter jurisdiction. In denying defendants' motion for reconsideration, Judge Holwell, to whom the case was reassigned, rejected defendants' arguments that there was no subject jurisdiction for claims of foreign purchasers on foreign exchanges, stating:

> In addition to the allegedly false statements made to Wall Street analysts on which Judge Baer bases his opinion, ***this Court finds Messier's and Hannezo's [high level executives of Vivendi] presence and conduct in the United States of crucial importance in determining subject matter juris diction***. *Vivendi* is accused of, among other things, misleading French investors. During the last 11 months of the period in which French investors claim to have been misled, *Vivendi*'s top two officers resided in and operated the company from the United States. ***The United States has a strong interest in imposing its law over the conduct of corporate officers operating out of the United States***.

*Vivendi II*, 2004 U.S. Dist. LEXIS 21230, at *23-*24. (emphasis added.)

In addition to the conduct described above, the AC details other conduct within the U.S. which contributed to the fraud. *See e.g.*, ¶59. As a result of meetings with U.S. analysts, these analysts issued positive reports aimed at investors such as Lothian.[12]

---

[12] The cases cited to by Defendants are inapposite because they did not involve the same type of conduct that took place in the U.S. here, and the other connections to the U.S. discussed above were not present in those cases.

Accordingly, because the conduct test has been satisfied, subject matter jurisdiction is established.[13]

**E.    The AC Adequately Pleads Scienter**

In order to state a claim under §10(b) and Rule 10b-5, a plaintiff must allege facts providing a strong inference that the defendants acted with scienter, *i.e.*, a mental state embracing intent to deceive, manipulate or defraud.  *See Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).  A plaintiff may satisfy this requirement by alleging: (i) facts constituting strong circumstantial evidence of defendants' conscious misbehavior or recklessness; or (ii) facts showing that defendants had the motive and opportunity to commit fraud.  *Id.* at 90.  Moreover, as the Supreme Court explained in *Tellabs*, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the most plausible of competing inferences," but merely "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007); *see also id.* at 2513 (holding that a plaintiff must "plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference") (emphasis in original).

As discussed below, Plaintiffs easily meet these pleading requirements.

**1.    The AC Alleges Strong Circumstantial Evidence of
        Defendants' Conscious Misbehavior or Recklessness**

To plead recklessness, a plaintiff must allege facts showing that the defendant's conduct was "highly unreasonable," representing "an extreme departure from the standards of ordinary care . . . to

---

[13]  Alternatively, the Court should exercise supplemental jurisdiction over the claims of Lothian because the Court has original jurisdiction over the claims asserted by U.S. purchasers who are part of the same case or controversy as Lothian.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005) (holding that 28 U.S.C. §1367 affords broad jurisdiction over both pendent-claim and pendent-party cases); *see also Ortman v. Stanray Corp.*, 371 F.2d 154 (7th Cir. 1967) (a court has "authority to take jurisdiction over foreign claims that are ancillary to domestic claims").

the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman*, 220 F.3d at 90 (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). Moreover, where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, an inference arises that defendants knew or should have known they were misrepresenting material facts with respect to the corporate business. *Novak*, 216 F.3d at 308. Furthermore, "knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued." *In re Winstar Commc'ns*, No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618, at *22 (S.D.N.Y. Feb. 27, 2006) (quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004)).

Here, Plaintiffs allege that the Individual Defendants, who sat on Vodafone's board of directors and were members of its Group Executive Committee and Integration and Operations Committee, were intimately involved with Vodafone and "ran Vodafone's business." ¶¶36-41.

Moreover, because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts plead in the AC (and discussed herein) had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and misleading.[14]

For example, the Individual Defendants knew, or should have known, about the following, among other things:

---

[14] As alleged in the AC, defendants Sarin and Hydon signed SEC filings and Sarbanes-Oxley Certifications (¶¶57, 93), which gave rise to a duty to familiarize themselves with Vodafone's core business operations. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506, at *63 (S.D.N.Y. Sept. 6, 2005).

- the integration problems with Vodafone's Mannesmann operations;

- the fact that Vodafone's Italian operations suffered from operational problems, inefficiencies and a lack of growth and were overvalued;

- the fact that Vodafone's Japanese operations were experiencing severe problems and were materially overvalued and that the introduction of 3-G service and products in Japan was a failure;

- that Vodafone's "One Vodafone" initiative was not succeeding or achieving any significant cost savings and would not result in Vodafone achieving anywhere near forecasted cash flow; and

- that Vodafone's top management was in a state of dissention and disarray, such that business and strategic decisions were being deferred or not properly or promptly implemented, which was hurting Vodafone's business.

