# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE CITY OF EDINBURGH COUNCIL ON
BEHALF OF THE LOTHIAN PENSION      :
FUND, On Behalf of Itself and All Others
Similarly Situated,                :

                   Plaintiff,      :      Civil Action No. 07 Civ. 9921 (PKC)

           v.                :

                             :

VODAFONE GROUP PUBLIC LIMTED
COMPANY, et al.,                   :

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**EXHIBITS A-F TO THE REPLY DECLARATION OF JORDAN T. RAZZA**

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------ x
                                     :
IN RE VODAFONE GROUP, PLC            :      MASTER FILE
SECURITIES LITIGATION                :
                                     :      02 Civ. 7592 (AKH)
                                     :
                                     :      This Document relates to:  All
                                     :      Actions
                                     :
------------------------------------ x
```

## ORDER AND FINAL JUDGMENT

On the 22 day of _____, 2005, a hearing having been held before this Court to determine: (1) whether the terms and conditions of the Stipulation and Agreement of Settlement dated as of March 4, 2005 (the "Stipulation") are fair, reasonable and adequate for the settlement of all claims asserted by the Class against the Defendants in the Complaints now pending in this Court under the above caption, including, among other things, the release of the Defendants and the Released Parties, as provided for in the Stipulation, and should be approved; (2) whether judgment should be entered dismissing the Third Consolidated Amended Class Action Complaint dated May 7, 2004 (the "Complaint") on the merits and with prejudice in favor of the Defendants and as against all persons or entities who are members of the Class herein who have not requested exclusion therefrom in a timely and proper manner; and (3) whether to approve the Plan of Allocation as a fair and reasonable method to allocate the settlement proceeds among the members of the Class.  The Court having considered all matters submitted to it at the Settlement Fairness Hearing and otherwise; and it appearing that a notice of that hearing substantially in the form approved by the Court was mailed to all persons or entities reasonably identifiable, who purchased or otherwise acquired Vodafone Group Plc ("Vodafone") American Depository Shares ("ADSs") during the period between March 7, 2001 and May 28, 2002,

inclusive (the "Class Period"), except those persons or entities excluded from the definition of the Class, as shown by the records of the depositary bank of the American Depositary Receipts of Vodafone, at the respective addresses set forth in such records, and that a summary notice of the hearing substantially in the form approved by the Court was published in the national edition of The Wall Street Journal and transmitted over the Business Wire pursuant to the specifications of the Court,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.     The Court has jurisdiction over the subject matter of the Action, the Lead Plaintiffs, all Class Members, and the Defendants.

2.     The Court finds that the prerequisites for a class action under Federal Rules of Civil Procedure 23 (a) and (b)(3) have been satisfied in that: (a) the number of Class Members is so numerous that joinder of all members thereof is impracticable; (b) there are questions of law and fact common to the Class; (c) the claims of the Class Representatives are typical of the claims of the Class they seek to represent; (d) the Class Representatives have and will fairly and adequately represent the interests of the Class; (e) the questions of law and fact common to the members of the Class predominate over any questions affecting only individual members of the Class; and (f) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

3.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure this Court hereby finally certifies this action as a class action on behalf of all persons or entities, who purchased or otherwise acquired Vodafone ADSs during the period between March 7, 2001 and May 28, 2002, inclusive. Excluded from the Class are Defendants, the officers and directors of Vodafone at all relevant times, members of their immediate families (parents, spouses, siblings, and

- 2 -

children) and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest. Also excluded from the Class are the persons and/or entities who timely and properly requested exclusion from the Class as listed on Exhibit 1 annexed hereto.

4.      Notice of the Pendency of this Action as a class action and of the proposed Settlement was given to all Class Members who could be identified by the Claims Administrator with reasonable effort. The form and method of notifying the Class of the Pendency of the action as a class action and of the terms and conditions of the proposed Settlement met the requirements of Rule 23 of the Federal Rules of Civil Procedure, Section 21D(a)(7) of the Securities Exchange Act of 1934, 15 U.S.C. §78u-4(a)(7) as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), due process, and any other applicable law, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.

5.      The Settlement is approved as fair, reasonable and adequate, and the Class Members and the parties are directed to consummate the Settlement in accordance with the terms and provisions of the Stipulation.

6.      The Complaint, which the Court finds was filed on a good faith basis in accordance with the PSLRA and Rule 11 of the Federal Rules of Civil Procedure based upon all publicly available information, is hereby dismissed with prejudice and without costs, except as provided in the Stipulation, as against the Defendants.