Similarly, due to the pervasiveness and significance of the financial problems, the Individual Defendants knew, or should have known, that, in violation of GAAP, Vodafone's financial statements were overstated, including the massive overstatement of its assets, goodwill, EBITDA and operating earnings. Vodafone has now admitted that the value of its goodwill was dramatically impaired and announced a $49 billion write-down (including an $8 billion impairment related to Japan), *one of the largest write-downs in history*. ¶133. The magnitude of the write-down, "coupled with evidence of 'corresponding fraudulent intent,'" *Novak*, 216 F.3d at 209 (quoting *Chill v. GE*, 101 F.3d 263, 270 (2d Cir. 1996)), may support a finding of scienter. *City of Sterling Heights Police & Fire Retirement Sys. v. Abbey Nat'l*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) ("*Sterling Heights P&F*"); *see also In re Atlas Air*, 324 F. Supp. 2d at 489 (holding that "the mere fact that the company had to make a large correction is some evidence of scienter"). Moreover, "the fact that the write-down concerned a core operation . . . about which key officers should have been intimately informed" further supports a finding of scienter. *Sterling Heights P&F*, 423 F. Supp. 2d at 362

- 23 -

(citation omitted).[15]

By the start of the Class Period, Defendants knew, or should have known, that Vodafone's businesses were significantly overvalued and that it should have recorded impairments of its assets. *See, e.g.*, ¶¶133-52. Since Vodafone paid such a steep price for Mannesmann, once its results were even the slightest bit disappointing, impairment would exist. And when the Company took the earlier impairment charge for Mannesmann's ground line assets, it should have also written down the value of its mobile assets, which were experiencing problems, due in part to operational problems, inefficiencies and a lack of growth and profitability, as evidenced by the deteriorating German telecom market during 2004 and 2005. ¶16(b). Defendants knew, or recklessly disregarded, these problems.

Demonstrating Vodafone's overstatement of its Japanese assets is the fact that after Softbank acquired Vodafone's Japanese business (at a loss to Vodafone), Softbank immediately wrote down the assets by half, or approximately $4.5 billion. This immediate write-down by Softbank raises a reasonable inference that the impairments in the Japanese business should have been reported by Vodafone prior to the sale to Softbank. *See, e.g.*, *Vivendi I*, 381 F. Supp. 2d at 177 (holding that large impairments taken immediately after the departure of key Vivendi executives raised a reasonable inference that the impairments should have been reported earlier by former management). Furthermore, Defendants knew, or should have known, that the Company would have to make multi-billion dollar cash tax payments beginning in fiscal 2006 or 2007, since Vodafone learned this

---

[15] *See also Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989) (finding that directors are rightfully imputed with knowledge of a "potentially significant source of income for the company"); *In re eSpeed*, 457 F. Supp. 2d at 293 (even in the absence of information contradicting public statements, "knowledge of contradictory information" may be "imputed to individual defendants" if the statements involve matters that are "sufficiently significant" to the company).

information from discussions and interactions with tax authorities in several countries. ¶16(i). Thus, Defendants concealed this information, which materially impaired its free operating cash flow. ¶10. In fact, defendant Sarin admitted that the "messaging [on the tax issue] wasn't good" and could have been better. ¶119.

Defendants also knew, or should have known, that Vodafone lacked adequate internal controls, including the failure to establish and maintain adequate internal controls over accounting for goodwill and recording impairment on a timely basis (¶146), failure to maintain accurate records concerning its accounting for assets (¶150), and the failure to implement procedures reasonably designed to prevent accounting irregularities (¶151), among others. These are precisely the types of problems that Defendants, due to their positions at the Company, should have known.

Nevertheless, Defendants contend that the AC fails to adequately allege recklessness. First, Defendants, citing to *In re Aegon N.V. Sec. Litig.*, No. 03 CIV 0603 (RWS), 2004 WL 1415973 (S.D.N.Y. June 23, 2004), contend that generalized allegations of a defendants' role in a company are insufficient as a matter of law to plead knowledge. Def. Mem. at 27. Here, however, Plaintiffs have not simply alleged that the Individual Defendants' positions with the Company are what evidence scienter; rather Plaintiffs allege that the roles of the Individual Defendants, along with the magnitude of the fraud and its relationship to the Company's core business, are what support their knowledge. Indeed, that is precisely what was missing from the allegations in *In re Aegon* – plaintiffs failed to allege facts "which relate to Aegon's 'core business.'" *In re Aegon*, 2004 WL 1415973, at *18.[16]

_____

[16] Defendants' reliance on *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478(NRB), 2003 U.S. Dist. LEXIS 21319 (S.D.N.Y. Nov. 25, 2003), is also misplaced because here Plaintiffs have alleged "facts and circumstances that would support an inference that defendants knew of specific facts that are contrary to their public statements." *Rombach*, 355 F.3d at 176.