7.      Members of the Class and the successors and assigns of any of them, are hereby permanently barred and enjoined from instituting, commencing or prosecuting, any and all

- 3 -

claims, debts, demands, rights, suits, matters, issues, causes of action or liabilities whatsoever (including, but not limited to, any claims for damages, interest, attorneys' fees, expert or consulting fees, and any and all other losses, costs, fees, expenses or liabilities whatsoever) against the Defendants, or any of them, and/or the Released Parties, or any of them, whether based on or under federal, state, local, foreign, statutory or common law or any other law, rule or regulation of any jurisdiction whatsoever, whether class or individual in nature, whether fixed or contingent, accrued or unaccrued, liquidated or unliquidated, at law or in equity, matured or unmatured, including both known claims and Unknown Claims, whether or not concealed or hidden (i) that were or have been involved, set forth, alleged, asserted or referred to in this Action by the Lead Plaintiffs, or any of them, or the Class Members, or any of them, that arise out of, are based upon, refer to or relate in any way to, the subject matter of the Action or to the purchase of securities of Vodafone during the Class Period, and including, but not limited to, claims in connection with, based upon, arising out of, or relating to the Settlement (but excluding any claims to enforce, or in connection with the enforcement of, the terms of the Settlement), or (ii) that could have been involved, set forth, alleged, asserted or referred to in this Action or in any forum whatsoever by the Lead Plaintiffs, or any of them, or the Class Members, or any of them, that arise out of, are based upon, refer to or relate in any way to the purchase or sale of Vodafone ADSs during the Class Period, or (iii) that are in connection with, based upon, arising out of, or relating to the Settlement (but excluding any claims to enforce, or in connection with the enforcement of, the terms of the Settlement) (the "Settled Claims") against any and all of the Defendants, their past or present subsidiaries, parents, successors and predecessors, officers, directors, principals, shareholders, agents, employees, attorneys, advisors, insurers, co-insurers, and reinsurers and any person, firm, trust, corporation, foundation, officer, director or other

- 4 -

individual or entity in which any Defendant has a controlling interest or that is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors in interest or assigns of any of the Defendants (the "Released Parties"). The Settled Claims are hereby compromised, settled, released, discharged and dismissed, fully, finally and forever, as against the Released Parties on the merits and with prejudice by virtue of the proceedings herein and this Order and Final Judgment. For purposes of this paragraph "Unknown Claims" shall mean any and all Settled Claims that any Lead Plaintiff or Class Member does not know or suspect to exist in his, her or its favor at the time of the release of the Released Parties, and any Settled Defendants' Claims that Defendants do not know or suspect to exist in their favor, which if known by him, her or it might have affected his, her or its decision(s) with respect to the Settlement. With respect to any and all Settled Claims and Settled Defendants' Claims, the Parties agree that, upon the Effective Date, the Lead Plaintiffs, and each of them, the Class Members, and each of them, and Defendants shall be deemed to have, and by operation of the Final Order and Judgment shall have, expressly waived any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or any other jurisdiction, or principle of common law, under, or that is similar, comparable or equivalent to, Cal. Civ. Code § 1542, which provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor." Lead Plaintiffs and Defendants acknowledge, and the Class Members by operation of law shall be deemed to have acknowledged, that the inclusion of "Unknown Claims" in the definitions of "Settled Claims" and "Settled Defendants' Claims" was separately bargained for and is a key element of the Settlement.

8.      Upon the Effective Date of the Settlement, Lead Plaintiffs, and each of them, and the Class Members, and each of them, shall be deemed to have covenanted not to sue any of the Released Parties, directly or indirectly, in any individual, class or other representative capacity with respect any Settled Claim.

9.      The Defendants and the successors and assigns of any of them, are hereby permanently barred and enjoined from instituting, commencing or prosecuting, either directly or in any other capacity, any and all claims, rights or causes of action or liabilities whatsoever, whether based on federal, state, local, statutory or common law or any other law, rule or regulation, including both known claims and Unknown Claims, that have been or could have been asserted in the Action or in any forum by the Defendants or any of them or the successors and assigns of any of them against any of the Lead Plaintiffs or any of the Class Members or their attorneys, that arise out of or relate in any way to the institution, prosecution, or settlement of the Action (except for claims to enforce the Settlement) (the "Settled Defendants' Claims") against any of the Lead Plaintiffs, Class Members or their attorneys. The Settled Defendants' Claims of all the Released Parties are hereby compromised, settled, released, discharged and dismissed on the merits and with prejudice by virtue of the proceedings herein and this Order and Final Judgment.