- 25 -

Defendants also assert that the AC fails to reference "internal documents including, or Vodafone personnel asserting, information that conflicted with Vodafone's public disclosures." Def. Mem. at 27-28. As is made clear by the two cases cited by Defendants, *Marcus v. Frome*, 275 F. Supp. 2d 496 (S.D.N.Y. 2003), and *In re Sotheby's*, 2000 WL 1234601, all that is required is an allegation that the "information that the defendants had access to . . .was inconsistent or contradicted the information that formed the basis of the defendants' public statements." *Marcus*, 275 F. Supp. 2d at 502; *see also In re Sotheby's*, 2000 WL 1234601, at *6. And, that is what Plaintiffs here have alleged. *See* ¶¶41-43; *see also* ¶¶106, 115, 116, 119, 139-145.[17]

## 2.    The AC Alleges Facts Demonstrating Motive and Opportunity

Although Plaintiffs have established a strong inference of Defendants' scienter by alleging their conscious misbehavior or recklessness, allegations of motive and opportunity here serve to further strengthen the inference of scienter. *See Rothman*, 220 F.3d at 93-94.[18]

For example, contrary to Defendants' contentions, the Individual Defendants' unusual insider selling, while negative information was allegedly withheld from the public, further supports an inference of conscious misconduct. *In re Scholastic*, 252 F.3d at 74. Sales may be unusual because of the size of the sales, the timing of the sales, the portion of holdings sold or the number of insiders selling. *Id.* at 74-75; *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999). There is no minimum level of sales at which insider trading becomes unusual *per se*; rather, each case must be decided on its own facts. *In re Scholastic*, 252 F.3d at 75.

---

[17] Defendants also mistakenly assert that the AC attempts to raise a strong inference of scienter through the group pleading doctrine. Def. Mem at 28. Contrary to Defendants' characterization, the AC alleges specific facts giving rise to a strong inference of scienter of each Defendant.

[18] Defendants do not contest that they had the "opportunity" to commit fraud, which is generally presumed for high-level corporate executives. *See, e.g., In re Scholastic*, 252 F.3d at 74.

Here, defendant Sarin and other Company executives took advantage of the temporary inflation in Vodafone's stock price by selling 11.1 million shares of their Vodafone stock for proceeds of $29 million. ¶154. As detailed in the AC, defendant Sarin, as well as Bamford, Donovan, Geitner, Harper, Horn-Smith and von Kuczkowski,[19] each sold millions of dollars of Vodafone stock during the Class Period. ¶154.[20] Moreover, these stock sales not only amounted to substantial sums of money, but they also comprised significant portions of those executives' stockholdings in the Company at the time of the sales.[21] ¶¶26-27, 30-34. Sales of much smaller percentages have been held sufficient for pleading scienter. *See, e.g., In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (finding insider sales of 11-17% of holdings sufficient to demonstrate motive).[22] Further, most of the insider sales by these Company executives were executed near the highs for the stock during the Class Period, which adds further support to a strong inference of scienter. ¶¶26-27, 30-34, 127; *In re Qwest Commc'ns Int'l Sec. Litig.*, 396 F.

---

[19]  Although Bamford, Donovan, Geitner, Harper, Horn-Smith and von Kuczkowski were named as Defendants in the AC, the parties subsequently agreed to their voluntary dismissal without prejudice after concerns were raised about this Court's personal jurisdiction over them.

[20]  Many cases hold that insider sales, in amounts and at times less suspicious than these, raise a strong inference of scienter. *See, e.g., Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996), *cert. denied*, 522 U.S. 808 (1997) (one insider sold shares for $1.3 million, a second sold 90,000 shares, while a third (who made many of the false statements) sold only 3,265 shares); *Rubinstein v. Collins*, 20 F.3d 160, 169 (5th Cir. 1994) (sales of just $760,599 raise an inference of scienter); *Fecht v. Price Co.*, 70 F.3d 1078, 1084 (9th Cir. 1995) (sales of 30,000 shares for $1.6 million by two insiders).