10.     This Order and Final Judgment will bar all future claims for contribution, whether arising under state, federal, common, foreign or any other law, against the Released Parties by any person or entity, based upon, arising out of, relating to, or in connection with, the Settled Claims of the Lead Plaintiffs, or any of them, or the Class Members, or any of them.

- 6 -

11.    This Order and Final Judgment, the Stipulation, and all proceedings taken pursuant to the Settlement:

(a)    shall not be offered or received against Defendants, or any of them, as evidence of, or construed as, or deemed to be evidence of, any presumption, concession, or admission by Defendants, or any of them, with respect to the truth of any allegation by Lead Plaintiffs, or any of them, or the Class Members, or any of them, or the validity of any claim that has been or could have been asserted in the Action or in any litigation, or the deficiency of any defense that has been or could have been asserted in the Action or in any litigation, or of any liability, negligence, fault, or wrongdoing of Defendants, or any of them;

(b)    shall not be offered or received against Defendants, or any of them, as evidence of any presumption, concession or admission of any fault, misrepresentation or omission with respect to any statement or written document approved, made by, or attributed to, Defendants, or any of them;

(c)    shall not be offered or received against Defendants, or any of them, as evidence of any presumption, concession or admission with respect to any liability, negligence, fault or wrongdoing, or in any way referred to for any other reason as against Defendants, or any of them, in any other civil, criminal or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation; *provided, however*, that the Defendants, or any of them, may refer to the Stipulation to effectuate the liability protection granted to them in the Stipulation,

(d)    shall not be construed as or received in evidence as any admission, concession or presumption against Defendants, or any of them, that the consideration to be given

- 7 -

hereunder represents the amount that would or could have been recovered after trial or at any other stage of this Action; and

       (e)     shall not be construed as or received in evidence as any admission, concession or presumption against Lead Plaintiffs, or any of them, or the Class Members, or any of them, that any of their claims is without merit, or that any defenses asserted by the Defendants, or any of them, has any merit, or that damages recoverable under the Complaints would not have exceeded the Gross Settlement Fund.

      12.    The Plan of Allocation is approved as fair and reasonable, and Plaintiffs' Co-Lead Counsel and the Claims Administrator are directed to administer the Stipulation in accordance with its terms and provisions.

      13.    The Court finds that all parties and their counsel have complied with each requirement of Rule 11 of the Federal Rules of Civil Procedure as to all proceedings herein.

      14.    Exclusive jurisdiction is hereby retained over the Parties and the Class Members for all matters relating to this Action, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order and Final Judgment, and including any application for fees and expenses incurred in connection with administering and distributing the settlement proceeds to the members of the Class.

      15.    All persons and/or entities listed on Exhibit 1 annexed to this Order and Final Judgment requested exclusion from the Class and such request is hereby granted.

      16.    Without further Order of the Court, the Parties may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

17.    Terms used, but not expressly defined, in this Order and Final Judgment have the meanings ascribed to them in the Stipulation.

18.    There is no just reason for delay in the entry of this Order and Final Judgment and immediate entry by the Clerk of the Court is expressly directed pursuant to Rule 54(b) of the

/////

/////

/////

Federal Rules of Civil Procedure. The entry of this Order and Final Judgment shall resolve all

outstanding claims against all Defendants in this Action.

Dated:          New York, New York
                        July 15, 2005

                                                SO ORDERED:

                                                Honorable Alvin K. Hellerstein
                                                UNITED STATES DISTRICT JUDGE

- 10 -

# EXHIBIT B

Copyright 2005 The Financial Times Limited
Financial Times (London, England)

November 16, 2005 Wednesday
London Edition 1

**SECTION:** LEX COLUMN; Pg. 20

**LENGTH:** 257 words

**HEADLINE:**  Vodafone suffers a congestion charge LEX COLUMN

**BODY:**

    Arun Sarin, Vodafone's chief executive, felt "slightly congested" while presenting interim results yesterday. The 11 per cent, or Pounds 9bn, drop in the company's market capitalisation should clear the head better than a lifetime of lozenges.

    Results were good, the outlook less so. Japan faces further "significant" margin pressure next year and could make an operating loss. A rapid recovery is unlikely. NTT DoCoMo, with sales four times larger, expects only a 10 per cent return on capital this year. It spends 37 per cent of sales on customer retention and acquisition, compared with 28 per cent for Vodafone Japan. At least Japan has disappointed its way to irrelevance - it now contributes just4 per cent of Vodafone's operating income. In Europe, Vodafone expects a modest dip in margins and intensifying competition in Germany and Italy. Finally, Vodafone expects Pounds 5bn of one-off tax payments.