[21]  A chart at ¶153 sets forth details on the sales of stock during the Class Period by key Company executives. For example, during the Class Period: (i) defendant Sarin sold nearly 30% of his total holdings (¶26); (ii) Horn-Smith sold 37% of his total holdings (¶27); (iii) Bamford sold 84% of his total holdings (¶30); (iv) von Kuczkowski sold 99% of his total holdings (¶32); and (v) Harper sold 81% of his total holdings (¶34).

[22]  *See also In re Guilford Mills, Inc. Sec. Litig.*, No. 98 Civ. 7739 (CLB), 1999 U.S. Dist. LEXIS 21690, at *10-*14 (S.D.N.Y. July 21, 1999) (sale of 10% of insider's holdings permitted inference of motive); *Stevelman*, 174 F.3d 79 (sell-off of large portions of their stock holdings by several officers while making optimistic statements about the corporation's financial position permitted an inference of bad faith and scienter).

Supp. 2d 1178, 1196 (D. Colo. 2004) (insider sales made near class period high are probative of scienter).

Moreover, simply because the total holdings for certain Defendants has not decreased does not negate the strong inference of scienter as a result of their stock sales during the Class Period. Indeed, it is reasonable to conclude that these individuals intended to sell these newly obtained shares at artificially inflated prices in the event the fraud lasted longer than the end of the Class Period. *See Crowell v. Ionics, Inc.*, No. 03-10393-WGY, 2004 U.S. Dist. LEXIS 22254, at *15 (D. Mass. Nov. 3, 2004) (finding scienter to be adequately plead where "[d]efendants could have commenced a fraudulent scheme, in hopes of profiting from insider trading, but simply have waited too long to sell . . . ."). Moreover, although defendant Sarin acquired 100,000 shares of the Company during the Class Period, that acquisition increased his ownership by only 5%, as compared to his sale of more than 30% of his shares during the Class Period.[23]

Finally, Defendants assert that since the last insider stock sale occurred in August 2005, those sales were not suspicious.[24] This ignores that insiders sold a large percentage of their holdings during the Class Period and did not sell any shares during the six month period before the start of the Class Period.[25]

---

[23] Defendant Sarin likely acquired those shares after the Company's shares declined due to its remedial disclosure on November 15, 2005, in order to benefit from the anticipated recovery in Vodafone's stock price going forward as a result of the ongoing fraud.

[24] *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358 (E.D.N.Y. 2003), is inapposite for several reasons, including that, unlike here, the plaintiffs did not allege that defendants sold a large percentage of their total shares. *Id*. at 382. Moreover, here Defendants repeatedly issued fraudulent statements throughout the Class Period so that the Company's stock was artificially inflated during the whole period, including at the time of the insider sales.

[25] The cases relied on by Defendants are inapposite. The Court in *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801 (2d Cir. 1996), held that the sale of stock by one company executive did not give rise to a strong inference of scienter because scienter was undermined by

Defendants Sarin and Hydon, as well as Horn-Smith, also profited by the fraud through lucrative bonuses and compensation packages that were directly tied to the financial performance of the Company and the performance of Vodafone's stock price.[26]  ¶42.  For example, the Individual Defendants received performance shares and options, which vested based on the growth in the apparent value of the Company, and the percentage that would vest immediately was based in part on the performance of the Company's stock price.  ¶42.  These facts, considered together, support an inference of scienter.[27]

Finally, the AC alleges that, as part of Defendants' fraudulent scheme and course of conduct, Defendants caused Vodafone to spend $13.2 billion to purchase 5.3 billion of Vodafone's ordinary shares on the open market to help inflate Vodafone's stock price, using corporate funds to purchase

---

other defendants not selling their shares.  *Id*. at 814.  Moreover, the Court in *Rothman* held that insider sales did not support motive to commit fraud in large part because, unlike here, the sales represented only 9.3% of the insider's total holdings.  220 F.3d at 8.  Likewise, *In re BISYS Sec. Litig.*, 397 F. Supp.2d 430, 445 (S.D.N.Y. 2005) and *In re Take-Two Interactive Sec. Litig.*, No. 06 Civ 803 (SWK), 2008 WL 1757823, at *20 (S.D.N.Y. Apr. 16, 2008), do not hold that it is inappropriate to allege gross proceeds, but rather that gross proceeds alone are insufficient to allege unusual trading.  In *Fishbaum v. Liz Clairborne, Inc.*, 189 F.3d 460 (2d Cir. 1999), the Court found that insider trades were not suspicious because they appeared to be part of a periodic investment plan, something Defendants here do not contend.  In *In re Sina*, 2006 WL 2742048, the Court took issue with the fact that the plaintiffs only listed sales during the Class Period, whereas here the AC alleges that there were no insider sales for the six months preceding the start of the Class Period.