    Taking a step back, it is genuinely surprising that the market is so upset. A Pounds 9bn tax provision sits on the balance sheet - a fair clue that historically low cash tax payments might reverse. Admittedly earnings forecasts for next year should fallby 5-8 per cent. But this says more about the City's failure to "kitchen sink" its Japan estimates than a new industrial reality.

    Vodafone could have increased its cash payout from the current 100 per cent of free cash flow. Still, it has big, legitimate acquisition opportunities. On the basis of today's capricious reaction, relying on equity markets to fund these might be foolish.

**LOAD-DATE:** November 15, 2005

# EXHIBIT C

# Vodafone Group Plc

Annual Report
For the year ended 31 March 2005

# Building
our future



Notes to the Consolidated Financial Statements continued

## 16. Investments

|  | Group | | Company | |
|---|---|---|---|---|
|  | **2005**<br>**£m** | 2004<br>£m | **2005**<br>**£m** | 2004<br>£m |
| Liquid investments | **816** | 4,381 | **28** | – |

Group liquid investments principally comprise collateralised deposits and investments in commercial paper.  The Company's liquid investments comprise short term foreign exchange deals.

## 17. Creditors: amounts falling due within one year

|  | Group | | Company | |
|---|---|---|---|---|
|  | **2005**<br>**£m** | 2004<br>£m | **2005**<br>**£m** | 2004<br>£m |
| Bank overdrafts | **47** | 42 | **–** | – |
| Bank loans and other loans | **332** | 2,000 | **15** | 956 |
| Finance leases | **13** | 12 | **–** | – |
| Trade creditors | **2,887** | 2,842 | **–** | – |
| Amounts owed to subsidiary undertakings | **–** | – | **88,710** | 93,553 |
| Amounts owed to associated undertakings | **9** | 8 | **–** | – |
| Taxation | **4,759** | 4,275 | **–** | – |
| Other taxes and social security costs | **332** | 367 | **–** | – |
| Other creditors | **444** | 741 | **4** | 71 |
| Accruals and deferred income | **4,619** | 4,011 | **301** | 371 |
| Proposed dividend | **1,395** | 728 | **1,395** | 728 |
|  | **14,837** | 15,026 | **90,425** | 95,679 |

## 18. Creditors: amounts falling due after more than one year

|  | Group | | Company | |
|---|---|---|---|---|
|  | **2005**<br>**£m** | 2004<br>£m | **2005**<br>**£m** | 2004<br>£m |
| Bank loans | **1,231** | 1,504 | **16** | 23 |
| Other loans | **10,269** | 10,596 | **8,800** | 8,795 |
| Finance leases | **113** | 124 | **–** | – |
| Other creditors | **12** | 7 | **–** | – |
| Accruals and deferred income | **757** | 744 | **358** | 453 |
|  | **12,382** | 12,975 | **9,174** | 9,271 |

Bank loans are repayable as follows:

|  | Group | | Company | |
|---|---|---|---|---|
|  | **2005**<br>**£m** | 2004<br>£m | **2005**<br>**£m** | 2004<br>£m |
| Repayable in more than one year but not more than two years | **1,182** | 105 | **6** | 6 |
| Repayable in more than two years but not more than five years | **28** | 1,398 | **10** | 16 |
| Repayable in more than five years | **21** | 1 | **–** | 1 |
|  | **1,231** | 1,504 | **16** | 23 |

# EXHIBIT D

# Vodafone Group Plc

Annual Report
For the year ended 31 March 2005

# Building
# our future



Notes to the Consolidated Financial Statements continued

## 21. Provisions for liabilities and charges

| | Deferred taxation £m | Post employment benefits £m | Other provisions £m | Total £m |
|---|---|---|---|---|
| 1 April 2004 | 3,608 | 68 | 521 | 4,197 |
| Exchange movements | (2) | – | 6 | 4 |
| Profit and loss account | 332 | 54 | 68 | 454 |
| Utilised in the year – payments | – | (45) | (141) | (186) |
| Other | – | 26 | 57 | 83 |
| **31 March 2005** | **3,938** | **103** | **511** | **4,552** |

### Deferred taxation

The Group's deferred tax charge of £332 million (2004: £744 million) in respect of deferred tax liabilities excludes a charge to the profit and loss account of £25 million (2004: £47 million) relating to associated undertakings and a credit to the profit and loss account of £604 million (2004: £49 million) relating to deferred tax assets. Therefore the net deferred tax credit is £247 million (2004 charge: £742 million or £736 million before exceptional items).