[26]  During the Class Period, defendant Sarin received a bonus of $1.8 million (¶26), defendant Hydon received a bonus of $1.1 million (¶35), and defendant Horn-Smith received a bonus of $1.3 million (¶27).

[27]  Defendants' reliance on *Kalnit v. Eichler*, 264 F.3d 131, 139-40 (2d Cir. 2001) and *Acito v. IMCERA Group*, 47 F.3d 47, 52 (2d Cir. 1995) is misplaced.  While those cases may stand for the proposition that bonuses alone may be insufficient to raise a strong inference of scienter, each case does recognize that bonuses may be combined with other allegations of motive to raise a strong inference of scienter.  *Acito*, 47 F.3d at 54 (holding that "the existence, *without more*, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter) (emphasis added); *Kalnit*, 264 F.3d 141 (indicating that the "more" under *Acito* concerns the combination of different types allegations of motive).  Thus, the compensation allegations lend further support to Plaintiffs' already strong motive allegations.  Indeed, the Second Circuit in *Kalnit* recognized the strength of allegations concerning stock sales:  "we have held motive sufficiently pleaded where plaintiff alleged that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares."  *Kalnit*, 264 F.3d at 139.

shares they knew were inflated. ¶154. Defendants' true purpose in buying those shares was to support and inflate the Company's stock price, enabling them to sell their personal shares at artificially inflated prices.

Plaintiffs have thus adequately plead Defendants' motive and opportunity to commit fraud.

### F.    The AC Adequately Pleads a Claim for Control Person Liability

A control person claim is governed by the liberal pleading standards of Rule 8.  *See In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007).  Here, the AC adequately alleges both primary and control claims against the Individual Defendants.  *See id*. at 402. Moreover, the AC alleges that the Individual Defendants had direct involvement in the day-to-day management of the Company and were responsible for its statements to the public – which is all that it must do.  *See, e.g., id*. at 401.  Further, to the extent that it must, the AC alleges that the Individual Defendants were "culpable participants" in the fraud with facts supporting an inference that they not only exerted control over Vodafone, but also participated in the alleged improprieties with scienter. *See In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 351 (S.D.N.Y. 2007).

### IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.[28]

---

[28] In the event that the Court grants dismissal, Plaintiffs respectfully request an opportunity to amend the AC. *See Cortec Ind., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").  As part of Plaintiffs' ongoing investigation of the claims asserted in the AC, Plaintiffs have spoken with additional confidential witnesses ("CWs") who have provided supplementary facts (that are not contained in the AC) to further support Plaintiffs' claims.  *See* Rosenfeld Decl., Ex. F. (attaching summary of CWs' statements).  Plaintiffs had intended to include these additional facts in a second amended complaint, which, by letter dated July 7, 2008, they had sought a pre-motion conference to request leave to file.  Accordingly, to the extent that the Court grants dismissal of any part of Plaintiffs' claims, Plaintiffs respectfully request an opportunity to amend.

DATED:  July 22, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARK S. REICH


         /s/ *David A. Rosenfeld*
        DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
PATRICK W. DANIELS
DAVID C. WALTON
MARK SOLOMON
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

*Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, David A. Rosenfeld, hereby certify that on July 22, 2008, I caused a true and correct copy of the attached:

      Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint; and

      Declaration of David A. Rosenfeld in Opposition to Defendants' Motion to Dismiss the Amended Complaint,

to be served: (i) electronically on all counsel registered for electronic service for this case; and (ii) by first-class mail to any additional counsel.

                                    */s/ David A. Rosenfeld*
                                       David A. Rosenfeld

VODAFONE 07

Service List - 1/10/2008    (07-0242)

Page 1 of  1

**Counsel For Defendant(s)**

Theodore  Edelman

Sullivan & Cromwell LLP

125 Broad Street

New York, NY  10004-2498

   212/558-4000

   212/558-3588 (Fax)


**Counsel For Plaintiff(s)**

Samuel H. Rudman

David A. Rosenfeld

Coughlin Stoia Geller Rudman & Robbins LLP

58 South Service Road, Suite 200

Melville, NY  11747

   631/367-7100

   631/367-1173 (Fax)