At 31 March 2005:

| | Gross deferred tax asset £m | Gross deferred tax liability £m | Net deferred tax (asset)/ liability £m | Less: amounts unprovided £m | Net deferred tax (asset)/ liability £m |
|---|---|---|---|---|---|
| Fixed asset timing differences | (227) | 1,704 | 1,477 | (10) | 1,467 |
| Deferred tax on overseas earnings | – | 1,747 | 1,747 | – | 1,747 |
| Other short term timing differences | (718) | 745 | 27 | – | 27 |
| Unrelieved tax losses | (11,257) | – | (11,257) | 10,413 | (844) |
| | (12,202) | 4,196 | (8,006) | 10,403 | 2,397 |
| Analysed, after offset, as: | | | | | |
| Deferred tax asset (note 15) | | | | | (1,541) |
| Deferred tax provision | | | | | 3,938 |
| | | | | | 2,397 |

At 31 March 2004:

| | Gross deferred tax asset £m | Gross deferred tax liability £m | Net deferred tax (asset)/ liability £m | Less: amounts unprovided £m | Net deferred tax (asset)/ liability £m |
|---|---|---|---|---|---|
| Fixed asset timing differences | (192) | 1,848 | 1,656 | (4) | 1,652 |
| Deferred tax on overseas earnings | – | 1,425 | 1,425 | – | 1,425 |
| Other short term timing differences | (812) | 662 | (150) | 118 | (32) |
| Unrelieved tax losses | (11,420) | – | (11,420) | 11,018 | (402) |
| | (12,424) | 3,935 | (8,489) | 11,132 | 2,643 |
| Analysed, after offset, as: | | | | | |
| Deferred tax asset (note 15) | | | | | (965) |
| Deferred tax provision | | | | | 3,608 |
| | | | | | 2,643 |

A deferred tax asset has not been recognised in respect of unrelieved tax losses of £10,413 million (2004: £11,018 million) as it is regarded as more likely than not that there will not be suitable taxable profits against which the reversal of the underlying timing differences can be deducted.

The potential net tax benefit in respect of all tax losses carried forward at 31 March 2005, including amounts both recognised and unrecognised for deferred tax purposes, was £610 million in UK subsidiaries (2004: £50 million) and £10,647 million in international subsidiaries (2004: £11,370 million). These losses are only available for offset against future profits (or in some circumstances capital gains) arising within these companies subject to the laws of the relevant jurisdiction. The Group's share of losses of international associated undertakings that are available for offset against future trading profits in these entities is £123 million (2004: £nil).

Details of the Company's deferred tax asset are included in note 15.

### Other provisions

Other provisions primarily comprise amounts provided for legal claims, decommissioning costs and restructuring costs. The associated cash outflows for restructuring costs are substantially short term in nature. For decommissioning costs, the associated cash outflows are generally expected to occur at the dates of exit of the assets to which they relate, which are long term in nature. The timing of cash outflows associated with legal claims cannot be reasonably determined.

# EXHIBIT E

# Vodafone Group Plc

Annual Report
For the year ended 31 March 2005

# Building
# our future



**Operating and Financial Review and Prospects** continued

In the year ended 31 March 2005, revenue from continuing operations under US GAAP was £29,873 million compared with revenue from continuing operations under UK GAAP of £34,133 million for the same period. The difference relates to the non-consolidation of Vodafone Italy as a result of the existence of significant participating rights of a minority shareholder requiring the equity method of accounting to be adopted under US GAAP rather than the full consolidation of results under UK GAAP, offset by the release of connection revenue deferred prior to the adoption of EITF 00-21 on 1 October 2003, which is required to be recognised over the period a customer is expected to remain connected to the network under US GAAP.

Net loss under US GAAP for the year ended 31 March 2005 was £13,782 million, compared with a net loss under UK GAAP of £7,540 million for the same period. The higher net loss under US GAAP was mainly driven by changes in accounting policy and higher amortisation charges, partially offset by income taxes and equity in earnings of equity method investments.

The reconciliation of the differences between UK GAAP and US GAAP is provided in note 36 to the Consolidated Financial Statements.

On 29 September 2004, the Staff of the SEC announced new guidance on the interpretation of US GAAP in relation to accounting for intangible assets. Further details on the guidance and its impact on the Group are provided on page 132.

## Liquidity and Capital Resources

### Cash flows

The major sources of Group liquidity for the 2005 financial year have been cash generated from operations and dividends from associated undertakings. For the year ended 31 March 2004, sources of Group liquidity also included borrowings through long term issuance in the capital markets and asset disposals. The Group does not use off-balance sheet special purpose entities as a source of liquidity or for other financing purposes.

The Group's key sources of liquidity for the foreseeable future are likely to be cash generated from operations and borrowings through long term and short term issuances in the capital markets, as well as committed bank facilities. Additionally, the Group has a put option in relation to its interest in Verizon Wireless which, if exercised, could provide a material cash inflow. Please see "Option agreements" at the end of this section.

The Group's liquidity and working capital may be affected by a material decrease in cash flow due to factors such as increased competition, litigation, timing of tax payments and the resolution of outstanding tax issues, regulatory rulings, delays in development of new services and networks, inability to receive expected revenue from the introduction of new services, reduced dividends from associates and investments or dividend payments to minority shareholders. Please see "Risk Factors", above. The Group is also party to a number of agreements that may result in a cash outflow in future periods. These agreements are discussed further in "Option agreements" at the end of this section.

Wherever possible, surplus funds in the Group (except in Albania and Egypt) are transferred to the centralised treasury department through repayment of borrowings, deposits and dividends. These are then on-lent or contributed as equity to fund Group operations, used to retire external debt or invested externally.

### Increase in cash in the year

During the 2005 financial year, the Group increased its net cash inflow from operating activities by 3% to £12,713 million and generated £7,847 million of free cash flow and £1,405 million of net cash flow, as analysed in the following table.

Free cash flow decreased from the prior financial year principally due to one-off cash receipts in the prior year, including £572 million received from the closure of financial instruments and £198 million from the fixed line business in Japan prior to its disposal.

The Group holds its cash and liquid investments in accordance with the counterparty and settlement risk limits of the Board approved treasury policy. The main forms of liquid investments at 31 March 2005 were collateralised deposits, money market funds, bank deposits and euro commercial paper.

|  | Year ended 31 March 2005 £m | Year ended 31 March 2004 £m |
|---|---|---|
| Net cash inflow from operating activities | 12,713 | 12,317 |
| Net capital expenditure on intangible and tangible fixed assets | (4,879) | (4,371) |
| Purchase of intangible fixed assets | (59) | (21) |
| Purchase of tangible fixed assets | (4,890) | (4,508) |
| Disposal of tangible fixed assets | 70 | 158 |
|  |  |  |
|  | 7,834 | 7,946 |
| Dividends from joint ventures and associated undertakings | 2,020 | 1,801 |
| Taxation | (1,616) | (1,182) |
| Net cash outflow for returns on investments and servicing of finance | (391) | (44) |
| Interest on group debt | (336) | 31 |
| Dividends from investments | 19 | 25 |
| Dividends paid to minority interests | (74) | (100) |
|  |  |  |
| Free cash flow | 7,847 | 8,521 |
| Other net capital expenditure and financial investment | 111 | 104 |
| Net cash outflow from acquisitions and disposals | (2,017) | (1,312) |
| Equity dividends paid | (1,991) | (1,258) |
| Management of liquid resources | 3,563 | (4,286) |
| Net cash outflow from financing | (6,108) | (700) |
| Increase in cash in the year | 1,405 | 1,069 |

### Capital expenditure and financial investment

The increase in net cash outflow for capital expenditure and financial investment from £4,267 million for the 2004 financial year to £4,768 million for the 2005 financial year was due primarily to the timing of cash payments for tangible fixed assets.

During the 2005 financial year, £59 million was spent on intangible assets, principally in respect of additional spectrum in Egypt and Italy. The Group's expenditure on tangible fixed assets increased by £382 million to £4,890 million during the 2005 financial year, including approximately £1.6 billion spent on incremental 3G network infrastructure.

# EXHIBIT F

# Vodafone Group Plc

Annual Report
For the year ended 31 March 2005

# Building
# our future



## Risk Factors and Legal Proceedings continued

Please see "Business Overview – Licences and network infrastructure" for more information on expenditures in connection with the acquisition of 3G licences and expected expenditure in connection with the roll-out of 3G services. There can be no assurance that the introduction of 3G services will proceed according to anticipated schedules or that the level of demand for 3G services will justify the cost of setting up and providing 3G services. Failure or a delay in the completion of networks and the launch of new services, or increases in the associated costs, could have a material adverse effect on the Group's operations.

### The Group may experience a decline in revenue per customer notwithstanding its efforts to increase revenue from the introduction of new services.

As part of its strategy to increase usage of its networks, the Group will continue to offer new services to its existing customers, and seek to increase non-voice service revenue as a percentage of total service revenue. However, the Group may not be able to introduce commercially these new services, or may experience significant delays due to problems such as the availability of new mobile handsets or higher than anticipated prices of new handsets. In addition, even if these services are introduced in accordance with expected time schedules, there is no assurance that revenue from such services will increase ARPU.

### The Group's business and its ability to retain customers and attract new customers may be impaired by actual or perceived health risks associated with the transmission of radiowaves from mobile telephones, transmitters and associated equipment.

Concerns have been expressed in some countries where the Group operates that the electromagnetic signals emitted by mobile telephone handsets and base stations may pose health risks at exposure levels below existing guideline levels and may interfere with the operation of electronic equipment. In addition, as described under "Legal Proceedings" below, several mobile industry participants, including the Company and Verizon Wireless, have had lawsuits filed against them alleging various health consequences as a result of mobile phone usage, including brain cancer. While the Company is not aware that such health risks have been substantiated, there can be no assurance that the actual, or perceived, risks associated with radiowave transmission will not impair its ability to retain customers and attract new customers, reduce mobile telecommunications usage or result in further litigation. In such event, because of the Group's strategic focus on mobile telecommunications, its business and results of operations may be more adversely affected than those of other companies in the telecommunications sector.

### Legal Proceedings

The Company and its subsidiaries are currently, and may be from time to time, involved in a number of legal proceedings, including inquiries from or discussions with governmental authorities, that are incidental to their operations. However, save as disclosed below, the Company and its subsidiaries are not involved currently in any legal or arbitration proceedings (including any governmental proceedings which are pending or known to be contemplated) which are expected to have, or have had in the twelve months preceding the date of this report, a significant effect on the financial position or profitability of the Company and its subsidiaries.

The Company is a defendant in four actions in the United States alleging personal injury, including brain cancer, from mobile phone use. In each case, various other carriers and mobile phone manufacturers are also named as defendants. These actions are at an early stage and no accurate quantification on any losses which may arise out of the claims can therefore be made as at the date of this report. The Company is not aware that the health risks alleged in such personal injury claims have been substantiated and will be vigorously defending such claims.

Between 18 September and 29 November 2002, nine complaints were filed in the United States District Court for the Southern District of New York against the Company and Lord MacLaurin, the Chairman of the Company, and Sir Christopher Gent, Sir Julian Horn-Smith and Mr. Kenneth Hydon, executive officers of the Company. The actions were brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission. The complaints, which purport to be brought on behalf of all purchasers of ADSs of Vodafone between 7 March 2001 and 28 May 2002, alleged that Vodafone's financial statements and certain Vodafone financial disclosures were materially false and misleading. More specifically, the complaints alleged that, between 7 March 2001 and 28 May 2002, defendants made various material misrepresentations relating to Vodafone's investments in fixed-wire operations, goodwill, and prior acquisitions in an effort to inflate artificially the price of Vodafone securities. The complaints sought compensatory damages in an unspecified amount, interest, reasonable costs including attorneys' fees and experts' fees, and equitable and/or injunctive relief as permitted by law.

The plaintiffs filed a consolidated class action complaint on 6 June 2003. On 14 October 2003, the Court ordered that the complaint be dismissed, with leave for the plaintiffs to re-plead. On 20 October 2003, the plaintiffs entered into a Stipulation dismissing the complaint against Lord Ian MacLaurin without prejudice. On 10 November 2003 the plaintiffs filed a second consolidated amended class action complaint against Vodafone, Sir Christopher Gent, Sir Julian Horn-Smith and Mr. Kenneth Hydon. On 26 March 2004, the Court dismissed without prejudice the remaining individual defendants from this action. On 7 May 2004, the plaintiffs filed a third consolidated amended class action complaint naming only the Company as a defendant. Thereafter, the parties entered into substantive discussions regarding the possibility of settling the action. Those discussions led to a mediation, following which the parties reached an agreement-in-principle to settle the claims against all defendants in exchange for a settlement payment of $24.5 million to a settlement class (the "Settlement Class") comprised of all purchasers of Vodafone ADSs during the period from 7 March 2001 to 28 May 2002 (other than those Class Members that exclude themselves, or automatically are excluded, from the Class). Following the mediation, Vodafone and its insurers paid $24.5 million into an escrow account to fund the settlement in the event that (i) the parties reached a definitive settlement agreement and (ii) that agreement received final approval by the Court after issuance of the necessary notices and the conduct of the necessary hearings. On 4 March 2005, the parties entered into definitive settlement documents and, on that date, participated in a conference and hearing before the Court, at which they submitted a motion for preliminary certification of the Settlement Class and preliminary approval of the settlement. On 15 March 2005, the Court entered an Order that, among other things, preliminarily certified the Settlement Class, preliminarily approved the settlement, set 23 May 2005 as the deadline for the submission by Class members of objections to the settlement or requests for exclusion from the Settlement Class, and scheduled a Settlement Fairness Hearing for 22 June 2005.

A subsidiary of the Company, Vodafone 2, is responding to an enquiry by the UK Inland Revenue with regard to the UK tax treatment of its Luxembourg holding company, Vodafone Investments Luxembourg SARL ("VIL"), under the Controlled Foreign Companies section of the UK's Income and Corporation Taxes Act 1988 ("the CFC Regime"). The enquiry by the UK Inland Revenue relates to the tax treatment of profits earned by the holding company for the accounting period ended 31 March 2001. The CFC Regime serves to subject a UK resident company to corporation tax in the UK in respect of the profits of a controlled foreign company in certain circumstances.

Vodafone 2's position is that it is not liable to corporation tax in the UK under the CFC Regime in respect of VIL on the basis that the CFC Regime is contrary to EU law. An application for closure of the enquiry (inter alia) was made by Vodafone 2 to the Special Commissioners of the UK Inland Revenue on 1 October 2004 on the basis that the enquiry could not reasonably be continued as it is premised on UK legislation (the CFC

Regime) which is contrary to EU law and thus invalid. In summary, it is argued that imposition of corporation tax under the CFC Regime amounts to unlawful discrimination or an unlawful restriction on the exercise of fundamental freedoms under the EU Treaty (particularly Articles 43 and 56).

On 3 May 2005 the Special Commissioners referred the matter to the European Court of Justice (the "ECJ") requesting that a number of questions in relation to the invalidity argument be determined as a preliminary matter. Pending resolution of such questions, Vodafone 2's application for closure of the enquiry (and, effectively, the enquiry itself) has been stayed. It is not expected that the ECJ will deliver a judgment in this matter until, at the earliest, mid 2006. The ECJ does not have jurisdiction to determine the outcome of Vodafone 2's application rather the Special Commissioners will apply the ECJ's judgment to the particular facts of Vodafone 2's application.

If the ECJ decides that the CFC Regime in its entirety is invalid under EU law, then no charge to UK corporation tax can arise to Vodafone 2 with respect to VIL under the CFC Regime and the Special Commissioners will order that the Inland Revenue's enquiry be closed. If the CFC Regime is held by the ECJ to be valid, either in part or as a whole, then it will be a matter for the Special Commissioners to apply the ECJ's reasoning to the particular circumstances of Vodafone 2's case. Although it is not possible to address all possible outcomes under such a scenario, it should be noted that even if the CFC Regime is held by the ECJ to be entirely lawful, Vodafone 2 would continue to resist the imposition of corporation tax liability on other grounds.

The Company has taken provisions, which at 31 March 2005 amounted to £1,757 million, for the potential UK corporation tax liability and related interest expense that may arise if the Company is not successful in its challenge of the CFC Regime. The provisions relate to the accounting period which is the subject of the proceedings and accounting periods after 31 March 2001 to date. Please see note 8 to the Company's Consolidated Financial Statements. The Company considers these provisions are sufficient to settle any assessments that may arise from the enquiry. However, the amount ultimately paid by the Company (if any) upon resolution of the enquiry may differ materially from the amount accrued and, therefore, could have a significant effect on the profitability or cash flows of the Group in future periods. In the absence of any material unexpected developments, the Company expects to reassess the amount of this provision when the views of the ECJ become known, which is expected to be during 2006.

A number of Vodafone subsidiaries acquired 3G licences through auctions in 2000 and 2001. An appeal was filed by Vodafone UK, along with other UK mobile network operators which were granted a 3G licence, with the VAT and Duties Tribunal on 18 October 2003 for recovery of VAT on the basis that the amount of the licence fee was inclusive of VAT. The amount of this claim is approximately £888 million. In August 2004, these claims were referred, jointly, to the ECJ although no hearing date has yet been listed. A decision from the ECJ is not expected before 2006. The Group has not recognised any amounts in respect of this matter to date. In addition, the Group has made a claim for recovery of VAT in relation to 3G licence fees in Portugal and may pursue similar claims in certain other European jurisdictions.